SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

***Attorneys for Defendant***
**TWITTER, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMARA FIELDS, et al., | Case No. 3:16-cv-00213-WHO |
| Plaintiffs, | **DEFENDANT TWITTER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| TWITTER, INC., | |
| Defendant. | Judge: Hon. William H. Orrick |
| | [Fed. R. Civ. Proc. 12(b)(6)] |
| | Hearing Date:  May 18, 2016 at 2:00 p.m. Courtroom 2, 17th Floor |

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

NOTICE OF MOTION AND MOTION ................................................................................... 1

STATEMENT OF REQUESTED RELIEF .............................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ....................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 2

FACTUAL BACKGROUND ................................................................................................... 3

LEGAL STANDARDS ON A MOTION TO DISMISS .......................................................... 7

ARGUMENT ............................................................................................................................ 8

I.     Section 230 Requires Dismissal Of Plaintiffs' Claims ................................................. 8

    A.     Section 230 Immunizes Entities Like Twitter From Civil Liability
        For Content Created By Third-Party Users ......................................................... 8

    B.     Section 230 Immunizes Twitter Against Plaintiffs' Claims ................................ 12

        1.     Twitter Is A Provider Of An Interactive Computer Service ..................... 12

        2.     The Allegedly Harmful Content Was Provided By A Third-
             Party User, And Not By Twitter ............................................................... 13

        3.     Plaintiffs Seek To Hold Twitter Liable As The Publisher Or
             Speaker Of Allegedly Harmful Content ................................................... 14

    C.     Section 230's Exception For Federal Criminal Prosecutions Is
        Inapplicable Here ............................................................................................... 16

II.    The Amended Complaint Fails To State A Claim Under The Terrorism
    Civil Remedy Provision ............................................................................................... 19

    A.     The Amended Complaint Fails To Allege Facts Plausibly Establishing That
        Twitter Proximately Caused The Deaths of Mr. Fields and Mr. Creach .............. 20

    B.     The Amended Complaint Fails To Allege Facts Plausibly
        Establishing That Twitter Committed An "Act Of International
        Terrorism" .......................................................................................................... 23

CONCLUSION ........................................................................................................................ 25

CERTIFICATE OF SERVICE

PROPOSED ORDER

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Almeida v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006)......................................................11

*Anderson v. New York Tel. Co.*, 320 N.E.2d 647 (N.Y. 1974) ......................................................10

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)......................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................7, 21, 23

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)...................................................... *passim*

*Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006)......................................................12, 14

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)......................................................10, 11, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................21

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980 (10th Cir. 2000), *cert. denied*, 531 U.S. 824 (2000)......................................................10, 11

*Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008) (en banc) ......................................................20, 23, 24

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)......................................................11

*Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085 (N.D. Cal. 2014) ......................................................7

*Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*, No. 14-cv-05609-YGR, 2015 WL 7720752 (N.D. Cal. Nov. 30, 2015)......................................................13

*Coto Settlement v. Eisenberg*, 593 F.3d 1031 (9th Cir. 2010) ......................................................6

*Dart v. Craigslist, Inc.,* 665 F. Supp. 2d 961 (N.D. Ill. 2009) ......................................................19

*Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015)......................................................18, 19

*Doe v. Am. Online, Inc.*, 783 So. 2d 1010 (Fla. 2001)......................................................12

*Doe v. Bates*, No. 5:05-CV-91-DF-CMC, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006) ......................................................17, 18, 19

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ......................................................11, 15, 16

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc) .................................................................. *passim*

*GoDaddy.com, LLC v. Toups*, 429 S.W.3d 752 (Tex. App. 2014) ..............................................19

*Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..............................................14

*Goddard v. Google, Inc.*, No. C 08-2738JF(PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ....................................................................................................16

*Green v. Am. Online (AOL)*, 318 F.3d 465 (3d Cir. 2003) ....................................................11

*Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010) ...........................................20, 23

*Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685 (S.D. Miss. 2014) ...............................19

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ...............................20, 21

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) .............................................7

*In re Terrorist Attacks on Sept. 11, 2001 (Burnett v. Al Baraka Inv. & Dev. Corp.)*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013) ....................................................................................................8, 24

*In re Terrorist Attacks on Sept. 11, 2001 (O'Neill v. Al Rajhi Bank)*, 714 F.3d 118 (2d Cir. 2013) ........................................................................................20

*Jane Doe No. 1 v. Backpage.com*, __F.3d __, 2016 WL 963848 (1st Cir. 2016)................. *passim*

*Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010) ...........................................................11

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ..................11, 12, 15

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) .........................................3, 9, 15

*Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539 (N.Y. 1999) .............................................10

*M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011) ..................................................................................................17, 19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ................9

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................................18

*Obado v. Magedson*, No. CIV. 13-2382 JAP, 2014 WL 3778261 (D.N.J. July 31, 2014), *aff'd*, 612 F. App'x 90 (3d Cir. 2015) ...............................................19

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................7

*Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902 (N.D. Cal. 2015) ...................................................7

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ........................................................20, 21, 23

*Shiamili v. Real Estate Grp. of New York, Inc.*, 952 N.E.2d 1011 (N.Y. 2011) ...........................11

*Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. Mar., 31, 2011) ....................................24, 25

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)...........................11, 14

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), *cert. denied*, 524 U.S.
937 (1998) ..................................................................................................... *passim*

## CONSTITUTIONAL AND STATUTORY PROVISIONS

18 U.S.C. § 2333 ................................................................................................ *passim*

18 U.S.C. § 2339A ...................................................................................................7

18 U.S.C. § 2339B ...................................................................................................7

28 U.S.C. § 4102(c)(1) .............................................................................................12

47 U.S.C. § 230 ................................................................................................. *passim*

47 U.S.C. § 230(b)(5) .............................................................................................17

47 U.S.C. § 941 .....................................................................................................12

U.S. Const. art. VI...................................................................................................19

## RULES

Fed. R. Civ. Proc. 12(b)(6) ..................................................................................... *passim*

## OTHER AUTHORITIES

H.R. Rep. No. 107-449 (2002)....................................................................................12

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 18, 2016 at 2:00 p.m., in Courtroom 2, 17th Floor, United States District Court for the Northern District of California, Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, Defendant Twitter, Inc. ("Twitter" or "Defendant") shall and hereby does move for an order dismissing all claims presented in Plaintiffs' Amended Complaint.  This motion is supported by the following Memorandum of Points and Authorities and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Fed. R. Civ. Proc. 12(b)(6), Defendant Twitter requests that the Court dismiss with prejudice all claims presented in Plaintiffs' Amended Complaint.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether 47 U.S.C. § 230 ("Section 230"), which broadly immunizes online intermediaries from liability for harms allegedly resulting from third-party content, bars this action, which seeks to hold Twitter liable under 18 U.S.C. § 2333(a) based on allegations that Twitter failed to block or remove content that ISIS affiliates transmitted via Twitter's online communications platform.

2. Whether the Amended Complaint fails to state a claim under the federal Terrorism Civil Remedy provision, 18 U.S.C. § 2333(a), because:

   a. The Amended Complaint fails to allege facts that would establish that Twitter proximately caused the deaths of Mr. Fields and Mr. Creach; and

   b. The Amended Complaint fails to allege facts that would establish that Twitter committed an "act of international terrorism" within the meaning of that provision.

## MEMORANDUM OF POINTS AND AUTHORITIES

The deaths of Lloyd Fields and James Damon Creach at the hands of former Jordanian police captain Abu Zaid are tragic, and the attack that killed them and three others is appalling. The senseless violence of Abu Zaid's shooting spree has been explained as an act of a "lone wolf" terrorist inspired by the Islamic State of Iraq and Syria ("ISIS"). But even accepting this explanation, there is no basis in law or fact for holding Twitter liable for that heinous crime. Not even the thinnest of reeds connects Twitter to this terrible event, and Twitter's alleged conduct is immune from liability under federal law. It is telling that even after Plaintiffs had the opportunity to revise the original complaint in response to Twitter's prior motion to dismiss, the Amended Complaint still suffers from these fatal defects.

The Amended Complaint does not allege any direct connection between Twitter and either Abu Zaid or the attack that killed Mr. Fields and Mr. Creach. Nor does it allege that Twitter itself created any of the Tweets, messages, or other content that the Amended Complaint strains to link, even indirectly, to that attack. Instead, the Amended Complaint seeks to hold Twitter responsible on the ground that Twitter's ubiquitously available online communications platform, which has hundreds of millions of users worldwide, allegedly was used by other terrorists (though not Abu Zaid) to transmit information promoting their views and activities. According to the Amended Complaint, the federal Terrorism Civil Remedy provision, 18 U.S.C. § 2333(a), would make Twitter liable for the highly speculative consequences of these messages—including, apparently, the deaths of Mr. Fields and Mr. Creach—because Twitter allegedly failed to block or remove some or all of the messages from its platform.

Plaintiffs' claims seek to hold Twitter liable for the content of messages posted to its platform by third parties and are thus barred by Section 230 of the Telecommunications Act of 1996, 47 U.S.C. § 230 ("Section 230"). In enacting Section 230, Congress unequivocally resolved the question whether computer service providers may be held liable for harms arising from content created by third parties. Announcing the policy of the United States to preserve the "free market that presently exists for the Internet . . . unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2), Congress broadly immunized entities like Twitter against lawsuits that

seek to hold them liable for harmful or unlawful third-party content, including suits alleging that such entities failed to block, remove, or alter such content, *id.* § 230(c)(1).  In the two decades since, courts in the Ninth Circuit and across the country have consistently recognized and broadly construed Section 230's protections.  Indeed, in line with this uniform precedent, the U.S. Court of Appeals for the District of Columbia Circuit recently affirmed the dismissal under Rule 12(b)(6) of a complaint brought against Facebook based on allegations strikingly similar to those alleged here.  *See Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014).

The Amended Complaint also must be dismissed for a second, independent reason:  It fails to state a claim for relief under the Terrorism Civil Remedy provision.  That provision requires Plaintiffs to allege and prove (1) that they were injured "by reason of"—i.e., that their injuries were proximately caused by—(2) an "act of international terrorism" committed by Twitter.  18 U.S.C. § 2333(a).  The Amended Complaint's allegations satisfy neither requirement.  *First*, the link the Amended Complaint attempts to draw between Twitter's alleged conduct and the attack is, as a matter of law, far too tenuous to establish that Twitter proximately caused the deaths of Mr. Fields and Mr. Creach.  *Second*, the Amended Complaint's allegations amount to nothing more than the claim that Twitter made its communications platform available to everyone in the world with an Internet connection.  That conduct cannot have constituted "an act of international terrorism" as defined by the statute because it plainly does not "appear to [have been] intended" "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping," *id.* § 2331(1)(B) (defining "international terrorism").

The Amended Complaint must, therefore, be dismissed in its entirety with prejudice.

### FACTUAL BACKGROUND

According to the Amended Complaint,[1] on November 9, 2015, Lloyd "Carl" Fields, Jr. and James Damon Creach were killed by a "lone wolf" terrorist who attacked the police training

---

[1] Twitter deems the allegations in the Amended Complaint to be true solely for purposes of this motion.

center in Amman, Jordan where Mr. Fields and Mr. Creach were working as government contractors.  Am. Compl., Dkt. No. 21, ¶¶ 71-73, 78, 80.  The man who killed Mr. Fields and Mr. Creach was a Jordanian police captain named Anwar Abu Zaid.  *Id.* ¶¶ 76, 78.  Abu Zaid's brother later told reporters that Abu Zaid had been inspired to carry out this heinous crime by ISIS's "brutal execution of Jordanian pilot Maaz al-Kassasbeh in February 2015."  *Id.* ¶ 84.  The United States has designated ISIS as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act.  *Id.* ¶ 18.  In subsequent statements, ISIS "claimed responsibility for the attack" on the police facility that killed Mr. Fields and Mr. Creach, and described Abu Zaid as a "lone wolf."  *Id.* ¶¶ 80, 81.

Defendant Twitter operates a global Internet platform for public self-expression and conversation that is free-of-charge and open for virtually anyone to use.  *See* Am. Compl. ¶ 1. Users with a Twitter account can send "Tweets"—messages of 140 characters or less, sometimes with pictures or video—to anyone who has chosen to "follow" that user.  *E.g.*, *id.* ¶¶ 4, 22, 28, 32.  Those followers may, in turn, "retweet" those messages to their own followers.  *E.g.*, *id.* ¶ 25.  Users can include hashtagged keywords (#) in their Tweets to facilitate searching for information on the same topic, *e.g.*, *id.* ¶¶ 40, 44, 46, or send a direct message to "[c]ommunicate quickly and privately with one person or many," *id.* ¶ 20.  These simple tools enable users to do everything from track the Arab Spring in real time, to argue with fellow Giants fans about whether to pull a struggling pitcher, to announce the birth of a child to family and friends.  Each day, Twitter users send and receive hundreds of millions of Tweets touching on every conceivable topic.  *Id.* ¶ 66.

Twitter's sole alleged connection to this controversy is that, among the hundreds of millions of individuals around the world who disseminate information to one another via the Twitter platform (Am. Compl. ¶ 65), there are some people affiliated with, or supportive of, ISIS who allegedly used the platform to transmit information for purposes of promoting ISIS's terrorist activities and agenda.  In particular, the Amended Complaint alleges that these users sent messages over the Twitter platform to recruit terrorists (*id.* ¶¶ 19-29), raise funds (*id.* ¶¶ 30-34), and spread propaganda (*id.* ¶¶ 35-47).  The Amended Complaint asserts, for example, that

"in June 2014, ISIS fighters tweeted guidelines in English targeting Westerners and instructing them on how to travel to the Middle East to join its fight," and that in September 2014, ISIS distributed "its notorious promotional training video, 'Flames of War'" over the Twitter platform, *Id.* ¶¶ 24, 26. Other content allegedly disseminated by ISIS (or persons affiliated with ISIS) via the Twitter platform includes fundraising appeals (*id.* ¶¶ 32-34) and gruesome pictures and videos of mass executions and beheadings (*id.* ¶¶ 35-45, 84).

Like the original complaint, the Amended Complaint makes no attempt to connect Twitter directly to Abu Zaid or his attack. It does not allege that ISIS recruited Abu Zaid over the Twitter platform. Nor does it allege that Abu Zaid or ISIS used the Twitter platform to plan, carry out, or raise money for the attack. It does not even allege that Abu Zaid ever had a Twitter account or ever accessed the Twitter platform. Instead, unable to cure these deficiencies, the Amended Complaint offers two irrelevant additions: first, it emphasizes the Twitter platform's direct-messaging capabilities, stressing that the direct-messaging tool "enables ISIS members to receive private Direct Messages from potential recruits, terrorist financiers, and other terrorists" (¶¶ 20-22); and second, it adds a series of grisly allegations concerning the horrific execution of Jordanian pilot Maaz al-Kassasbeh, including the assertions that ISIS used Twitter's platform to "crowd source ideas for his method of execution" and to promote a "22-minute snuff film of the killing" (¶ 84).[2] Although these additions augment the already considerable attention the original complaint devoted to how *other* terrorists allegedly used the Twitter platform, they do nothing to connect that alleged use to Abu Zaid or his "lone wolf" attack. *See* Am. Compl. ¶¶ 15, 16, 79-81. The Amended Complaint does not, for example, allege that the terrorists who allegedly used Twitter helped Abu Zaid plan the attack—by way of Twitter's platform or otherwise—or that they provided Abu Zaid with weapons or funds. The closest the Amended Complaint comes to even hinting at a connection between Abu Zaid and Twitter is the allegation that ISIS promoted its "brutal execution of Jordanian pilot Maaz al-Kassasbeh in February 2015"

---

[2] The Amended Complaint also adds as additional plaintiffs the wife and children of James Damon Creach.

via Twitter's platform, paired with the suggestion that ISIS's gruesome execution of al-Kassasbeh may have inspired Abu Zaid to become a "lone wolf" terrorist nine months later.  *Id.* ¶ 84.  But even that tenuous connection is incomplete, missing any allegation that Abu Zaid learned of or viewed that execution via Twitter.

What is clear from the Amended Complaint is that the online content at the root of its claims was created and developed entirely by third parties, specifically terrorists and their allies, and not by Twitter or its employees.  The Amended Complaint nonetheless seeks to hold Twitter liable for the asserted (and attenuated) consequences of these messages because Twitter allegedly "knowingly permitted" ISIS to transmit them, Am. Compl. ¶ 1, and because Twitter allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down . . . ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up," *id.* ¶¶ 48, 66, 69.

The rules Twitter has prescribed to govern what information individuals may transmit through its online platform have always banned content that encourages terrorism.  Since Twitter's inception, its rules have prohibited "threats," as well as use of the platform "for any unlawful purposes or in furtherance of illegal activities."  *See* The Twitter Rules, *available at* https://support.twitter.com/articles/18311# (last visited April 6, 2016).[3]  For the sake of clarity, the Rules now make the ban on terrorist content more explicit by expressly prohibiting "threats of violence … including threatening or promoting terrorism."  Am. Compl. ¶ 70.  The Amended Complaint alleges that Twitter enforced these rules primarily by reviewing and removing content, and by blocking accounts, when notified of a violation of its rules, rather than by pre-screening Tweets before they were sent or running background checks on users before they opened an account.  *Id.* ¶¶ 65-66.  According to Plaintiffs, this complaint-driven approach was

---

[3] The Twitter Rules are incorporated by reference into the Amended Complaint because the Amended Complaint "necessarily relies upon" them, portions of the Rules are quoted in the Amended Complaint (¶¶ 66, 70), there is no basis to question the authenticity of the cited Rules, and the Rules are relevant.  *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).  The court may therefore consider any portion of the Rules in ruling on this motion to dismiss.  *See id.*

1   not good enough:  Twitter should have "proactively" and preemptively "monitor[ed] [the]

2   content" of the hundreds of millions of Tweets that were sent via its platform each day.  *Id.* ¶ 66.

3       Based on these allegations, Plaintiffs seek treble money damages from Twitter under the

4   Terrorism Civil Remedy provision, 18 U.S.C. § 2333(a).  Am. Compl. 18.  Count I asserts that

5   Twitter "purposefully, knowingly or with willful blindness" provided "services and support" to

6   ISIS, that those "services and support … constitute material support to the preparation and

7   carrying out of acts of international terrorism," that providing such material support "was a

8   proximate cause" of the deaths of Mr. Fields and Mr. Creach, that Twitter therefore violated 18

9   U.S.C. § 2339A, and that "[b]y virtue of its violations of 18 U.S.C. § 2339A, [Twitter] is liable

10  pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained."  *Id.* ¶¶ 87-

11  90.  Count II repeats the same allegations with respect to 18 U.S.C. § 2339B, asserting that

12  Twitter "purposefully, knowingly or with willful blindness" provided material support to a

13  Foreign Terrorist Organization.  *Id.* ¶¶ 91-94.

14              **LEGAL STANDARDS ON A MOTION TO DISMISS**

15      To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "contain

16  sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

17  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is

18  plausible on its face only if the "plaintiff pleads factual content that allows the court to draw the

19  reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The court is

20  not "required to accept as true allegations that are merely conclusory, unwarranted deductions of

21  fact, or unreasonable inferences."  *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 913 (N.D.

22  Cal. 2015) (quoting *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008)).  Nor is

23  the court "bound to accept as true a legal conclusion couched as a factual allegation."

24  *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1093 (N.D. Cal. 2014) (quoting

25  *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Threadbare recitals of the elements of a cause of

26  action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

27      Given "the extreme nature of the charge of terrorism," satisfying these basic pleading

28  requirements is especially important in an action brought under the Terrorism Civil Remedy

1   provision.  *In re Terrorist Attacks on Sept. 11, 2001 (Burnett v. Al Baraka Inv. & Dev. Corp.)*,

2   349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013).  Accordingly,

3   "'fairness requires extra-careful scrutiny of Plaintiff[s'] allegations.'"  *Id.*

## ARGUMENT

4

5          Two independent legal grounds require dismissal of the Amended Complaint.  *First*,

6   Plaintiffs' claims fall within the heartland of the immunity Congress granted Internet service

7   providers in 47 U.S.C. § 230, for they seek to hold Twitter liable solely because third parties

8   allegedly disseminated harmful content over Twitter's platform.  *Second*, the Amended

9   Complaint fails to plead facts sufficient to establish two essential elements under the Terrorism

10  Civil Remedy provision:  (1) that Twitter's own conduct proximately caused the deaths of Mr.

11  Fields and Mr. Creach; and (2) that such conduct constituted an "act of international terrorism."

12  **I.      Section 230 Requires Dismissal Of Plaintiffs' Claims**

13         Section 230 of the Telecommunications Act of 1996, 47 U.S.C. § 230 ("Section 230"),

14  bars any cause of action that attempts to hold a provider of interactive computer services liable

15  for content created by a third party, or for the service provider's decision to permit, remove, or

16  alter that content.  Alleging that Twitter is liable for the attack that killed Mr. Fields and Mr.

17  Creach because Twitter allowed individuals affiliated with ISIS to disseminate extremist content

18  through Twitter's platform and failed to block or sufficiently censor that content, Plaintiffs'

19  claims seek to do precisely that.  For this reason, the Amended Complaint must be dismissed in

20  its entirety.

21         **A.      Section 230 Immunizes Entities Like Twitter From Civil Liability For
                    Content Created By Third-Party Users**

22

23         Section 230's powerful protection is plain on the face of the statute.  It commands that

24  "[n]o provider or user of an interactive computer service shall be treated as the publisher or

25  speaker of any information provided by another information content provider."  47 U.S.C.

26  § 230(c)(1).  As the Ninth Circuit has explained, by its terms this provision "immunizes

27  providers of interactive computer services against liability arising from content created by third

28  parties."  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157,

1162 (9th Cir. 2008) (en banc); *accord Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998) ("§ 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.").

Of particular relevance here, because Section 230 prohibits claims that would treat providers of interactive computer services as the "publisher" of third-party content, it bars any lawsuit that turns on whether or to what extent a service provider exercised a traditional editorial function with respect to the torrent of third-party information that courses through its networks, including "reviewing, editing, and deciding whether to publish or to withdraw from publication" any content created by users of its service. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). In other words, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170-1171. Whether that material is unlawfully discriminatory, *id.* at 1173-1174, false and defamatory, *Zeran*, 129 F.3d at 330, or an abhorrent and explicit incitement to violence by a terrorist group, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356-1357 (D.C. Cir.), *cert. denied*, 135 S. Ct. 680 (2014), Section 230 immunity attaches "at the earliest possible stage of the case," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). It "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Roommates.com*, 521 F.3d at 1175; *accord Nemet Chevrolet*, 591 F.3d at 254 (Section 230 immunity "is an *immunity from suit* rather than a mere defense to liability" (internal quotation marks omitted)).[4]

As the Ninth Circuit has repeatedly recognized, Section 230's broad grant of immunity serves two important policy goals. *First*, because imposing civil liability on service providers for disseminating harmful third-party content would dramatically chill online expression, Congress

---

[4] Although an affirmative defense, Section 230 immunity "support[s] a motion to dismiss" where, as here, "the statute's barrier to suit is evident from the face of the complaint." *Klayman*, 753 F.3d at 1357; *see also Barnes*, 570 F.3d at 1105-1106 (affirming, in part, dismissal under Fed. R. Civ. P. 12(b)(6) on Section 230 grounds).

enacted Section 230 "to encourage the unfettered and unregulated development of free speech on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see also Barnes*, 570 F.3d at 1099 (Section 230 is designed "to promote the free exchange of information and ideas over the Internet" (internal quotation marks omitted)); *Zeran*, 129 F.3d at 331 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect."); 47 U.S.C. § 230(b)(2) (preserving the Internet's "vibrant and competitive free market . . . unfettered by Federal or State regulation" is "the policy of the United States").  When Section 230 was passed, interactive computer services already had "millions of users," making it "impossible for service providers to screen each of their millions of postings for possible problems." *Zeran*, 129 F.3d at 331.  Fearing that service providers would "severely restrict the number and type of messages posted" in the face of such staggering liability, "Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect," *id.*; *see also Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000), *cert. denied*, 531 U.S. 824 (2000) (recognizing same).  This concern is even more compelling today given the Internet's exponential growth in the two decades since Section 230's enactment, as well as the previously unimaginable quantity of user-created content that more than a billion Internet users are sharing every minute through every manner of social-media platform.  Indeed, Twitter users alone send hundreds of millions of Tweets each day.  *See* Am. Compl. ¶ 66 (emphasis added).  If a service provider like Twitter were potentially subject to liability for every third-party communication, it would face enormous pressure to transform its open platform into a tightly restricted and heavily censored one—or to shut down altogether.[5]

---

[5] When Congress enacted Section 230, this notion—namely that a service provider acting as a conduit for huge quantities of third-party speech should not be held liable for harms stemming from that speech—was already well established.  Although more robust, Section 230 immunity is much like the common-law privilege courts had long afforded telephone companies which, "as far as [third-party] content is concerned, play[] only a passive role." *Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539, 541-542 (N.Y. 1999) (declining to retroactively apply Section 230, and instead granting summary judgment to Internet service provider based on common-law privilege); *see also Anderson v. New York Tel. Co.*, 320 N.E.2d 647 (N.Y. 1974) (no liability for

*Second*, in enacting Section 230, Congress sought to eliminate disincentives for service providers to self-police their platforms for unlawful and offensive material, out of fear that such action might itself subject them to liability. *Barnes*, 570 F.3d at 1099-1100; *Batzel*, 333 F.3d at 1028; *Zeran*, 129 F.3d at 331. "Without the immunity provided in Section 230(c)," interactive computer services that "review material could be found liable for the statements of third parties, yet providers and users that disavow any responsibility would be free from liability." *Batzel*, 333 F.3d at 1029. Congress sought, in other words, "to spare interactive computer services th[e] grim choice" between "taking responsibility for all messages and deleting no messages at all." *Roommates.com*, 521 F.3d at 1163. Section 230 thus forbids imposing liability for actions taken by a service provider to restrict some, but not all, content. *See* 47 U.S.C. § 230(c). This protection has proved increasingly critical as the number of individuals posting online, and the quantity of content they share and exchange, continues to skyrocket. Indeed, because Twitter cannot screen each of the hundreds of millions of messages sent over its platform each day, Section 230 immunity is essential to Twitter's practice of reviewing and removing at least some third-party content that violates its prohibition against "threats of violence . . . including threatening or promoting terrorism." *See* Am. Compl. ¶ 70; *see also id.* ¶ 69 (noting that each time Twitter "shuts down an ISIS-linked account," it faces another popping up in its place).

Given the expansive reach of Section 230's text, as well the important interests at stake, courts across the country "have treated § 230(c) immunity as quite robust." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); *see also, e.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014); *Johnson v. Arden*, 614 F.3d 785, 791-792 (8th Cir. 2010); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 415 (1st Cir. 2007); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra*, 206 F.3d at 984-986; *Zeran*, 129 F.3d at 330-331; *Shiamili v. Real Estate*

---

phone company that furnished service to someone who used the connection to play a defamatory recording to all callers).

1   *Grp. of New York, Inc.*, 952 N.E.2d 1011, 1016 (N.Y. 2011); *Barrett v. Rosenthal*, 146 P.3d 510,

2   518 (Cal. 2006); *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1013 (Fla. 2001).

3      Congress, for its part, has endorsed this approach more than once.  In 2002, when

4   Congress established a new "kids.us" subdomain dedicated to content deemed safe for minors,

5   *see* 47 U.S.C. § 941, it expressly extended Section 230 immunity to providers of interactive

6   computer services operating in the new domain, *see id.* § 941(e)(1).  Invoking the Fourth

7   Circuit's decision in *Zeran* and the Tenth Circuit's opinion in *Ben Ezra*, the committee report

8   recognized that "[t]he courts have correctly interpreted section 230(c)," and stated that "[t]he

9   Committee intends these interpretations of section 230(c) to be equally applicable to those

10  entities covered by [the new statute]."  H.R. Rep. No. 107-449, at 13 (2002).  More recently, in

11  the 2010 SPEECH Act, Congress again expanded the application of Section 230 immunity, this

12  time announcing that U.S. courts "shall not recognize or enforce a foreign judgment for

13  defamation" unless the judgment "would be consistent with section 230."  28 U.S.C.

14  § 4102(c)(1); *see also Jones*, 755 F.3d at 408 (explaining that "[t]he protection provided by

15  § 230 has been understood to merit expansion").  In no uncertain terms, then, Congress has

16  declared that service providers like Twitter are protected against any cause of action arising from

17  third-party content, including in their exercise of traditional editorial functions, "such as deciding

18  whether to publish, withdraw, postpone, or alter content."  *Zeran*, 129 F.3d at 330.  Section 230

19  thus applies with full force here.

20     **B.**  **Section 230 Immunizes Twitter Against Plaintiffs' Claims**

21     Section 230 mandates dismissal when (1) the defendant is a "provider . . . of an

22  interactive computer service"; (2) the allegedly harmful content at issue was "provided by

23  another information content provider," and not the defendant; and (3) the plaintiff is seeking to

24  hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see*

25  *also Barnes*, 570 F.3d at 1100-1101.  Each of these elements is satisfied here.

26     **1.**  **Twitter Is A Provider Of An Interactive Computer Service**

27     Under Section 230, an "interactive computer service" includes "any information service,

28  system, or access software provider that provides or enables computer access by multiple users

---

to a computer server." 47 U.S.C. § 230(f)(2).  Twitter's open Internet platform plainly satisfies this broad definition because users around the world access Twitter's servers in order to send messages and share information with others.  *See* Am. Compl. ¶ 1 (describing Twitter's platform as a "social network"); *Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*, No. 14-cv-05609-YGR, 2015 WL 7720752, at *2 (N.D. Cal. Nov. 30, 2015) (Twitter is "an online social network that facilitates the transmission of 140-character limited 'tweets'").  In fact, given Congress's goal in enacting Section 230—"to encourage the unfettered and unregulated development of free speech on the Internet," *Batzel*, 333 F.3d at 1027—Twitter is the very exemplar of an "interactive computer service" that Congress sought to protect.

### 2.   The Allegedly Harmful Content Was Provided By A Third-Party User, And Not By Twitter

Section 230 defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development" of the objectionable material at issue.  47 U.S.C. § 230(f)(3).  There is no allegation here that Twitter had any hand in the "creation or development" of any of the ISIS-related content that forms the basis of Plaintiffs' claims.  To the contrary, the Amended Complaint alleges that all of the objectionable material was created and posted by third-party users—namely persons associated with, or inspired by, "the terrorist group ISIS."  Am. Compl. ¶ 1; *see also, e.g.*, *id.* ¶¶ 2-5, 19, 30, 35.  Because all of the allegedly harmful content at issue was "provided by another information content provider," 47 U.S.C. § 230(c)(1), it falls squarely within the scope of Section 230 immunity.

This is true even though Twitter offers its users neutral tools to create, promote, and discover online content.  For example, Twitter users can include hashtagged keywords (#) in their Tweets to promote their message to other users interested in the same topic, as well as to facilitate searching for information on the keyword topic.  *E.g.*, Am. Compl. ¶¶ 40, 44, 46.  And, as the Amended Complaint takes pains to emphasize, Twitter users can communicate privately using an email-like direct-messaging tool.  *Id.* ¶¶ 20-22.  But whatever their form, "*neutral* tools," even if used "to carry out what may be unlawful or illicit" activities, do not affect Section 230 immunity.  *Roommates.com*, 521 F.3d at 1169; *accord id.* at n.24 (Internet service providers

are entitled to Section 230 immunity "even if . . . users commit[] their misconduct using electronic tools of general applicability provided by the website operator").  Indeed, "absent substantial affirmative conduct on the part of the website creator *promoting the use of such tools for unlawful purposes*," the provision of neutral tools "is fully protected by CDA immunity." *Id.* at 1174 n.37 (emphasis added); *see also Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009) ("[T]he provision of neutral tools generally will not affect the availability of CDA immunity[.]"); *Jane Doe No. 1 v. Backpage.com*, __F.3d __, 2016 WL 963848, at *6 (1st Cir. 2016) (service provider's "provision of e-mail anonymization, forwarding, auto-reply, and storage services" are "publisher choices[] entitled to the protections of section 230(c)(1)").

Section 230 immunity also attaches whether or not Twitter knew of the objectionable content at issue.  To be sure, the Amended Complaint nowhere alleges that Twitter employees knew of any *specific* unlawful account or message and yet failed to block it.  But even if it did, such an allegation would be irrelevant.  "It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech."  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007).  After all, notice-based liability "would defeat the dual purposes advanced by § 230 of the CDA," *Zeran*, 129 F.3d at 333, "discourag[ing] active monitoring of Internet postings," and "allow[ing] complaining parties to impose substantial burdens on the freedom of Internet speech by lodging complaints whenever they were displeased by an online posting," *Barrett v. Rosenthal*, 146 P.3d 510, 525 (Cal. 2006).  Section 230's protections thus apply "even after notice of the potentially unlawful nature of the third-party content."  *Lycos*, 478 F.3d at 420; *accord Roommates.com*, 521 F.3d at 1169 n.24 (although Section 230 does not immunize a service provider's own "affirmative acts that are unlawful," it does protect against lawsuits based on "passive acquiescence in the misconduct of [third-party] users").

### 3.    Plaintiffs Seek To Hold Twitter Liable As The Publisher Or Speaker Of Allegedly Harmful Content

Finally, Plaintiffs' claims attempt to hold Twitter liable as the "publisher or speaker" of the content allegedly created by ISIS and its followers.  The Amended Complaint explicitly

alleges that Twitter is liable for the attack that killed Mr. Fields and Mr. Creach because Twitter "knowingly *permitted*" ISIS or its allies to use its platform to spread propaganda, raise funds, and recruit followers, Am. Compl. ¶ 1 (emphasis added), and because Twitter failed to take "meaningful action to stop it" by "censor[ing] user content," "shut[ting] down . . . ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up," *id.* ¶¶ 43, 66, 69. This is "precisely the kind of  activity for which Congress intended to grant absolution with the passage of section 230." *Roommates.com*, 521 F.3d at 1171-1172 (rejecting effort to hold service provider liable for "failing to detect and remove" unlawful content).

As the D.C. Circuit recently recognized in a closely analogous case, "the very essence of publishing is making the decision whether to print or retract a given piece of content." *Klayman*, 753 F.3d at 1359.  Relying on Section 230, the D.C. Circuit thus rejected a plaintiff's attempt to hold social-networking website Facebook liable for "allowing . . . Third Intifada pages"—which "called for Muslims to rise up and kill the Jewish people"—"to exist on its website," *id.* at 1355, 1359, and for "'refus[ing]' to 'take down the page[s],'" *id.* at 1358 (quoting complaint).  Every other court of appeals to weigh in, including the Ninth Circuit, has likewise rejected attempts to hold service providers liable for deciding whether or how to engage in such publishing conduct. *See Roommates.com*, 521 F.3d at 1170 ("determin[ing] whether or not to prevent [a] posting" is "precisely the kind of activity for which [S]ection 230 was meant to provide immunity"); *Barnes*, 570 F.3d at 1103 ("removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove"); *Backpage*, 2016 WL 963848, at *6 ("decisions about how to treat postings" are "editorial choices that fall within the purview of traditional publisher functions"); *Jones*, 755 F.3d at 416 (service provider's "decision not to remove" content is a traditional editorial function protected by Section 230); *MySpace*, 528 F.3d at 420 (Section 230 insulates service providers' "decisions relating to the monitoring, screening, and deletion of content" (internal quotation marks omitted)); *Zeran*, 129 F.3d at 328 (CDA immunity applies even if service provider "unreasonably delayed in removing defamatory messages posted by an

unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter").

The result should be no different here.  As the Ninth Circuit has explained, regardless of how a litigant may label a claim or attempt to recast a complaint's allegations, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another."  *Barnes*, 570 F.3d at 1101-1102; *see also Backpage*, 2016 WL 963848, at *4 (same); *Barnes*, 570 F.3d at 1102-1103 ("a plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory" or by placing a different label on "an action that is quintessentially that of a publisher").  Here, then, Plaintiffs cannot skirt Section 230's protections by invoking a novel cause of action or by styling Twitter's editorial conduct and provision of neutral tools as "material support" for terrorists or terrorism. Am. Compl. ¶¶ 22, 60, 66, 88, 92.  Courts have consistently rejected such efforts to artfully plead around Section 230, *see, e.g.*, *Backpage*, 2016 WL 963848, at *5; *Barnes*, 570 F.3d at 1102-1103; *MySpace*, 528 F.3d at 419-420; *Goddard v. Google, Inc.*, No. C 08-2738JF(PVT), 2008 WL 5245490, at *4-5 (N.D. Cal. Dec. 17, 2008), and in any event, the face of the Amended Complaint forecloses that approach in this case.  By its terms, the Amended Complaint seeks to hold Twitter liable for the attack that killed Mr. Fields and Mr. Creach on the grounds that Twitter "knowingly permitted" ISIS to transmit extremist material through Twitter's platform, and failed to "actively monitor" users' speech, adequately "censor user content," and appropriately "shut down clear incitements to violence."  Am. Compl. ¶¶ 1, 60, 66; *see also id.* ¶ 69 ("Even when Twitter shuts down an ISIS-linked account, it does nothing to stop it from springing right back up.").  Whatever theory or label Plaintiffs invoke, "such conduct is *publishing conduct*," and "[S]ection 230 protects from liability 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online."  *Barnes*, 570 F.3d at 1103 (quoting *Roommates.com*, 521 F.3d at 1170-1171).

## C.   Section 230's Exception For Federal Criminal Prosecutions Is Inapplicable Here

Any attempt by Plaintiffs to evade Section 230's broad immunity by trying to shoehorn

this civil suit into the statute's exception for "enforcement" of "any … Federal criminal statute," 47 U.S.C. § 230(e)(1), should fail.  Entitled "No effect on criminal law," that exception provides:

> Nothing in [Section 230] shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

*Id.*  Plaintiffs might try to argue that their civil claims under 18 U.S.C. § 2333(a) fall within this exception because they purport to be based on alleged violations of two provisions of Title 18, namely sections 2339A and 2339B.  *See* Am. Compl. ¶¶ 90, 94.  But there would be no merit to any such argument.  As courts deciding this issue have uniformly recognized, the plain language of Section 230's criminal-law exception, as well as the unequivocal policy goals set forth in the preamble to Section 230, make clear that subsection 230(e)(1) creates only a narrow exception for the prosecution of federal crimes by government authorities—not a gaping loophole for private civil actions.

By its terms, subsection 230(e)(1) is limited to the *enforcement* of federal *criminal* law. The very use of the word "criminal" demonstrates that the provision exempts only criminal prosecutions, and not private civil claims.  *See, e.g.*, *Doe v. Bates*, No. 5:05-CV-91-DF-CMC, 2006 WL 3813758, at *21 (E.D. Tex. Dec. 27, 2006); *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1055 (E.D. Mo. 2011).  Similarly, Congress's use of the word "enforcement" indicates that subsection 230(e)(1) applies to criminal prosecutions only. Beyond the common-sense understanding that "enforcement" in the context of "criminal law" refers to government action by law *enforcement* officials, Congress consistently used the term "enforcement" throughout Section 230 to refer to government action—not to the claims of private litigants.  *See* 47 U.S.C. § 230(b)(5) (it is the "policy of the United States" to "ensure vigorous *enforcement* of Federal criminal laws to *deter and punish* trafficking in obscenity, stalking, and harassment by means of computer")  (emphasis added); *id.* § 230(e)(3) (providing that the substantive immunities of Section 230 do not "prevent any *State* from *enforcing* any State law that is consistent with" Section 230) (emphasis added).  Thus, as the First Circuit—the first federal court of appeals to consider the question—just recently concluded, "[t]he plain-

language reading of [S]ection 230(e)(1) . . . excludes civil suits," and any argument to the contrary is nothing more than an "attempted end run[]" around Section 230 immunity. *Backpage*, 2016 WL 963848, at *8; *see also id.* (noting that the subsection's title, "[n]o effect on criminal law," as well as its disparate treatment of the Electronic Communications Privacy Act in subsection 230(e)(4), likewise indicate that the provision is limited to criminal prosecutions).

Limiting subsection 230(e)(1) to criminal prosecutions, moreover, comports with Section 230's critical policy goals. Construing the exception to permit civil actions predicated on federal criminal statutes would usher in the "'obvious chilling effect'" Congress sought to avoid in establishing Section 230 immunity in the first place. *Bates*, 2006 WL 3813758, at *4 (quoting *Zeran*, 129 F.3d at 331); *accord Backpage*, 2016 WL 963848, at *8. Indeed, if private civil actions were permitted, "'the incentive to bring a civil claim for the settlement value could be immense, even if a plaintiff's claim w[ere] without merit,'" because "'the service provider would face intense public scrutiny and substantial expense.'" *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 160 (D. Mass. 2015) (quoting *Bates*, 2006 WL 3813758, at *22), *aff'd*, *Backpage*, 2016 WL 963848. The Supreme Court recognized this reality more than a half century ago in *New York Times Co. v. Sullivan*, explaining that under civil liability regimes, "[t]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." 376 U.S. 254, 277 (1964). While an individual or a company charged with a crime "enjoys ordinary criminal-law safeguards such as the requirements of an indictment and of proof beyond a reasonable doubt," such "safeguards are not available to the defendant in a civil action." *Id.* Judgments awarded in civil actions may also be dramatically greater than any applicable criminal fine. *Id.* And because double-jeopardy protections do not apply to civil suits, service providers may face multiple rounds of litigations, along with multiple judgment awards, for the same publication. *Id.* at 278. Whether or not a publisher "can survive a succession of such judgments," the Court warned, "the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." *Id.* Congress understood as much when it enacted Section 230, declaring in the statute's preamble that it is "the policy of the United States" to preserve the

Internet's "vibrant and competitive free market . . . unfettered by Federal or State regulation." *See* 47 U.S.C. § 230(b)(2).  And Congress carefully crafted subsection 230(e)(1) with this lesson in mind, providing only a narrow exception for federal criminal prosecutions.[6]

Given subsection 230(e)(1)'s clear language and Section 230's speech-protective purpose, it is unsurprising that every court to decide the question has concluded that Section 230's criminal-law exception does not encompass private civil suits that purport to be based on federal criminal statutes.  *See Backpage*, 2016 WL 963848, at *8; *Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 691 (S.D. Miss. 2014);  *Obado v. Magedson*, No. CIV. 13-2382 JAP, 2014 WL 3778261, at *8 (D.N.J. July 31, 2014), *aff'd*, 612 F. App'x 90 (3d Cir. 2015); *Vill. Voice Media Holdings*, 809 F. Supp. 2d at 1055; *Dart v. Craigslist, Inc.,* 665 F. Supp. 2d 961, 965 n.6 (N.D. Ill. 2009) (same); *Bates*, 2006 WL 3813758, at *22; *GoDaddy.com, LLC v. Toups,* 429 S.W.3d 752, 760 (Tex. App. 2014).  There is no basis for this Court to deviate from the overwhelming weight of this authority.

## II.   The Amended Complaint Fails To State A Claim Under The Terrorism Civil Remedy Provision

The Amended Complaint also must be dismissed for a second reason:  It fails to state a claim for relief under the Terrorism Civil Remedy provision, which is the sole legal basis for both counts of the Amended Complaint.  This provision creates a private cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  By its plain terms, this provision

---

[6] Beyond robust procedural protections, the "filter of prosecutorial discretion" provides an additional safeguard in a criminal prosecution that is missing in a civil suit.  *Backpage.com*, 104 F. Supp. 3d at 161.  Federal prosecutors have a duty "to support th[e] Constitution," requiring that they bear in mind the First Amendment interests at stake in any prosecution of an Internet service provider.  *See* U.S. Const. art. VI.  Private litigants, by contrast, are often motivated by the prospect of a lucrative judgment or settlement, and are thus more likely to be indifferent to the First Amendment implications of their lawsuit.  The absence of prosecutorial discretion is thus another reason "'Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws.'" *Backpage.com*, 104 F. Supp. 3d at 160; *see also Backpage*, 2016 WL 963848, at *8 (noting the critical "availability of prosecutorial discretion" in criminal actions).

requires a plaintiff to plead and prove (1) that he or she was injured "by reason of"—i.e., that the injury was proximately caused by—(2) an "act of international terrorism" committed by the defendant.  Because the Amended Complaint fails to allege facts sufficient to plausibly establish either of these two essential elements, it must be dismissed.

**A.      The Amended Complaint Fails To Allege Facts Plausibly Establishing That Twitter Proximately Caused the Deaths of Mr. Fields and Mr. Creach**

The Terrorism Civil Remedy provision's "'by reason of' language … restricts the imposition of … liability [under the statute] to situations where plaintiffs plausibly allege that defendant's actions proximately caused their injuries."  *In re Terrorist Attacks on Sept. 11, 2001*, (*O'Neill v. Al Rajhi Bank*), 714 F.3d 118, 123-124 (2d Cir. 2013) (affirming a Rule 12(b)(6) dismissal for failure to plausibly allege proximate cause); *Rothstein v. UBS AG*, 708 F.3d 82, 95-97 (2d Cir. 2013) (same).  Congress borrowed this proximate-cause requirement from the civil remedy provisions of the federal antitrust and anti-racketeering laws, which likewise require a plaintiff to show that her injury was caused "by reason of" the unlawful predicate act the defendant allegedly committed.  *See Rothstein*, 708 F.3d at 95.  To satisfy that requirement, a plaintiff must show "some *direct relation* between the injury asserted and the injurious conduct alleged."  *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (emphasis added) (discussing "by reason of" requirement in the context of a civil RICO claim).  The "central question" in evaluating proximate cause, in other words, is "whether the alleged violation *led directly* to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added) (same).  A "theory of causation" that "stretche[s] the causal chain" linking defendant's alleged conduct to plaintiff's injury "well beyond the first step" cannot satisfy this "direct relationship requirement."  *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 10-11 (2010) (same).[7]

---

[7] Although the Seventh Circuit has held that "the requirement of proving causation is relaxed" under the Terrorism Civil Remedy provision, *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 697 (7th Cir. 2008) (en banc), that construction ignored the plain language of the statute.  As the Second Circuit later explained in *Rothstein*, by the time Congress enacted the Terrorism Civil Remedy provision, its "by reason of" language already had a "well-

The Amended Complaint's allegations fall far short of this requirement.  The deaths of Mr. Fields and Mr. Creach are heartrending, and the attack that killed them is appalling.  But nothing that Twitter allegedly did can plausibly be said to have "led directly" to that horrible crime.  The Amended Complaint's "conclusory" assertion that Twitter's alleged "provision of material support to ISIS was a proximate cause of the injury inflicted on Plaintiffs" (¶¶ 89, 93) is "not entitled to be assumed true," and so cannot establish a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) ("a formulaic recitation of a cause of action's elements will not do").  And the Amended Complaint's "factual content"  posits a causal chain that is far too attenuated to satisfy the statute's direct-relationship requirement.  *Iqbal*, 556 U.S. at 678.

The Amended Complaint does not allege that ISIS recruited the attacker, Abu Zaid, through communications via Twitter's platform.  Nor does it allege that Abu Zaid or ISIS used the Twitter platform to plan, carry out, or raise money for that attack.  It does not even allege that Abu Zaid ever had a Twitter account or ever accessed the Twitter platform.  And certainly the Amended Complaint does not say that Twitter knew of any Tweets or other messages that were in any way connected to the attack and declined to remove or block them.  Indeed, the sole message of any sort that the Amended Complaint alleges was sent or received by Abu Zaid was transmitted not through Twitter's platform, but through a *different* Internet-based platform—the WhatsApp mobile messaging application.  ¶ 77.[8]

Moreover, the Amended Complaint barely connects Abu Zaid to ISIS.  Although ISIS allegedly claimed credit for the attack, even that statement described Abu Zaid as a "lone

---

understood meaning"—and that meaning does not "permit recovery on a showing of less than proximate cause, as the term is ordinarily used."  708 F.3d at 95; *see also Holmes*, 503 U.S. at 267 (explaining that the Supreme Court and "many lower federal courts … before [it]" had long construed "by reason of" to require proof of proximate cause).

[8] This fact appears in the Reuters news article reproducing Abu Zaid's message.  Because the Amended Complaint "necessarily relies upon" that article, quoting portions of it in paragraph 77, and because neither the article's relevance nor authenticity is in question, it is incorporated by reference into the Amended Complaint and thus fairly before the Court.  *See supra* at p. 7 n.3.

wolf"—i.e., a terrorist who acted independently.  Am. Compl. ¶ 80; *see also id.* ¶ 81.  The Amended Complaint does not allege that ISIS helped Abu Zaid plan the attack or that ISIS provided Abu Zaid with weapons or funds.  The sole link drawn between Abu Zaid and ISIS is the assertion that Abu Zaid's brother "told reporters that Abu Zaid had been very moved by ISIS's brutal execution of Jordanian pilot Maaz al-Kassasbeh in February 2015."  *Id.* ¶ 84.

Rather than allege any facts that would connect Twitter directly to the attack, the Amended Complaint piles speculation upon speculation:  (1) Twitter allegedly committed an "act of international terrorism" because Twitter allegedly "knowingly permitted" ISIS to post content on Twitter's platform (Am. Compl. ¶¶ 1, 12), and because Twitter allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down . . . ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up" (*id.* ¶¶ 48, 66, 69). (2) These failures allegedly permitted ISIS to send, via Twitter's platform, messages designed to recruit new members (*id.* ¶¶ 19-29), raise money (*id.* ¶¶ 30-34), and spread propaganda (*id.* ¶¶ 35-47).  (3) Recipients of those messages allegedly responded by joining ISIS and contributing funds.  *Id.* ¶¶ 28, 29, 32, 34.  (4) These recruits, funds, and publicity allegedly helped ISIS grow into a larger terrorist organization.  *Id.* ¶¶ 1-2.  (5) Having grown, ISIS brutally executed Jordanian pilot Maaz al-Kassasbeh in February 2015.  *Id.* ¶ 84.  And (6) al-Kassasbeh's execution allegedly inspired Abu Zaid to become a "lone wolf" terrorist and to carry out the attack that killed Mr. Fields and Mr. Creach.  *Id.* ¶¶ 78, 80, 81, 84. [9]

This theory of causation is breathtakingly broad and remarkably attenuated.  It would potentially expose every Internet service provider to liability for horrible crimes committed

---

[9] In an apparent effort to shorten this protracted chain, the Amended Complaint adds an allegation that ISIS promoted this gruesome execution via Twitter's platform, "crowd sourc[ing] ideas for [the] method of execution" and tweeting a "22-minute snuff film of the killing." ¶ 84.  But these new examples of how *other* terrorists allegedly used the Twitter platform are no help.  The Amended Complaint does not aver that Abu Zaid learned of al-Kassasbeh's execution through Twitter, and even if it did, its flawed theory of causation would remain the same.  Far from linking Twitter's alleged conduct directly to Plaintiffs' injury, such an assertion would only underscore that Plaintiffs are seeking to hold  Twitter liable solely because its platform allegedly enabled ISIS to *inspire* Abu Zaid to become a lone-wolf terrorist.

anywhere in the world, not only by their users but even by individuals who were loosely affiliated with or even just *inspired* by those users.  A theory that "stretche[s] the causal chain" this far "beyond the first step" plainly cannot satisfy the statute's "direct relationship requirement."  *Hemi Group*, 559 U.S. at 10-11.  The Amended Complaint must therefore be dismissed for failure to plead facts sufficient to plausibly establish that Twitter proximately caused Plaintiffs' injury.

> **B.    The Amended Complaint Fails To Allege Facts Plausibly Establishing That Twitter Committed An "Act Of International Terrorism"**

Even if the Amended Complaint somehow satisfied the Terrorism Civil Remedy provision's proximate cause requirement, it would still have to be dismissed for failing to state a claim under the statute because the Amended Complaint's "factual content" does not "plausibly suggest" that Twitter committed an "act of international terrorism."  *See Iqbal*, 556 U.S. at 683. The Terrorism Civil Remedy provision requires Plaintiffs to demonstrate that Twitter's own conduct amounted to an "act of international terrorism."  18 U.S.C. § 2333(a).[10]  "International terrorism" is a defined term within chapter 113B of Title 18.  *See* 18 U.S.C. § 2331(1); *see also Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) (the "statutory definition of 'international terrorism'" is the "first link in the chain" of "explicit statutory incorporations" that delineates a plaintiff's burden).  Under that definition, Plaintiffs must allege facts establishing three separate elements.  *First,* Twitter's conduct must "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State."  18 U.S.C. § 2331(1)(A).  *Second*, Twitter's conduct must "appear to be intended" to achieve a terrorism purpose—i.e., "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  *Id.* § 2331(1)(B).  *Third*, Twitter's conduct must have an international nexus.  *Id.* § 2331(1)(C).

---

[10] *See also Rothstein*, 708 F.3d at 97-98 (the Terrorism Civil Remedy provision creates only primary, not secondary, liability); *Boim*, 549 F.3d at 688-690 (same).

1  Plaintiffs' theory is apparently that making available a service that is used by a terrorist

2  organization always constitutes providing "material support" to that organization, and that such

3  "material support" is always "dangerous to human life," regardless of the nature of the service or

4  how far removed it may be from actual terrorist acts.  Even if Plaintiffs' theory were correct and

5  the Amended Complaint could therefore satisfy the first and third elements, the Amended

6  Complaint clearly does not allege facts sufficient to plausibly satisfy the second element:  even

7  as alleged, Twitter's conduct does not objectively "appear to [have been] intended" to achieve a

8  terrorism purpose.

9         The Terrorism Civil Remedy provision's objective intent requirement is essential "to

10  distinguish terrorist acts from other violent crimes."  *Boim*, 549 F.3d at 694.  It measures

11  "external appearance rather than subjective intent."  *Id.*  The question is thus whether the

12  "allegation[s] [in the Amended Complaint] would … lead an objective observer to conclude

13  [Twitter] intended to ['intimidate or coerce a civilian population,' 'to influence the policy of a

14  government by intimidation or coercion,' or 'to affect the conduct of a government by mass

15  destruction, assassination, or kidnapping']."  *Stansell v. BGP, Inc.*, 2011 WL 1296881, *9 (M.D.

16  Fla. Mar., 31, 2011).

17        Courts have concluded that such intent is lacking where, as here, a defendant openly

18  offers a general service to all-comers.  In *Boim*, for example, the Seventh Circuit observed that

19  the Red Cross, Doctors Without Borders, and the United Nations Relief and Works Agency for

20  Palestine Refugees in the Near East "provide [medical and refugee] assistance without regard to

21  the circumstances giving rise to the need for it."  *Boim*, 549 F.3d at 699.  Although those

22  organizations "might know in advance" that while aiding all in need they will "provid[e] …

23  assistance to [individual] terrorists," an objective observer would conclude that providing such

24  aid was intended to achieve a humanitarian, not a terrorism purpose.  *Id.*  Likewise, in *Burnett v.

25  Al Baraka Investment & Development Corporation*, the court dismissed the complaint under

26  Rule 12(b)(6) because the complaint relied on the mistaken "proposition that a bank is liable for

27  injuries done with money that passes through its hands in the form of deposits, withdrawals,

28  check clearing services, or any other routine banking service."  *In re Terrorist Attacks on Sept.*

1    *11, 2001 (Burnett v. Al Baraka Inv. & Dev. Corp.)*, 349 F. Supp. 2d 765, 832 (S.D.N.Y. 2005)

2    (quotation marks omitted), *aff'd*, 714 F.3d 118 (2d Cir. 2013).  An objective observer of these

3    service providers would conclude that their sole aim is to offer beneficial services to the public

4    at-large, not that they intend to promote terrorism.[11]

5           That reasoning fully applies here.  Like the aid organizations discussed in *Boim* or the

6    bank in *Burnett*, Twitter opens its service to virtually everyone.  The neutral tools allegedly used

7    by persons affiliated with ISIS were available to anyone with a Twitter account.  *E.g.*, Am.

8    Compl. ¶ 3 (Tweets); *id.* ¶ 20 (direct messaging); *id.* ¶ 47 (hashtags).  The Amended Complaint

9    nowhere asserts that Twitter provided a specialized service specifically to ISIS.  An objective

10   observer confronted with these allegations would conclude that Twitter's aim has been exactly

11   what Twitter founder Biz Stone described:  "creat[ion] [of] a platform that allows for freedom of

12   expression for hundreds of millions of people around the world."  *Id.* ¶ 65.  No reasonable

13   observer could conclude that Twitter's worldwide operation of its communications platform was

14   intended "to intimidate or coerce a civilian population," "to influence the policy of a government

15   by intimidation or coercion," or "to affect the conduct of a government by mass destruction,

16   assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).  The facts pled in the Amended

17   Complaint are thus insufficient to plausibly establish that Twitter committed "an act of

18   international terrorism," and the Amended Complaint must accordingly be dismissed.

**CONCLUSION**

20           For the foregoing reasons, the Amended Complaint should be dismissed with prejudice in

21   its entirety.

---

[11] Even where the alleged "material support" was targeted specifically to a terrorist organization, rather than incidentally made available to that organization in the course of providing an undifferentiated service to many millions of users (as in the present case), courts have concluded that the requisite terrorism intent is lacking when the context "would … lead an objective observer to conclude" that the defendant sought to achieve some other objective.  *Stansell*, 2011 WL 1296881, *9 (granting Rule 12(b)(6) dismissal to defendants who allegedly paid more than 800 million Colombian pesos to a designated terrorist organization not to promote terrorism, but so that they could "conduct [their] oil exploration activities without fear of terrorist acts").

Dated: April 6, 2016                    Respectfully submitted,


                                        _____/s/ Seth P. Waxman_____
                                        SETH P. WAXMAN (admitted *pro hac vice*)
                                        seth.waxman@wilmerhale.com
                                        PATRICK J. CAROME (admitted *pro hac vice*)
                                        patrick.carome@wilmerhale.com
                                        WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                        1875 Pennsylvania Avenue
                                        Washington, D.C. 20006
                                        Telephone:  (202) 663-6800
                                        Facsimile:  (202) 663-6363

                                        MARK D. FLANAGAN (CA SBN 130303)
                                        mark.flanagan@wilmerhale.com
                                        WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                        950 Page Mill Road
                                        Palo Alto, California  94304
                                        Telephone:  (650) 858-6000
                                        Facsimile:  (650) 858-6100

                                        ***Attorneys for Defendant***
                                        **TWITTER, INC.**


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2016, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   /s/ Seth P. Waxman
      Seth P. Waxman