**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
            jluster@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA FIELDS, on behalf of herself and as a representative of the ESTATE OF LLOYD FIELDS, JR., HEATHER CREACH, on behalf of herself and as a representative of the ESTATE OF JAMES DAMON CREACH, J.C. (1), a minor, and J.C. (2), a minor, <br><br>                                   Plaintiffs, <br><br>        v. <br><br> TWITTER, INC., <br><br>                                   Defendant. | Case No. 3:16-cv-00213-WHO <br> Hon. William H. Orrick <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> Date: June 15, 2016 <br> Time: 2:00 p.m. <br> Courtroom 2, 17th Floor |

1

2

**TABLE OF CONTENTS**

**PAGE(S)**

3   I.      INTRODUCTION ............................................................................................................ 1

4   II.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CDA............................................ 2

5           A.      Providing Terrorists With Twitter Accounts Is Not Publishing ............................... 3

6           B.      Direct Messages Are Not Published ...................................................................... 9

7           C.      Barring Plaintiffs' Claims Would Not Further The Goals Of The CDA................. 11

8   III.    PLAINTIFFS STATE CLAIMS UNDER THE ANTI-TERRORISM ACT ...................... 13

9           A.      Plaintiffs Adequately Plead Proximate Causation .................................................. 13

10          B.      Twitter Committed Acts of International Terrorism................................................. 16

11  IV.     CONCLUSION.............................................................................................................. 20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Abecassis v. Wyatt*,
7 F. Supp. 3d 668 (S.D. Tex. 2014) ............................................................... 18, 19, 20

*Al Shimari v. CACI Int'l, Inc.*,
679 F.3d 205 (4th Cir. 2012) ........................................................................... 3

*Almog v. Arab Bank, PLC*,
471 F. Supp. 2d 257 (E.D.N.Y. 2007) ............................................................. 20

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ................................................................. passim

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .................................................................... 11, 12

*Boim v. Holy Land Found. for Relief & Dev. ("Boim III")*,
549 F.3d 685 (7th Cir. 2008) .................................................................. 14, 17, 19

*Boim v. Quranic Literacy Inst. ("Boim I")*,
291 F.3d 1000 (7th Cir. 2002) ......................................................................... 17

*City of Chicago, Ill. v. StubHub!, Inc.*,
624 F.3d 363 (7th Cir. 2010) ............................................................................. 7

*Diamond v. Diehr*,
450 U.S. 175 (1981) ......................................................................................... 11

*Doe No. 14 v. Internet Brands, Inc.*,
767 F.3d 894 (9th Cir. 2014) ........................................................................ 6, 7

*Estates of Ungar ex rel. Strachman v. Palestinian Authority*,
304 F. Supp. 2d 232 (D.R.I. 2004) ................................................................... 2

*F.T.C. v. Accusearch, Inc.*,
2007 WL 4356786 (D. Wyo. 2007) ............................................................. 7, 11

*Gill v. Arab Bank, PLC ("Gill I")*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...................................................... 13, 14, 17

*Goldberg v. UBS AG*,
690 F. Supp. 2d 92 (E.D.N.Y. 2010) ............................................................... 17

*Hare v. Richie*,
2012 WL 3773116 (D. Md. Aug. 29, 2012) ...................................................... 3

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ................................................................................... 11, 14, 15

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003) ......................................................................... 12

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
   227 F.3d 8 (2d Cir. 2000) ................................................................................. 14

*Keniston v. Roberts*,
   717 F.2d 1295 (9th Cir. 1983) ........................................................................... 20

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ...................................................................... 9, 11

*Lansing v. Sw. Airlines Co.*,
   980 N.E.2d 630 (Ill. App. Ct. 2012) ................................................................... 7

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) .............................................................................. 13

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ................................................................................ 17

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) ............................................... 13, 14, 17, 18

*Maracich v. Spears*,
   133 S. Ct. 2191 (2013) ...................................................................................... 13

*Nitro-Lift Techs., L.L.C. v. Howard*,
   133 S. Ct. 500 (2012) ........................................................................................ 13

*Peruta v. Cty. of San Diego*,
   742 F.3d 1144 (9th Cir. 2014) ........................................................................... 12

*Pirozzi v. Apple Inc.*,
   913 F. Supp. 2d 840 (N.D. Cal. 2012) ................................................................ 3

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ................................................................................ 13

*Stansell v. BGP, Inc.*,
   2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) .................................................. 19

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................................... 8, 12

*Strauss v. Credit Lyonnais, S.A.*,
   2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ..................................................... 16

*Strauss v. Credit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) ......................................................... 14, 17

*Tamam v. Fransabank Sal*,
   677 F. Supp. 2d 720 (S.D.N.Y. 2010) ............................................................... 16

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) .............................................................................. 17

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ................................................................ 19

**STATUTES**

18 U.S.C. § 2331 ............................................................................................ 1, 21, 22

18 U.S.C. § 2331(1)(B) ........................................................................................ 20, 23

18 U.S.C. § 2333(a) ............................................................................................ passim

18 U.S.C. § 2339A ............................................................................................ passim

18 U.S.C. § 2339A(b)(1) .................................................................................... 1, 5, 19

18 U.S.C. § 2339B ............................................................................................ passim

18 U.S.C. § 2339B(a)(1) ........................................................................................ 22

18 U.S.C. § 2339B(g)(4) ........................................................................................ 5

47 U.S.C. § 230 ............................................................................................ 2

47 U.S.C. § 230(c)(1) ............................................................................................ 2

## I.      INTRODUCTION

For years, Twitter has knowingly permitted ISIS to sign up for accounts on its social network.  ISIS has used these accounts as an essential resource to support its terrorist organization.  Through private Direct Messages, ISIS spreads extremist propaganda, raises funds and attracts new recruits.  The role of Twitter in the rise of ISIS cannot be overstated.  Indeed, without Twitter, ISIS's dramatic emergence over the last few years into one of the most feared terrorist groups in the world would not have been possible.  Twitter was not an innocent bystander in all this.  It has long known that ISIS has been using its social network to terrorize, but has largely refused to act.

The Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* ("ATA") prohibits knowingly providing terrorist organizations with precisely these kinds of services.  Among other things, the ATA prohibits providing any type of "material support or resources" to terrorists, including "any property, tangible or intangible, or service" such as "communications equipment."  18 U.S.C. §§ 2339A(b)(1); 2339B(g)(4).  Congress purposefully defined "material support or resources" in a broad fashion because providing <u>any</u> assistance to terrorists frees up resources that they can use for their criminal and violent activities.  Even the provision of seemingly benign services (like social network accounts) bolsters a terrorist organization's efficacy and strength in a community, thus undermining this nation's efforts to delegitimize and weaken these groups.

Anyone who violates the ATA's criminal material support statutes may be held liable under the ATA's private right of action, which provides the following:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a).  The legislative history of the ATA's civil remedy indicates that it "was to be construed broadly," and, in the words of Senator Grassley, the bill's co-sponsor, "it empowers victims with **all** the weapons available in civil litigation."  *Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 304 F. Supp. 2d 232, 265 (D.R.I. 2004) (original emphasis).

Defendant makes two arguments in its effort to dismiss this action.  First, it argues that Plaintiffs' claims are barred by the Communications Decency Act of 1996, 47 U.S.C. § 230

("CDA").  But the CDA's protections do not apply to this case because Plaintiffs' cause of action does not seek to treat Defendant as a publisher or speaker of ISIS's harmful messages, but rather as the provider of the high-tech platform through which ISIS delivered those messages.  Plaintiffs' theory of liability is thus not premised on the content of tweets and does not require that Twitter be held responsible for content created by others, or that it otherwise be treated as a publisher or speaker.  Indeed, Twitter's violation of the ATA occurred even before ISIS issued even a single tweet.  In addition, Plaintiffs seek to hold Defendant liable for providing ISIS with access to its Direct Messaging capabilities.  Twitter has permitted ISIS to use this tool to send private communications in order to raise funds, recruit and otherwise further its extremist agenda.  Because these private messages are not published (i.e. not disseminated to the public), a lawsuit based on their content is not barred by the CDA.  Barring Plaintiffs' claims would also contravene the CDA's policy goals of encouraging free speech on the Internet or Good Samaritan filtering of offensive content.

        Second, Defendant argues that Plaintiffs fail to state a claim under the ATA because they do not properly allege proximate causation or that Twitter committed an act of international terrorism.  But Defendant misstates the law on both fronts.  Under the ATA, Plaintiffs are not required to allege a "direct" link between Twitter's provision of material support to ISIS and the deaths of Lloyd Fields, Jr. or James Damon Creach.  Rather, because the provision of any kind of material support to terrorists helps them commit acts of terrorism, it is sufficient to allege that Defendant provided material support to ISIS and that ISIS is responsible for the deaths of Mr. Fields and Mr. Creach.  That is what Plaintiffs have done.  In addition, Plaintiffs adequately allege that Twitter committed an act of international terrorism because they allege that Defendant violated the ATA's material support statutes, which are *per se* acts of international terrorism.

        For all of these reasons, and those set out below, Defendant's motion to dismiss the Amended Complaint should be denied in its entirety.

## II.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CDA

        Defendant argues that "Plaintiffs' claims attempt to hold Twitter liable as the 'publisher or speaker' of the content allegedly created by ISIS and its followers."  Mot. at 14.  This is incorrect.

1   Plaintiffs' claims are not premised on the contents of tweets, Twitter's decision to publish or

2   withdraw any published content, or any other "publishing" decisions attributable to Twitter.  Rather,

3   Defendant's violation of the ATA stems from its provision of Twitter accounts to ISIS.  Twitter also

4   violated the ATA by providing ISIS with Direct Messaging capabilities so that it could send private

5   communications outside the scope of the CDA.  In addition, barring Plaintiff's claims would conflict

6   with—and, indeed, detract from—the goals of the CDA.[1]

7        **A.    Providing Terrorists With Twitter Accounts Is Not Publishing**

8          Defendant argues that the CDA bars Plaintiffs' claims because they are based on "content

9   allegedly created by ISIS and its followers."  Mot. at 14.  But this case is not about the contents of

10   tweets, the issuing of tweets or the failure to remove tweets.  It is about Defendant's provision of

11   Twitter accounts to ISIS in the first place.  In knowingly permitting ISIS to sign up for accounts on

12   its social network, Twitter provided ISIS with material support in violation of the ATA.  This

13   violation is not based on the publishing of offensive content.  Accordingly, Plaintiffs do not seek to

14   hold Twitter liable as a publisher or speaker and their claims are not barred by the CDA.

15          The protections of the CDA apply only when a claim seeks to treat a defendant as a

16   "publisher or speaker."  47 U.S.C. § 230(c)(1); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir.

17   2009) (Courts must determine whether "a plaintiff's theory of liability would treat a defendant as a

18   publisher or speaker of third-party content.").  "To put it another way, courts must ask whether the

19   duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as

20   a 'publisher or speaker.'"  *Id.* at 1102.  Under the CDA, "what matters is whether the cause of action

21   inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided

---

[1] At the very least, Defendant's argument under the CDA is premature.  Courts have not hesitated to decline ruling on such arguments at the pleadings stage when a more complete record would help evaluate arguments under the CDA.  *See, e.g.*, *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 849 (N.D. Cal. 2012) ("[B]ased on the scant record before the Court, it is premature to decide whether the CDA bars Plaintiff's claims . . . . [T]he Court cannot make that determination based on the allegations in the CAC."); *Hare v. Richie*, 2012 WL 3773116, at *19 (D. Md. Aug. 29, 2012) ("I am mindful of the Fourth Circuit's admonition that § 230(c)(1) immunity should be resolved at an early opportunity. Nevertheless, 'a court is entitled to have before it a proper record, sufficiently developed through discovery proceedings, to accurately assess any claim, including one of immunity.  And even a party whose assertion of immunity ultimately proves worthy must submit to the burdens of litigation until a court becomes sufficiently informed to rule.'") (quoting *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 220 (4th Cir. 2012) (*en banc*)).

1    by another." *Id.* at 1102.  A publisher is one who "reviews material submitted for publication,

2    perhaps edits it for style or technical fluency, and then decides whether to publish it."  *Id.*

3             Here, Plaintiffs' claims are not premised on Defendant's role as a publisher or speaker of

4    content, but rather its provision of Twitter accounts to ISIS in the first place.  18 U.S.C. § 2339A

5    prohibits providing material support or resources with the knowledge that they are to be used in

6    preparation for, or in carrying out, a violation of specific violent crimes.  Likewise, 18 U.S.C. §

7    2339B prohibits knowingly providing material support or resources to a foreign terrorist

8    organization ("FTO") such as ISIS.  Both of these statutes broadly define "material support or

9    resources" as:

10                        any property, tangible or intangible, or service, including currency or
                         monetary instruments or financial securities, financial services,
11                       lodging, training, expert advice or assistance, safehouses, false
                         documentation or identification, **communications equipment**,
12                       facilities, weapons, lethal substances, explosives, personnel (1 or more
                         individuals who may be or include oneself), and transportation, except
13                       medicine or religious materials

14    18 U.S.C. § 2339A(b)(1) (emphasis supplied); 18 U.S.C. § 2339B(g)(4).  A Twitter account

15    constitutes "material support or resources" under this definition because it is tangible or intangible

16    property.  Accordingly, Twitter violated the ATA's material support statutes—and became liable

17    under the ATA's civil remedies provision, 18 U.S.C. § 2333(a)—the moment it permitted ISIS to

18    create an account on its social network.  Because the creation of a Twitter account necessarily occurs

19    before the issuing of tweets from that account, and separately from the creation of published content,

20    Defendant's violations of the ATA cannot be accurately characterized as publishing activity, but

21    rather the provision of the means through which ISIS spreads its poison.

22             In this same vein, the Amended Complaint focuses on Defendant's provision of Twitter

23    accounts to ISIS, not the contents of tweets:

24        •    Since first appearing on Twitter in 2010, ISIS accounts on Twitter
               have grown at an astonishing rate and, until recently, ISIS maintained
25             official accounts on Twitter unfettered.  These official accounts
               included media outlets, regional hubs and well-known ISIS members,
26             some with tens of thousands of followers.  FAC ¶ 3.

27        •    Likewise, Al-Hayat Media Center, ISIS's official public relations
               group, maintained at least a half dozen accounts, emphasizing the
28             recruitment of Westerners.  As of June 2014, Al-Hayat had nearly

20,000 followers. *Id.* ¶ 4.

- Another Twitter account, @ISIS_Media_Hub, had 8,954 followers as of September 2014. *Id.* ¶ 5.

- As of December 2014, ISIS had an estimated 70,000 Twitter accounts, at least 79 of which were "official," and it posted at least 90 tweets every minute. *Id.* ¶ 6.

- ISIS reaches potential recruits by maintaining accounts on Twitter so that individuals across the globe may reach out to them directly. *Id.* ¶ 20.

- Even when Twitter shuts down an ISIS-linked account, it does nothing to stop it from springing right back up. According to the New York Times, the Twitter account of the pro-ISIS group Asawitiri Media has had 335 accounts. When its account @TurMedia333 was shut down, it started @TurMedia334. When that was shut down, it started @TurMedia335. This "naming convention—adding one digit to a new account after the last one is suspended—does not seem as if it would require artificial intelligence to spot." *Id.* ¶ 69.

- Notably, while Twitter has now put in place a rule that supposedly prohibits "threats of violence . . . including threatening or promoting terrorism," many ISIS-themed accounts are still easily found on Twitter.com. To this day, Twitter also permits groups designated by the U.S. government as Foreign Terrorist Organizations to maintain official accounts, including Hamas (@hamasinfo and @HamasInfoEn) and Hizbollah (@almanarnews). *Id.* ¶ 70.

Where, as here, a plaintiff's theory of liability is not dependent on a defendant's role as a publisher, courts do not hesitate to rule that the CDA does not apply. For example, in *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), the plaintiff filed a promissory estoppel claim against defendant Yahoo because she had relied on its promise that it would remove private information and photographs that her ex-boyfriend had posted. *Id.* at 1098-99. The Ninth Circuit held that this claim was not barred by the CDA because plaintiff did "not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached." *Id.* at 1107. This "[c]ontract liability" did not arise from "Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication." *Id.*

Similarly, in *Doe No. 14 v. Internet Brands, Inc.*, 767 F.3d 894 (9th Cir. 2014), plaintiff brought a negligent failure to warn claim based on her allegation that defendant knew rapists were

1   using its website to lure victims.[2]  The court ruled that such a claim was not barred by the CDA

2   because it "ha[d] nothing to do with Internet Brands' efforts, or lack thereof, to edit or remove user

3   generated content":

4
5

> [T]hat Internet Brands was in some sense an "intermediary" between
> Jane Doe and the rapists does not mean that the failure to warn claim
> treats Internet Brands as the publisher or speaker of user content. . . .

---

[2] This opinion was withdrawn, apparently because the panel effectively permitted plaintiff to amend her pleadings at oral argument on appeal.  It is cited here for its persuasive reasoning, not its precedential value.  Nevertheless, at the rehearing held on April 8, 2015, the panel persisted in its view that while the CDA bars claims that seek to hold a defendant liable as a publisher, it does not cover all claims that are somehow related to publishing activity.  Judge Cogan, for instance, noted the following:

> But then what you're saying is that everything related in any way to
> publication or speaking that your client does cannot give rise to
> liability.  And if Congress wanted to give that kind of blanket
> immunity, why couldn't it simply say the provider shall be immune for
> any act arising from, or relating to its publishing activity?  They didn't
> say that.  There must be something that's not covered. . . .  [T]he
> *Barnes* case had a special fact, and the special fact was one of the
> employees of the provider made a promise; that's not part of its
> publishing.  **Here, there's a special fact also which is that the**
> **company came into knowledge of these particular abusers.**  That
> doesn't happen all the time, and so I'm less worried about opening the
> flood gates than you are.  This is a pretty strange fact pattern, it seems,
> to me. . . .  That's my difficulty with your position.  It's not just the
> publishing.  It's the fact that during an acquisition, lawyers did a
> review of a file, and they found in the file a particular fact.  That's not
> part of publication; that's the due diligence that any company would
> do in acquiring another company.

*Jane Doe No. 14 v. Internet Brands, Inc.*, Apr. 8, 2015 Unofficial Tr. at 21:10-23:24 (emphasis added).  Judge Clifton likewise questioned whether the CDA was intended to cover knowing violations of law:

> And Congress intended to say and you don't have to let anybody else
> know that you've got this knowledge that bad stuff's going on out
> there? . . .  In a provision labeled "Good Samaritan"? . . .  I have
> trouble looking at the statute seeing how a provision that's entitled . . .
> "Protection for a Good Samaritan blocking and screening offensive
> materials" gets turned into a hall pass, a get out of jail free card when
> it has something to do with the Internet.

*Id.* at 33:25-34:6; 39:19-40:2.  Patrick Carome, counsel for Twitter in this matter, who was then acting as counsel for Amicus Curiae Computer and Communications Industry Association, likewise admitted the limitations of the CDA: "It is not immunity, as we know from *Barnes*, when there's an independent legal event – independently significant legal event like a contract, or the equivalent of a contract that's enforceable in law to be created."  *Id.* at 40:7-12.

> We have already held that the CDA does not declare "a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100. Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses. . . . Barring Jane Doe's failure to warn claim would stretch the CDA beyond its narrow language and its purpose.

*Id.* at 899.  *See also Lansing v. Sw. Airlines Co.*, 980 N.E.2d 630, 639 (Ill. App. Ct. 2012) ("Plaintiff's negligent supervision cause of action does not require publishing or speaking as a critical element, and holding defendant liable for its failure to supervise its employee after defendant had received notice of the employee's wrongful conduct does not treat defendant as if it were the publisher or speaker of the alleged e-mails and texts."); *F.T.C. v. Accusearch, Inc.*, 2007 WL 4356786, at *5 (D. Wyo. 2007) (Claim for unfair trade practices did "not seek to 'treat' Defendants as a publisher within the meaning of the CDA" because it arose out of the fact that defendant "advertised the availability of phone records, solicited orders, purchased the records from third-party sources for a fee, and then resold them to the end-consumers."); *City of Chicago, Ill. v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010) (CDA did not apply because "Chicago's amusement tax does not depend on who 'publishes' any information or is a 'speaker,' . . . Section 230(c) is irrelevant.")

Just like in these cases, Plaintiffs' claim does not turn on Defendant's role as a publisher or speaker.  Defendant's liability does not arise out of its publishing conduct, but rather its separate legal duty under the ATA not to provide terrorists with material support.  *Barnes*, 570 F.3d at 1107. Indeed, Plaintiffs' claims "do[] not require publishing or speaking as a critical element." *Lansing*, 980 N.E.2d at 639.  In no sense was Defendant acting as a publisher when it permitted ISIS members to sign up for and create these accounts.  It was not reviewing, revising or editing content.  Nor was it deciding whether content should be publicly disseminated or withdrawn from the Internet. Plaintiffs' claims are not premised on a theory that any particular tweets from ISIS members should have been altered or restricted in any way.  Indeed, Plaintiffs' claims under the ATA are not based on offending content at all.  They are based on Twitter's provision of material support to ISIS, which is separate and apart from—and antecedent to—the publication of any content.  Even if ISIS had never issued a single tweet, Defendant's provision of material support to ISIS in the form of Twitter

accounts would constitute a violation of the ATA.[3]

Plaintiffs' claims are likewise not based on Defendant's publishing activity because Twitter's duty not to provide material support to terrorists is not based on its role as a publisher, but rather its knowledge that it was providing material support to ISIS—knowledge that it acquired independently of its publishing activity.  Twitter is liable under the ATA only because it <u>knew</u> that it was providing material support to ISIS, but did so anyway.  As set out in the Amended Complaint, the use of Twitter by terrorists has been widely reported in the media.  FAC ¶¶ 48-56.  Since at least 2011, major media outlets like the New York Times, USA Today, CNN and Time Magazine all wrote articles on the use of Twitter by ISIS and other terrorist organizations.  *Id.*  The Amended Complaint also includes allegations that politicians and other critics have long been urging Twitter to do more to keep ISIS off of its social network.  *Id.* ¶¶ 57-62.  There have been committee hearings in Congress about Twitter's provision of material support to ISIS and even the White House and former Secretary of State Hillary Clinton have urged Twitter to do more to block terrorists from accessing its services.  *Id.*  Twitter has also made several statements over the years indicating that it was aware that ISIS was using its social network but that it would decline to kick them off for ideological reasons.  *Id.* ¶¶ 63-70.  Because Plaintiffs' claims under the ATA are premised on Twitter's knowledge that it was providing material support to ISIS—knowledge that it derived from outside of its own website and outside of its publishing activities—the CDA does not bar their claims.

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) is inapposite.  In that case, the plaintiff brought claims against Facebook for intentional assault and negligence based on his

---

[3] Plaintiffs' allegations differ markedly from the typical case in which the CDA applies.  "The cause of action most frequently associated with the cases on section 230 is defamation."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009).  "This is not surprising, because . . . Congress enacted the Amendment in part to respond to a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished), which held that an internet service provider could be liable for defamation."  *Id.*  The CDA was thus meant to protect interactive computer services from being sued for their role in publishing defamatory content.  Here, however, Plaintiffs are not seeking to hold Defendant liable for the speech of ISIS.  Rather, it is Twitter's provision of a powerful communications tool in the first place that constitutes a violation of the ATA.  Handing a megaphone to a terrorist group constitutes the provision of material support, regardless of what the terrorists communicate with that tool.

1   allegation that it "delay[ed] in removing" a page on its social network encouraging a Third Intifada.

2   The court ruled that such claims sought to hold Facebook liable as a publisher because "the very

3   essence of publishing is making the decision whether to print or retract a given piece of content."  *Id.*

4   at 1359.  In contrast, Plaintiffs' allegations in the case at hand are not about a decision by Twitter to

5   issue or remove particular tweets or any other content.  Rather, they allege a violation of the ATA

6   that is antecedent to any publishing activity whatsoever.  As set out more fully below, this case also

7   differs from *Klayman* because it involves private communications in the form of Direct Messages—

8   communications that are not published.

9            **B.        Direct Messages Are Not Published**

10           Plaintiffs also allege that Defendant is liable under the ATA because it provided ISIS with

11   Direct Message capabilities.  FAC ¶ 20-22.  Because Direct Messages are unpublished private

12   communications, this theory of liability does not seek to treat Defendant as a publisher or speaker

13   and, accordingly, the CDA does not apply.

14           As Twitter acknowledges, Direct Messages sent through its social network are private

15   communications:

16                  Direct Messages are the private side of Twitter. . . .  Communicate
                   quickly and privately with one person or many.  Direct Messages
17                  support text, photos, links, emoji and Tweets, so you can make your
                   point however you please. . . .  Have a private conversation with
18                  anyone on Twitter, even a friend of a friend.  Direct messages can only
                   be seen between the people included.

19

20   *Id.* ¶ 20 (emphasis added).  Twitter also advertises its Direct Messaging tool by stressing privacy:

21



*Id.* ¶¶ 21-22.

ISIS has used these Direct Messages to its great advantage.  "ISIS reaches potential recruits by maintaining accounts on Twitter so that individuals across the globe may reach out to them directly.  After first contact, potential recruits and ISIS recruiters often communicate via Twitter's Direct Messaging capabilities."  *Id.* ¶ 20.

> These Direct Messages are "extensively monitored by [ISIS's] emirs and supervisors of the recruiting unit."  According to FBI Director James Comey, "[o]ne of the challenges in facing this hydra-headed monster is that if (ISIS) finds someone online, someone who might be willing to travel or kill in place they will begin a twitter direct messaging contact."  Indeed, according to the Brookings Institution, some ISIS members "use Twitter purely for private messaging or covert signaling."  ISIS has also been known to use Twitter's Direct Messaging capabilities for fundraising and operational purposes. . . .
>
> Through its Direct Messaging tool, Twitter enables ISIS members to receive private Direct Messages from potential recruits, terrorist financiers and other terrorists with operational and intelligence information.  Giving ISIS the capability to send and receive Direct Messages in this manner is no different to handing it a satellite phone, walkie-talkies or the use of a mail drop, all of which terrorists use for private communications in order to further their extremist agendas.

*Id.* ¶¶ 21-22.

This theory of liability, based on purely private content, is not barred by the CDA because it does not involve publishing.  Publishing necessarily involves the dissemination of information to the public.  *Klayman*, 753 F.3d at 1359 ("Although the [CDA] does not define 'publisher,' its ordinary meaning is 'one that makes public,' and 'the reproducer of a work intended for public consumption.'") (quoting Webster's Third New International Dictionary 1837 (1981)); *Publish Definition*, merriam-webster.com, http://www.merriam-webster.com/dictionary/publish (last visited May 4, 2016) ("to disseminate to the public"); *Publish Definition*, Dictionary.com, http://www.dictionary.com/browse/publish (last visited May 4, 2016) ("to issue . . . for sale or

distribution to the public"; "to issue publicly the work of"; "to make publicly or generally known"); *Publish Definition*, Black's Law Dictionary (2d Pocket Ed.) ("To distribute copies (of a work) to the public."); *see also Diamond v. Diehr*, 450 U.S. 175, 182 (1981) (in construing a statute, "[u]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").

As the protections of the CDA are limited to an interactive computer service's publishing activities, that statute does not apply to lawsuits based on content that is intended to be private. *Batzel v. Smith*, 333 F.3d 1018, 1033-35 (9th Cir. 2003) ("The congressional objectives in passing § 230 therefore are not furthered by providing immunity in instances where posted material was clearly not meant for publication."); *Accusearch*, 2007 WL 4356786, at *4-5 (claims based on defendants' sale of confidential customer phone records did not treat defendants as publishers).

### C.    Barring Plaintiffs' Claims Would Not Further The Goals Of The CDA

Barring Plaintiffs' claims in this case would be at odds with the purported goals of the CDA. First, in passing the CDA, "Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet." *Batzel*, 333 F.3d at 1027; *id.* at 1033 (Congress was "concern[ed] with assuring a free market in ideas and information on the Internet."). But Congress surely did not intend to promote speech that aids designated terrorist organizations. To the contrary, it expressly prohibited such speech through the ATA's material support provisions. 18 U.S.C. §§ 2339A-B (defining "material support or resources" to include "training, expert advice" and "communications equipment"). Numerous courts have held that that violations of the ATA's material support statutes do not implicate free speech concerns. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (the ATA's prohibition on providing material support to terrorists in the form of legal and political advocacy training is constitutional because such a ban is necessary to further the "[g]overnment's interest in combating terrorism," which "is an urgent objective of the highest order"); *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1194 (9th Cir. 2014) ("There are, of course, certain types of speech that do not fall within the protection of the First Amendment, such as . . . speech that materially assists a foreign terrorist organization."); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) (holding "as other courts

have," that "there is no First Amendment right nor any other constitutional right to support

terrorists").  Accordingly, nothing about the allegations in this lawsuit infringe upon Congress's goal

of promoting free speech on the Internet.  To the contrary, barring Plaintiffs' claims in this case

would directly contradict the express language of the ATA and expand the reach of the CDA far

beyond its intended purpose.  Nor would allowing this case to go forward have a "chilling effect" on

Internet free speech.  Rather, at most, it would deter interactive computer services from knowingly

providing material support to terrorists.

Second, Congress enacted the CDA in order "to encourage interactive computer services and

users of such services to self-police the Internet for obscenity and other offensive material. . . ."

*Batzel*, 333 F.3d at 1028.  The CDA was enacted in large part in reaction to the decision in *Stratton*

*Oakmont*, where the court held that Prodigy could be held responsible for libelous statements posted

on one of its bulletin boards because it had proactively monitored that forum for offensive content.

1995 WL 323710, at *1-4.  But this is not a case that has anything to do with Twitter's efforts, or

lack thereof, to edit or remove user generated content.  Nothing about this case should discourage

"Good Samaritan" filtering of third party content.  Indeed, it defies credulity that a section entitled

"Protection For 'Good Samaritan' Blocking And Screening Of Offensive Material" would create

immunity for the knowing provision of material support to a terrorist organization.  Such an

interpretation of the CDA would expand that law far beyond its narrow language and purpose.

Various canons of statutory interpretation further counsel against a ruling that the CDA bars

Plaintiffs' claims.  First, such a ruling should be avoided because it would needlessly create a

conflict between the CDA's protections for interactive computer services and the ATA's prohibition

on providing material support to terrorists.  *See Maracich v. Spears*, 133 S. Ct. 2191, 2205 (2013)

("The provisions of a text should be interpreted in a way that renders them compatible, not

contradictory. . . .  [T]here can be no justification for needlessly rendering provisions in conflict if

they can be interpreted harmoniously.") (quoting A. Scalia & B. Garner, Reading Law: The

Interpretation of Legal Texts ("Scalia/Garner") 180 (2012)).  But a ruling that the scope of the CDA

does not cover the ATA violations alleged in this case would maintain a harmonious reading of the

two statutes.  In addition, the CDA's general language stating that "an interactive computer service"

should not "be treated as the publisher or speaker" must give way to the ATA's specific prohibitions against providing material support to terrorists, including in the form of "communications equipment." *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 504 (2012) (referring to "the ancient interpretive principle that the specific governs the general (*generalia specialibus non derogant* )"); Scalia/Garner 185 ("[T]he [general/specific] canon does apply to successive statutes.").

## III.   PLAINTIFFS STATE CLAIMS UNDER THE ANTI-TERRORISM ACT

### A.   Plaintiffs Adequately Plead Proximate Causation

Defendant argues that Plaintiffs fail to adequately allege proximate causation because "nothing that Twitter allegedly did can plausibly be said to have 'led directly'" to the deaths of Lloyd Fields, Jr. or James Damon Creach.  Mot. at 21.  But this argument both misstates the applicable law and ignores Twitter's role in the rise of ISIS.  The material support that Twitter has provided to ISIS more than adequately satisfies the ATA's proximate causation requirement.

Proximate causation is established under the ATA when a defendant's "acts were a substantial factor in the sequence of responsible causation," and the injury at issue "was reasonably foreseeable or anticipated as a natural consequence."[4]  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) ("The causation charge the Court gave focused solely on whether defendant's acts were a substantial factor in causing plaintiffs' injuries, and whether such injuries were a foreseeable result of those acts.").  "A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012) ("*Gill I*") (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 15 (2d Cir. 2000)).

Importantly, there is no "directness" requirement for proximate causation under the ATA.

---

[4] Notably, the ATA does not require but-for causation.  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015) ("As the only cases to directly address the issue have held, requiring 'but for' causation would effectively annul the civil liability provisions of the ATA.  That cannot have been the intent of Congress in enacting them."); *Gill I*, 893 F. Supp. 2d at 507 ("'But for' cause cannot be required in the section 2333(a) context.").

1    *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) ("[P]roposed language [for the

2    jury instructions] concerning the 'directness' of the relation between plaintiffs' injury and

3    defendant's acts was inappropriate in the ATA context.").  In cases involving the provision of

4    financial support to terrorist organizations, courts have refused to impose a "directness" requirement

5    for proximate causation under the ATA because money is fungible.  *See, e.g.*, *Boim v. Holy Land*

6    *Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) ("*Boim III*") ("Because money is

7    fungible, the combination of the link to Hamas and the receipt of an amount that would have been

8    sufficient to finance the shooting at the Beit El bus stop would be enough to show that the 'material

9    assistance' of giving money caused the terrorist act that took David Boim's life.") (Posner, J.);

10   *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433–34 (E.D.N.Y. 2013) ("[P]laintiffs who

11   bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the

12   proximate cause standard.  Such a task would be impossible and would make the ATA practically

13   dead letter because '[m]oney is fungible.'") (quoting *Holder v. Humanitarian Law Project*, 561 U.S.

14   1, 30 (2010)); *Gill I*, 893 F. Supp. 2d at 507 ("The money used need not be shown to have been used

15   to purchase the bullet that struck the plaintiff.  A contribution, if not used directly, arguably would

16   be used indirectly by substituting it for money in [ISIS's] treasury. . . .").

17          As the Supreme Court has noted, non-financial forms of material support to terrorists are just

18   as fungible.  In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), plaintiffs sought a

19   preliminary injunction because they wished to provide legal and political advocacy training to

20   designated terrorist organizations, but feared that they would be prosecuted under 18 U.S.C. § 2339B

21   for providing material support to FTOs.  *Id.* at 10.  The Supreme Court considered "whether the

22   Government may prohibit" the provision of "material support to [terrorists] in the form of speech,"

23   and focused on whether a ban on the kind of material support at issue was necessary to further the

24   Government's interest in combatting terrorism.  *Id.* at 28.  The Supreme Court, following the lead of

25   Congress, determined that "foreign organizations that engage in terrorist activity are so tainted by

26   their criminal conduct that *any contribution to such an organization* facilitates that conduct."  *Id.* at

27   29 (quoting Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7), 110 Stat.

28   1247, note following 18 U.S.C. § 2339B (Findings and Purpose)) (original emphasis).  The court

likewise deferred to the expertise of the State Department which found that "all contributions to foreign terrorist organizations further their terrorism," and that "it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." *Id.* at 33.

"Material support," the court reasoned, "is a valuable resource by definition." *Id.* at 30.

> Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks. . . . Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.

*Id.* at 30-31 (quotation marks omitted). It is thus unsurprising that the ATA's material support statutes prohibit not only providing money to terrorists groups, but also "any property, tangible or intangible, or service," which expressly includes "communications equipment." 18 U.S.C. 2339A(b)(1). "The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Humanitarian Law Project*, 561 U.S. at 35.

Under the standard for proximate causation set out in other ATA cases, Plaintiffs adequately allege that Twitter provided invaluable support to ISIS and thereby proximately caused the deaths of Lloyd Fields, Jr. and James Damon Creach. Twitter has permitted ISIS to use its social network "as a tool for spreading extremist propaganda, raising funds and attracting new recruits." *Id.* ¶ 1. Twitter even knowingly permitted ISIS to maintain dozens of official accounts with tens of thousands of followers. *Id.* ¶ 3. Twitter also gave ISIS access to its Direct Messaging capabilities which it used for "covert signaling" as well as "fundraising and operational purposes." *Id.* ¶ 21.

The value of the material support that Twitter provided to ISIS cannot be overstated. "Without Twitter, the explosive growth of ISIS over the last few years into the most-feared terrorist group in the world would not have been possible." *Id.* ¶ 2. Over just the last year, ISIS has used Twitter to recruit more than 30,000 foreign fighters, "including 4,500 Westerners and 250 Americans." *Id.* ¶ 29. ISIS has also been able to use Twitter to raise untold sums from its supporters

around the world.  *Id.* ¶¶ 21, 22, 30-34.  And, perhaps above all else, Twitter has enabled ISIS to

effectuate one of the most widespread effective propaganda campaigns in history.  *Id.* ¶¶ 35-47.

This material support from Twitter not only enabled ISIS to raise funds and recruit new

members, but it also freed up resources for ISIS to carry out numerous terrorist attacks like the one

at issue in this case.  Because of its access to and use of Twitter, ISIS was able to spend substantially

less time, money and other resources on winning hearts and minds through charity work and media

outlets as many other terrorist organizations do.  *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 2006 WL

2862704, at *3 (E.D.N.Y. Oct. 5, 2006) (describing Hamas's "social wing," known as the "Dawa,"

which combines "charitable and social institutions"); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d

720, 723 (S.D.N.Y. 2010) (noting that the television station Al-Manar and radio station Al-Nour,

both run by Hizbullah, are designated Specially Designated Global Terrorists ("SDGT")).  ISIS was

also able to save money on communications equipment like radios and phones.  As a result, ISIS was

able to redirect its resources from recruiting new members and raising money to planning and

organizing attacks, and to purchasing guns, ammunition and other items necessary for carrying out

acts of terrorism, including the attack in which Mr. Fields and Mr. Creach were killed.

## B.    Twitter Committed Acts of International Terrorism

Defendant argues that Plaintiffs have not sufficiently alleged that it "committed an 'act of

international terrorism" because "even as alleged, Twitter's conduct does not objectively 'appear to

[have been] intended' to achieve a terrorism purpose."  Mot. at 23-24.  That is because, according to

Defendant, "[n]o reasonable observer could conclude that Twitter's worldwide operation of its

communications platform was intended 'to intimidate or coerce a civilian population,' 'to influence

the policy of a government by intimidation or coercion,' or 'to affect the conduct of a government by

mass destruction, assassination, or kidnapping.'"  Mot. at 25 (quoting 18 U.S.C. § 2331(1)(B)).  This

argument misstates the applicable law.

The ATA's civil remedies create a private right of action for "[a]ny national of the United

States injured in his or her person, property, or business by reason of an act of international

terrorism. . . ."  18 U.S.C. § 2333(a).  Violations of each of the ATA's material support provisions

(18 U.S.C. §§ 2339A-B) constitute acts of international terrorism for purposes of 18 U.S.C. §

1   2333(a).  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 68-69 (2d Cir. 2012)

2   ("The Seventh Circuit, and several district courts in this Circuit, have concluded that a defendant's

3   violation of the criminal material-support statutes, *see* 18 U.S.C. §§ 2339A-C, constitutes an act of

4   'international terrorism' within the meaning of section 2331(1).") (citing *Boim v. Quranic Literacy*

5   *Inst.*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("*Boim I*")); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp.

6   2d 414, 426 (E.D.N.Y. 2013) ("Violations of Sections 2339B and 2339C are considered to be acts of

7   'international terrorism' under Section 2333(a).").  For example, in *Linde v. Arab Bank, PLC*, 97 F.

8   Supp. 3d 287 (E.D.N.Y. 2015), when the defendant made the same argument raised here and insisted

9   that the jury should have been "charged on each constituent element of an 'act of international

10  terrorism' under 18 U.S.C. § 2331," including that the bank's actions must "'appear to be intended'

11  to intimidate a civilian population, influence government policy, or affect the conduct of government

12  by certain specified means," the court held that such a charge was improper.  *Id.* at 322. ("I agree

13  with those courts that have held that a violation of 18 U.S.C. § 2339B is itself an act of international

14  terrorism.").  Likewise, here, because Plaintiffs adequately allege that Defendant knowingly

15  provided material support to ISIS in violation of 18 U.S.C. §§ 2339A-B, they also sufficiently allege

16  that Defendant committed an act of international terrorism for purposes of 18 U.S.C. 2333(a).[5]  No

17  further inquiry is necessary.

18        Even if Plaintiffs are required to allege that Defendant intended "to achieve a terrorism

19  purpose," Mot. at 23-24, they have done so.  A defendant's actions "appear to be intended to

20  intimidate or coerce a civilian population, influence the policy of a government by intimidation or

21  coercion, or affect the conduct of a government by mass destruction, assassination or kidnaping

22

_____

23  [5] "[T]he scienter standards for" for the material support provisions and "§ 2333(a) are one and the
    same."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 332 (E.D.N.Y. 2015).  That is, "a plaintiff

24  must prove that a defendant acted intentionally, knowingly, or recklessly."  *Gill I*, 893 F. Supp. 2d at
    503; *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 113 (E.D.N.Y. 2010) ("[S]ections 2339A and 2339B

25  make clear Congress' intent that the intentional (or reckless) provision of material support to a
    terrorist organization fulfills each prong of Section 2331(1)'s definition of 'international terrorism,'

26  and therefore suffice to establish liability under Section 2333(a)."); *Weiss v. Nat'l Westminster Bank
    PLC*, 768 F.3d 202, 208 (2d Cir. 2014) ("For the purposes of § 2339B(a)(1), a defendant has

27  knowledge that an organization engages in terrorist activity if the defendant has actual knowledge of
    such activity or if the defendant exhibited deliberate indifference to whether the organization

28  engages in such activity."); *Boim III*, 549 F.3d at 693 (a state of mind of criminal recklessness is
    sufficient for a violation of Section 2339A as incorporated into Section 2333(a)).

1  when a [defendant] knows the terrorist aims and activities of its recipient and when it is

2  foreseeable that [its actions] will advance such terroristic aims." *Abecassis v. Wyatt*, 7 F. Supp. 3d

3  668, 676 (S.D. Tex. 2014).  Whether a defendant committed an act of international terrorism

4  "distill[s] to relatively simple questions":

> Did the defendant know that it was providing material support to [a
> terrorist organization], and did the defendant know that [the terrorist
> organization] was a foreign terrorist organization (or 'engaged in
> terrorist activity' or 'terrorism')?  If those are the only questions that
> need be answered to determine whether a defendant committed an 'act
> of international terrorism' with the requisite mental state—and they
> are—then they are the only questions a jury should be asked.

9  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015).

10  Here, both questions must be answered in the affirmative.  Plaintiffs' Amended Complaint is

11  replete with allegations that Defendant has not only been aware of ISIS's use of its communications

12  platform for terroristic purposes since at least December 2011, but that it has also affirmatively

13  refused to take any action to thwart such use.  *See* FAC ¶¶ 48-70.  For instance, "[o]n June 20, 2014,

14  Twitter founder Biz Stone, responding to media questions about ISIS's use of Twitter to publicize its

15  acts of terrorism, said, '[i]f you want to create a platform that allows for the freedom of expression

16  for hundreds of millions of people around the world, you really have to take the good with the bad.'"

17  *Id.* ¶ 65.

18  These allegations establish that Defendant continued providing material support in the form

19  of a communications platform to ISIS despite having allegedly been aware of a substantial

20  probability that its support would facilitate the planning, preparation for, and execution of terrorist

21  attacks worldwide.  As such, these allegations are sufficient to allow a reasonable person to infer that

22  Defendant shared ISIS's intent to achieve a terrorism purpose:

> Based on the[] allegations [that BOC knowingly continued to carry out
> the PIJ Transfers after being expressly warned of the consequences of
> its actions and asked to desist], the Court easily finds that the plaintiffs
> have sufficiently pled grounds from which an objective observer could
> conclude defendant BOC intended to achieve any of the three results
> set forth under § 2331(1)(B). … Although directly attributable to the
> PIJ, a reasonable person could easily infer similar intent of BOC by
> virtue of its having allegedly provided material support to PIJ despite
> having allegedly been aware of a substantial probability that its
> support would facilitate the planning, preparation for, and execution of
> terrorist attacks in Israel. *Cf. Boim III*, 549 F.3d at 708 (noting that
> mere financial support of a Hamas-affiliated charity without reason to

impute intent from the charity to the financier did not create the requisite appearance of intent).  Plaintiffs have thus adequately pled appearance of intent by BOC to achieve goals similar to those of the PIJ.

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 49 (D.D.C. 2010) (emphasis added); *see also Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 676 (S.D. Tex. 2014) ("In this case, the terrorist attacks at issue in Israel, by their nature, were intended to intimidate and coerce the Israeli population and influence the policies of the Israeli government by intimidation, coercion, and mass destruction. . . . [T]he continued financial and material support outside of the regulations of the OFP by the defendants to the Hussein regime, which was known to fund terrorist acts in Israel, could lead an objective observer to infer that such donations appeared to be intended to accomplish terroristic aims.  Plaintiffs' allegations in their first amended complaint satisfy the minimum pleading requirements for this element of their ATA claims.").[6]

While Defendant compares its activities to the provision of "routine banking service[s]," Mot. at 24, presumably it is not "routine" for interactive computer services to knowingly provide material support to terrorists.  This case is thus no different from *Arab Bank*:

> Nothing in the amended complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant.  Given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing "routine" about the services the Bank is alleged to have

---

[6] Defendant also contends that "[e]ven where the alleged 'material support' was targeted specifically to a terrorist organization . . . courts have concluded the requisite terrorism intent is lacking where the context 'would . . . lead an objective observer to conclude' that the defendant sought to achieve some other objective."  Mot. at 25 n.11 (quoting *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011).  However, *Stansell* is the only case to reach this conclusion.  As noted above, the vast majority of courts look only to whether a plaintiff alleges a violation of the material support statutes for determining if the "international terrorism" element is properly plead.  Moreover, the lone court to have considered the holding in *Stansell* criticized and rejected its reasoning.  In *Abecassis v. Wyatt*, 7 F. Supp. 3d 668 (S.D. Tex. 2014), the court noted that "[w]hile the [*Stansell*] court found an objective observer could not conclude defendants intended to achieve any of the results listed in the statute, the court relied on the subjective intent of the defendants as pled by the plaintiffs."  *Id.* at 676.  In any event, the *Abecassis* court found, "the continued financial and material support" of oil and gas companies "outside of the regulations of the [Oil for Food Program]" to the regime of Saddam Hussein, "which was known to fund terrorist acts in Israel, could lead an objective observer to infer that such donations appeared to be intended to accomplish terroristic aims."  *Id.*  Likewise, in this case, Twitter's knowing provision of material support to the well-known terrorist group ISIS could lead an objective observer to infer that the company intended to accomplish terroristic aims.

provided.  Thus, plaintiffs' allegations with respect to Arab Bank's knowledge and conduct are sufficient under their first factual theory.

*Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 291 (E.D.N.Y. 2007).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in all respects. Alternatively, if the motion is granted in any respect, Plaintiff should be given leave to amend.  *See, e.g.*, *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983) ("Ordinarily, leave to amend should be freely given in the absence of prejudice to the opposing party. . . . In the absence of such a reason, denial of leave to amend is an abuse of discretion and reversible.").

Dated:  May 4, 2016                     Respectfully submitted,

**BURSOR & FISHER, P.A.**


By:   /s/ *Scott A. Bursor*
            Scott A. Bursor

Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
             jluster@bursor.com

*Attorneys for Plaintiffs*