SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

*Attorneys for Defendant*
**TWITTER, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMARA FIELDS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., <br><br> Defendant. | Case No. 3:16-cv-00213-WHO <br><br> **DEFENDANT TWITTER, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT** <br><br> Judge: Hon. William H. Orrick <br><br> [Fed. R. Civ. Proc. 12(b)(6)] <br><br> Hearing Date:  June 15, 2016 at 2:00 p.m. <br> Courtroom 2, 17th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... ii

ARGUMENT .................................................................................................................1

I.    Section 230 Mandates Dismissal Of Plaintiffs' Claims...........................................1

    A.    Plaintiffs' Claims Are Based On Content Created By Third-Party Users And Twitter's Alleged Publishing Conduct With Respect To That Content.................................................................................................2

    B.    Section 230 Applies With Equal Force To Third-Party Content Privately Transmitted Through Service-Provider Platforms ...................................7

    C.    Allowing This Case To Proceed Would Give Rise To Precisely The Harms Section 230 Was Enacted To Prevent ....................................9

II.   Plaintiffs Fail To State A Claim Under The Terrorism Civil Remedy Provision ......................................................................................................11

    A.    The Amended Complaint Fails To Plausibly Allege Proximate Cause.................11

    B.    Plaintiffs Fail To Plausibly Allege An "Act of International Terrorism" By Twitter .........................................................................13

CONCLUSION...........................................................................................................15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abecassis v. Wyatt*, 7 F. Supp. 3d 668 (S.D. Tex. 2014) ..................................................15

*Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965 (9th Cir.
    2011) ....................................................................................................................10

*Allen v. City of Beverly Hills*, 911 F.2d 367 (9th Cir. 1990) ........................................15

*Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007)................................15

*Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009)................................................5, 6, 7, 8

*Barrett v. Rosenthal*, 146 P.3d 510 (2006) ...............................................................9, 10

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)..............................................................10

*Beyond Sys. v. Keynetics*, 422 F. Supp. 2d 523 (D. Md. 2006) ......................................9

*Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th
    Cir. 2008) (en banc) ......................................................................................14, 15

*Couch v. Cate*, 379 F. App'x 560 (9th Cir. 2010) .........................................................12

*Doe No. 14 v. Internet Brands*, 767 F.3d 894 (9th Cir. 2014), *reh'g granted,
    opinion withdrawn*, 778 F.3d 1095 (9th Cir. 2015) ............................................6

*Doe v. Myspace*, 528 F.3d 413 (5th Cir. 2008)................................................................8

*Fair Hous. Council v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) .............3, 11, 15

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012)....................................13

*Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010) .....................................12

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .............................................10

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)............................................11, 12

*Hung Tan Phan v. Lang Van Pham*, 182 Cal. App. 4th 323 (2010)................................9

*In re Terrorist Attacks on Sept. 11, 2001 (O'Neill v. Al Rajhi Bank)*, 714 F.3d 118
    (2d Cir. 2013)................................................................................................12, 13

*Jane Doe No. 1 v. Backpage.com*, 817 F.3d 12 (1st Cir. 2016)............................5, 6, 11

*Johnson v. Buckley*, 356 F.3d 1067 (9th Cir. 2004) ............................................................15

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ........................14

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) ........................................12, 13, 14

*Mattel v. MGA Entm't*, 782 F. Supp. 2d 911 (C.D. Cal. 2011) ........................................12

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ................................................12, 13

*Smith v. People of the State of California*, 361 U.S. 147 (1959) ........................................9

*Stansell v. BGP*, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ........................................14

*Stratton Oakmont v. Prodigy Services Company*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................................7

*Strauss v. Credit Lyonnais*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ........................................12, 13

*Universal Comm'n Sys. v. Lycos*, 478 F.3d 413 (1st Cir. 2007) ........................................4, 5, 10

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) ........................................15

*Zeran v. Am. Online*, 129 F.3d 327 (4th Cir. 1997) ........................................4, 7, 8, 10

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 2331 ........................................1, 13, 14

18 U.S.C. § 2333 ........................................1, 3, 5, 13, 14

18 U.S.C. § 2339A ........................................4, 5, 6

18 U.S.C. § 2339B ........................................4, 5, 6, 10

47 U.S.C. § 230 ........................................*passim*

15 U.S.C. § 15(a) ........................................11, 14

18 U.S.C. § 1964(c) ........................................11, 12

26 Stat. 210 (1890) (Sherman Act) ........................................11

## OTHER AUTHORITIES

Prosser & Keaton on Torts § 113 ........................................7, 8

Restatement (Second) of Torts § 577(1) (1965) ........................................7

Plaintiffs' Opposition leaves no question that the Amended Complaint should be dismissed with prejudice. *First*, despite Plaintiffs' best efforts to artfully plead and argue around Section 230, they cannot evade the statute's broad grant of immunity. To the contrary, Plaintiffs' claims do—and as a matter of law *must*—treat Twitter as the "publisher" of third-party content allegedly transmitted via Twitter's platform, in violation of 47 U.S.C. § 230(c)(1). *Second*, Plaintiffs cannot state a claim under the federal Terrorism Civil Remedy provision. Indeed, even under Plaintiffs' preferred test of proximate causation, they have not plausibly alleged that they were injured "by reason of" Twitter's conduct. Nor, moreover, does that alleged conduct meet the statutory definition of "an act of international terrorism." 18 U.S.C. § 2333(a). Under any fair reading, Twitter's operation of its platform for freedom of expression does not "appear to be intended" to achieve a terrorism purpose. *Id.* § 2331(1)(B). Because Plaintiffs have already amended their pleadings, and because, in any event, these deficiencies cannot be cured by further amendment, the Amended Complaint should be dismissed with prejudice.

## I.   Section 230 Mandates Dismissal Of Plaintiffs' Claims

Plaintiffs do not dispute that Twitter is a provider of "an interactive computer service," or that the ISIS-related content highlighted in nearly every paragraph of the Amended Complaint was "provided by another information content provider," and not by Twitter. 47 U.S.C. § 230(c)(1). Yet Plaintiffs contend that Section 230 is no obstacle here because their claims do not treat Twitter as the "publisher or speaker" of that content. *Id.* In particular, Plaintiffs maintain that their lawsuit does not seek to hold Twitter liable for harm allegedly arising from any third-party messages posted to Twitter's platform, or for injuries allegedly stemming from any of Twitter's editorial decisions with respect to such content. Instead, they say, their claims seek to hold Twitter liable on the grounds that Twitter (1) "knowingly permitted ISIS to sign up for accounts" and (2) "permitted ISIS to use" Twitter's direct-messaging tool, thereby allowing ISIS to "send private communications outside the scope" of Section 230. Opp. at 1-3. Neither argument is defensible.

## A.  Plaintiffs' Claims Are Based On Content Created By Third-Party Users And Twitter's Alleged Publishing Conduct With Respect To That Content

Plaintiffs insist (at 3) that their claims arise solely from Twitter's "provision of Twitter accounts to ISIS," and have nothing to do with third-party content or any "'publishing' decisions attributable to Twitter."  That is false.

It is clear on the face of the Amended Complaint that Plaintiffs' claims rely heavily on ISIS-related user content and Twitter's alleged handling of that content.  In the very first paragraph, Plaintiffs summarize their suit by alleging that Twitter "has been instrumental to the rise of ISIS" by "knowingly permit[ting]" the terrorist group to use Twitter's platform "for *spreading extremist propaganda*, *raising funds* and *attracting new recruits*."  Am. Compl. ¶ 1 (emphasis added).  Contrary to Plaintiffs' contention (at 4) that "the Amended Complaint focuses on Defendant's provision of Twitter accounts to ISIS, not the contents of Tweets," the remaining 93 paragraphs are likewise riddled with descriptions of messages, images, and videos allegedly created by ISIS, as well as accounts of harm allegedly caused by that content.  *See id.* ¶¶ 19-29 ("ISIS Uses Twitter to Recruit New Terrorists"); ¶¶ 30-34 ("ISIS Uses Twitter to Fund Terrorism"); ¶¶ 35-47 ("ISIS Uses Twitter to Spread Its Propaganda"); *see also* ¶¶ 49-56, 62, 84.

Even the few allegations in the Amended Complaint that reference Twitter *accounts* used by ISIS—which Plaintiffs now feature prominently (at 4-5) in arguing that their lawsuit is actually about the provision of Twitter accounts rather than third-party content—quickly turn to the ISIS-related messages allegedly disseminated from those accounts.  *E.g.*, ¶ 3 (ISIS media wing "maintained a dedicated Twitter page where it posted messages from ISIS leadership as well as videos and images of beheadings"); ¶ 4 (ISIS public relations group "maintained at least a half dozen accounts, emphasizing the recruitment of Westerners"); ¶ 20 ("ISIS reaches potential recruits by maintaining accounts on Twitter"); ¶ 69 (describing account that tweeted during the aftermath of the attack in San Bernardino: "California, we have already arrived with our soldiers . . . .").  What is more, the Amended Complaint repeatedly faults Twitter for its alleged exercise of (or failure to exercise) a publisher's traditional editorial functions with respect to such third-party content, asserting that Twitter is liable for the attack that killed Mr. Fields and Mr. Creach because Twitter "knowingly permitted" ISIS to transmit extremist

material through Twitter's platform, and failed to "actively monitor" users' speech, adequately "censor user content," and appropriately "shut down clear incitements to violence." Am. Compl. ¶¶ 1, 60, 66. This is precisely what Section 230 prohibits. *See, e.g.*, *Fair Hous. Council v. Roommates.com*, 521 F.3d 1157, 1171-1172 (9th Cir. 2008) (en banc) ("review[ing]" and deciding whether to "remove" third-party content is "precisely the kind of activity for which Congress intended to grant absolution with the passage of [S]ection 230").

The Amended Complaint's content-based allegations are no accident and cannot be cured by further amendment. However Plaintiffs attempt to recast their theory of liability—now framed as predicated on Twitter's alleged provision of accounts to ISIS—the ISIS-related content assertedly transmitted via Twitter's platform, as well as Twitter's alleged publishing decisions in relation to that content, remain essential components of Plaintiffs' claims.

*First*, under the Terrorism Civil Remedy provision, Plaintiffs must establish that Twitter proximately caused the deaths of Mr. Fields and Mr. Creach before Twitter may be held liable for Plaintiffs' injuries. *See* 18 U.S.C. § 2333(a) (requiring plaintiff to demonstrate injury "*by reason of* an act of international terrorism" (emphasis added)). Plaintiffs' own brief reveals that the ISIS-related content allegedly transmitted via Twitter's platform is crucial to that effort, *no matter what standard* of proximate causation is applied. Attempting to satisfy their favored "substantial factor" test, Plaintiffs point out that they allege that "Twitter has permitted ISIS to use its social network 'as a tool for *spreading extremist propaganda*, *raising funds* and *attracting new recruits*.'" Opp. at 15 (quoting Am. Compl. ¶ 1) (emphasis added). They also note that, according to the Amended Complaint, Twitter "gave ISIS access to its Direct Messaging capabilities which it *used for 'covert signaling*' as well as '*fundraising and operational purposes*.'" *Id.* (quoting Am. Compl. ¶ 21) (emphasis added); *see also* Mot. at 22 (outlining Amended Complaint's protracted chain of causation, which relies at every turn on ISIS-related user content and Twitter's alleged handling of that content). Such allegations—and argument— are no surprise. Without them, there is no connection at all, not even a distant and speculative one, between Twitter's alleged conduct and the "lone wolf" attack that took the lives of Mr. Fields and Mr. Creach. Indeed, if, as Plaintiffs now insist (at 3), their claims are premised

merely on the allegation that Twitter has "permit[ted] ISIS to sign up for accounts," and not on any allegation that ISIS has *used* those accounts to transmit messages aimed at recruiting new members, raising funds, or spreading its extremist agenda, Plaintiffs can hardly claim that Twitter "has been instrumental to the rise of ISIS," Am. Compl. ¶ 1; *accord* Opp. at 1—much less that Twitter proximately caused the tragic attack at issue here.

　　　　*Second*, the same is true of Plaintiffs' effort to plausibly demonstrate, as they must, that Twitter "*knowingly* permitted ISIS to sign up for accounts." Opp. at 1 (emphasis added); 18 U.S.C. § 2339A (defining offense as providing material support "knowing or intending" that it be used for terrorism purposes); *id.*§ 2339B (proscribing "knowingly provid[ing] material support . . . to a foreign terrorist organization").  After all, unless Plaintiffs seek to impose a duty on all computer service providers to carry out a thorough background check on every would-be user before allowing him or her to sign up for an account—the logical but unworkable upshot of Plaintiffs' theory—user content is generally the only means by which service providers like Twitter can even begin to "know" who their users are.  The Amended Complaint proves as much.  Attempting to support the claim that Twitter has "Knowingly Permit[ted] ISIS to Use Its Social Network," Am. Compl. at 9, the Amended Complaint alleges that terrorism experts and the media have reported on ISIS's use of Twitter to "brag[] about recent attacks," "recruit individuals, fundraise and distribute propaganda," display "posters" with extremist messages, and show "graphic video" of terrorist acts, *id.* ¶¶ 49-56.  Even more revealing is the solution proposed by the Amended Complaint to the alleged problem of ISIS using Twitter's platform to advance its agenda: "Twitter could and should" try to stop ISIS, Plaintiffs assert, by deploying a content-based algorithm, like that used to track child pornography, that "could be applied to *terror content*."  Am. Compl. ¶ 67 (emphasis added).[1]

---

[1] Of course, Section 230 applies whether or not Twitter knew of any objectionable user or content.  *See* Mot. at 14 (because "notice-based liability 'would defeat the dual purposes advanced by § 230 of the CDA,'" *Zeran v. Am. Online*, 129 F.3d 327, 333 (4th Cir. 1997), the statute's protections "apply 'even after notice of the potentially unlawful nature of the third-party content,'" *Universal Comm'n Sys. v. Lycos*, 478 F.3d 413, 420 (1st Cir. 2007)).

In short, in order for Plaintiffs to have any shot at satisfying the basic pleading requirements of either the material support statutes, 18 U.S.C. §§ 2339A & 2339B, or the Terrorism Civil Remedy provision, 18 U.S.C. § 2333(a), their theory of liability *must as a matter of law* depend on ISIS-related user content and Twitter's alleged publishing role with respect to it. *See Barnes v. Yahoo!*, 570 F.3d 1096, 1101-1102 (9th Cir. 2009) (explaining that however a plaintiff styles her cause of action, "what matters [in Section 230 analysis] is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another").

In any event, *even if* Plaintiffs could somehow satisfy their pleading requirements relying only on their revised, account-provision theory of liability, Section 230 would still mandate dismissal.  As courts have repeatedly recognized, "decisions regarding the 'construct and operation' of a defendant's website[]," are "no less publisher choices" than the decision whether to withdraw or alter content.  *Jane Doe No. 1 v. Backpage.com*, 817 F.3d 12, 20-21 (1st Cir. 2016) (quoting *Universal Comm'n Sys. v. Lycos*, 478 F.3d 413, 422 (1st Cir. 2007)).  Most recently, in *Backpage*, the plaintiffs "insist[ed] that their allegations d[id] not treat Backpage as a publisher or speaker of third-party content," but instead sought to hold Backpage liable under the civil remedy provision of the Trafficking Victims Protection Reauthorization Act (TVPRA) for its "acceptance of anonymous payments," "lack of controls on the display of phone numbers," and "option to anonymize e-mail addresses."  *Backpage*, 817 F.3d at 20.  The First Circuit rejected those contentions, reaffirming that the "language of [S]ection 230(c)(1) extends to the formulation of precisely the[se] sort[s] of website policies and practices."  *Id.*  As the court explained, a service provider's decision to grant users "the option to anonymize e-mail addresses," *id.*, or "accept[] anonymous payments," *id.*, or "register[] under multiple screen names," *Lycos*, 478 F.3d at 420, "reflect choices about what content can appear on the website," *Backpage*, 817 F.3d at 21.

The same is true here.  Although Twitter does sometimes block accounts or remove content when enforcing its rules, *see*, Am. Compl. ¶ 69 (noting that Twitter "shuts down [] ISIS-linked account[s]"); *id.* ¶ 70 (describing Twitter's prohibition on "threats of violence" and

"promoting terrorism"), Twitter was established as a platform to facilitate "the freedom of expression [of] hundreds of millions of people around the world" (*id.* ¶ 65), and as such it opens its service to virtually all comers. This decision to allow essentially anyone to "sign up for [an] account[] on its social network," Opp. at 3, reflects Twitter's decision about which voices may be heard, and so "what content can appear," on its platform, *Backpage*, 817 F.3d at 21. Thus, "even if we assume, for argument's sake, that [Twitter's] conduct amounts to" material support under 18 U.S.C. §§ 2339A & 2339B, Plaintiffs' claims "premise that [support] on [Twitter's] actions as a publisher or speaker of third-party content." *Backpage*, 817 F.3d at 21 (rejecting plaintiffs' TVPRA claims as based on Backpage's role as a publisher). "The strictures of [S]ection 230(c) foreclose such suits." *Id.*[2]

---

[2] Neither *Barnes* nor the retracted opinion in *Internet Brands* is to the contrary. The *Barnes* case "had a special fact, and the special fact was [that] one of the employees of the provider made a promise" to remove explicit photographs from the provider's website. Opp. at 6 n.2 (quoting *Jane Doe No. 14 v. Internet Brands*, Unofficial Oral Argument Tr. at 21:10-23:24 (Apr. 8, 2015)). As the First Circuit explained in *Backpage*, Ms. Barnes's promissory estoppel claim therefore "did not attempt to treat Yahoo as the publisher or speaker of the photograph's content but, instead, the claim sought to hold Yahoo liable for its 'manifest intention to be legally obligated to do something.'" *Backpage*, 817 F.3d at 22 (quoting *Barnes*, 570 F.3d at 1107); *see also* Opp. at 6 n.2 (quoting *Internet Brands* oral argument) (noting that the employee's promise was "not part of [] publishing"). "No comparable promise [was] alleged" in *Backpage*, 817 F.3d at 22—nor has anything similar been asserted here.

*Internet Brands*, in which the defendant prevailed in the district court and for which there is no operative appellate decision as of this Reply, has many distinctions from the present case. There the plaintiff, who had posted a profile on defendant's website, alleged that the defendant had breached a common law duty to warn her of an ongoing scheme in which two men targeted users of the website to rape them. Notably, however, the perpetrators never themselves posted any information on the website. *Doe No. 14 v. Internet Brands*, 767 F.3d 894, 896 (9th Cir. 2014), *reh'g granted, opinion withdrawn*, 778 F.3d 1095 (9th Cir. 2015). Even if the Ninth Circuit were to reject immunity in that case, its decision likely would focus on both the absence of any "allegation that [the website] transmitted any potentially harmful messages between" the plaintiff and the two men, as well as a theory that, in those unusual circumstances, imposition of a duty to warn would merely require a defendant to speak on its own behalf and would not require it to regulate content created by others. *Id.* at 897-899. The "strange fact pattern" of the case appears to have caused the panel on rehearing to be "less worried about opening the flood gates." Opp. at 6 n.2 (quoting Judge Cogan during *Internet Brands* oral argument). The same cannot be said here, where Plaintiffs' claims—now recast to rely on the kind of open sign-up policy shared by every major Internet service provider—would do exactly that.

**B.** **Section 230 Applies With Equal Force To Third-Party Content Privately Transmitted Through Service-Provider Platforms**

Equally unconvincing is Plaintiffs' second theory for evading Section 230.  According to Plaintiffs, Twitter may be held liable for the deaths of Mr. Fields and Mr. Creach because it "provided ISIS with Direct Message capabilities."  Opp. at 9.  Abandoning all pretense of not relying on third-party content sent through Twitter's platform, Plaintiffs argue that because direct messages are private communications, they "are not published," Opp. at 2, and so a theory of liability premised on their contents "does not seek to treat [Twitter] as a publisher or speaker," Opp. at 9.  Plaintiffs are wrong.  This argument not only defies common sense—because, at least in the prototypical case implicating Section 230, private communications are at once less likely to cause harm and virtually impossible for a service provider to police—it is also foreclosed by the text of Section 230.

As Plaintiffs acknowledge, Congress established Section 230's protections "to respond to a New York state court decision, *Stratton Oakmont v. Prodigy Services Company*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which held that an internet service provider could be liable for defamation."  Opp. at 8 n.3 (quoting *Barnes*, 570 F.3d at 1101).  Recognizing that such liability "would have an obvious chilling effect," *Zeran v. Am. Online*, 129 F.3d 327, 331 (4th Cir. 1997), Congress responded by immunizing service providers against lawsuits seeking to hold them liable as a "*publisher* or speaker" of third-party content, 47 U.S.C. § 230(c)(1) (emphasis added); *see also Zeran*, 129 F.3d at 330.  In light of this background, both the Fourth and Ninth Circuits have recognized that "the term[] 'publisher' [in Section 230]. . . derive[s] [its] legal significance from the context of defamation law."  *Zeran*, 129 F.3d at 332; *accord Barnes*, 570 F.3d at 1104.  And in defamation law, where "[o]ne of the elements of the tort of defamation is 'publication' of the defamatory matter," it "simply means 'communication intentionally or by a negligent act to *one* other than the person defamed.'"  *Barnes*, 570 F.3d at 1104 (quoting Restatement (Second) of Torts § 577(1) (1965) (emphasis added)); *see also* Prosser & Keaton on Torts § 113, at 798 ("There may be publication to any third person.").

To be sure, Congress chose not to *limit* Section 230 to the defamation context.  *See Barnes*, 570 F. 3d at 1104; *Zeran*, 129 F.3d at 332.  Under the statute, a publisher is likewise "one who 'reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it,'" Opp. at 4 (quoting *Barnes*, 570 F.3d at 1102), as well as one who "disseminat[es] information to the public" at large, Opp. at 10; *see Zeran*, 129 F.3d at 332.  Plainly, however, the term also retains its original meaning:  Section 230 "precludes courts from treating internet service providers as publishers" as that term is understood "for purposes of defamation," *Barnes* 570 F.3d at 1104—that is, as one who communicates to "*any third person*," Prosser & Keaton § 113, at 798 (emphasis added).[3]

Lest there be any doubt, the logical consequences of Plaintiffs' theory evidence its implausibility.  If Plaintiffs were right that Section 230 did not bar lawsuits premised on the contents of private online communications, then any networking website with a messaging tool—indeed, *any email provider*—could be held liable for any harmful message sent through that component of its platform.  Google could be sued for a defamatory statement sent via Gmail, Facebook for a threatening note transmitted through WhatsApp, or LinkedIn for a discriminatory job description delivered through its messaging tool.  In this vast realm of online communication, interactive service providers would be subject to endless lawsuits and staggering liability.  Plaintiffs' construction of Section 230, in other words, would not simply chill online expression contrary to Congress's clear intent.  *See* 47 U.S.C. § 230(b)(2).  It would threaten providers of email service and other online-messaging tools with crippling liability.[4]

---

[3] Critically, in electing to define "publisher" broadly, Congress did not leave parties allegedly harmed by a service provider's publication of user-generated content without recourse: "[T]hey may sue the third-party user who *generated* the content," just "not the interactive computer service that enabled [the third-party] to publish the content online." *Doe v. Myspace*, 528 F.3d 413, 419 (5th Cir. 2008).  Section 230 thus reflects Congress's policy choice "not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran*, 129 F.3d at 330-331.

[4] Plaintiffs cite no authority for their proposed private-communications loophole, and we are aware of none.  Unsurprisingly, where courts have considered claims against online service

C.   **Allowing This Case To Proceed Would Give Rise To Precisely The Harms Section 230 Was Enacted To Prevent**

Lastly, and relatedly, Plaintiffs' contention (at 11) that their claims would further the policy goals of Section 230 turns the statute on its head.  Plaintiffs' theories of liability would eviscerate the law's protections and bring about precisely the problems Congress sought to avoid in establishing Section 230 immunity.

Under Plaintiffs' account-provision theory, liability would attach "*the moment* [a service provider] permitted [a terrorist or defamer or fraudster] to create an account," Opp. at 4 (emphasis added), leaving service providers little choice but to exhaustively evaluate every would-be user before allowing him to sign up for service.  Even ignoring the question whether any major Internet service provider would continue to operate under such conditions, this extraordinary "burden would become the public's burden."  *Smith v. People of the State of California*, 361 U.S. 147, 153 (1959) (invalidating strict liability anti-obscenity ordinance).  The resulting "self-censorship, compelled by the State, would be a censorship affecting the whole public," and through it, *all* online expression, "both [unprotected] and [protected], would be impeded."  *Id.* at 154.

That Plaintiffs' theory would impose liability only if a service provider *knowingly* allowed a terrorist to sign up for service is no answer.  For one thing, the question whether a service provider knew of the danger posed by a particular would-be user at the time he signed up for an account is a question of fact, so service providers would often be subjected to the burdensome process of discovery, even if not to ultimate liability.  For another, imposing liability based on a service provider's knowledge—whether with respect to a particular user or

---

providers premised on e-mail communications, they have not hesitated to reject them under Section 230.  *See, e.g.*, *Hung Tan Phan v. Lang Van Pham*, 182 Cal. App. 4th 323, 324, 328 (2010) (Section 230 bars liability for republishing "defamatory e-mail over the internet" absent "material contribution"); *Barrett v. Rosenthal*, 146 P.3d 510, 513-514, 529 (2006) (Section 230 bars distributor liability for both service providers and users accused of republishing "defamatory statements in e-mails"); *Beyond Sys. v. Keynetics*, 422 F. Supp. 2d 523, 536-537 (D. Md. 2006) (rejecting on Section 230 grounds claim against service provider based on "allegedly offensive e-mails that were sent" via provider's platform).

user content—would undermine Congress's second aim of eliminating disincentives for service providers to self-police their platforms. *See, e.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). Notice-based liability would "motivate providers to insulate themselves from receiving complaints" and "discourage active monitoring of Internet postings." *Barrett v. Rosenthal*, 146 P.3d 510, 525 (Cal. 2006); *accord Zeran*, 129 F.3d at 330; *Lycos*, 478 F.3d at 420.

Moreover, Plaintiffs' alternative theory—that service providers may be held liable for harms arising from any third-party content transmitted *privately* through their platforms—fares no better. Because such speech is virtually impossible for a platform-provider to police, service providers might well choose to protect themselves from liability on this front by altogether ceasing to offer private messaging applications. Plaintiffs' theory could do more than just *chill* private online speech, then, it could eliminate it altogether.

Contrary to Plaintiffs' assertion (at 11-12), courts have repeatedly recognized that application of the material support statutes very much *can* "implicate [the] free speech concerns" that animate Section 230. For example, although the Supreme Court in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") upheld 18 U.S.C. § 2339B under the First Amendment "as applied to the particular activities" the plaintiffs wished to pursue, *id.* at 8, it did so only after applying strict scrutiny in light of the important speech interests at stake, *id.* at 27-28 (rejecting government's request for intermediate scrutiny because "§ 2339B regulates speech on the basis of its content"). And the Ninth Circuit, noting these interests and the manner in which the Supreme Court "carefully circumscribed its analysis in *HLP*," has "hesit[ated] to apply that decision to facts far beyond those at issue in that case." *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 1001 (9th Cir. 2011). Indeed, Congress issued a similar warning in Section 2339B itself, advising that the material support statutes should be carefully construed to safeguard "the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. § 2339B(i). But Plaintiffs ignore these many admonitions, and ask this Court to do the same.

Nor is there any conflict here between the Terrorism Civil Remedy provision and Section 230. Even assuming that Twitter's opening of its platform for free speech to virtually all comers

---

10

1  could somehow give rise to a cause of action under that provision—and it cannot, *see infra* at 12-

2  15—Congress enacted Section 230 for the very purpose of barring a cause of action where one

3  might otherwise lie.  Whether that cause of action is predicated on the common law, *supra* at 7

4  (Congress enacted Section 230 in response to defamation case), a local ordinance, 47 U.S.C.

5  § 230(e)(3) (prohibiting any cause of action under "any State or local law that is inconsistent

6  with this section"), or a federal statute like the material support provisions, *Roommates*, 521 F.3d

7  1157 (dismissing in part complaint alleging violations of federal Fair Housing Act on Section

8  230 grounds); *Backpage*, 817 F.3d 12 (affirming dismissal of complaint alleging violations of

9  TVPRA on Section 230 grounds), Section 230 mandates dismissal where a lawsuit seeks to hold

10  a service provider liable for harm allegedly arising from third-party content.

11      Because such is the case here, and because Plaintiffs' content-based allegations cannot be

12  cured by further amendment, *supra* at 3-5, this Court should dismiss the Amended Complaint in

13  its entirety with prejudice.

14  **II.    Plaintiffs Fail To State A Claim Under The Terrorism Civil Remedy Provision**

15  **A.  The Amended Complaint Fails To Plausibly Allege Proximate Cause**

16      Plaintiffs contend (at 13) that to establish proximate causation they need only plead and

17  prove that Twitter's "acts were a substantial factor in the sequence of responsible causation" and

18  that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence."

19  That argument is not only wrong, as it disregards the Terrorism Civil Remedy provision's "by

20  reason of" language; it is also no help to Plaintiffs, for their allegations fail to satisfy even their

21  preferred "substantial factor/foreseeability" formulation.

22      The Terrorism Civil Remedy provision is not the first time Congress used that statute's

23  "by reason of" language to describe a law's causation requirement.  Congress first used the

24  phrase in the Sherman Act, 26 Stat. 210 (1890), then again in the Clayton Act, 15 U.S.C. § 15(a)

25  (1914), and yet again in the RICO statute, 18 U.S.C. § 1964(c) (1970).  Because Congress "used

26  the same words," we "assume it intended them to have the same meaning"—namely, that a

27  plaintiff must show "some *direct relation* between the injury asserted and the injurious conduct

28  alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (discussing "by reason of"

1    in civil RICO context) (emphasis added); *id.* at 269 ("directness of relationship is [a] …

2    requirement of Clayton Act causation").  Knowing the "meaning that courts had already given"

3    these words, *id.* at 268, Congress used them again in the Terrorism Civil Remedy provision.

4    Plaintiffs therefore must satisfy the same "direct relationship requirement."  *Hemi Grp., LLC v.*

5    *City of New York, N.Y.*, 559 U.S. 1, 10 (2010) (construing "by reason of" in civil RICO case).

6         To be sure, in *Rothstein v. UBS AG*, the Second Circuit quoted both the direct-

7    relationship standard and Plaintiffs' preferred test to describe the causation requirement of the

8    Terrorism Civil Remedy provision.  *See* 708 F.3d 82, 91-92 (2d Cir. 2013).  But the difference

9    between the two formulations was not at issue in *Rothstein*, as the allegations in that case

10   satisfied neither standard.  *See id.* at 95-97.  And both Supreme Court and Ninth Circuit

11   precedent foreclose applying a "substantial factor/foreseeability" test under a statute—like the

12   Terrorism Civil Remedy provision—that requires a litigant to demonstrate that her injury was

13   caused "by reason of" the defendant's conduct.  *See Hemi Grp.*, 559 U.S. at 12 (rejecting

14   "foreseeability" in favor of "direct relationship" requirement); *Couch v. Cate*, 379 F. App'x 560,

15   565 (9th Cir. 2010) (recognizing that *Hemi Group* endorses "direct relationship" test and rejects

16   "foreseeab[ility]"); *Mattel v. MGA Entm't*, 782 F. Supp. 2d 911, 1024 (C.D. Cal. 2011) (same).

17        In any event, there is no need for this Court to decide which version of proximate cause

18   to apply because the Amended Complaint's allegations fail even Plaintiffs' preferred test.

19   Although courts applying the "substantial factor" standard have not required plaintiffs to "trace

20   specific dollars to specific attacks," *Strauss v. Credit Lyonnais*, 925 F. Supp. 2d 414, 433

21   (E.D.N.Y. 2013), they have readily dismissed claims under Rule 12(b)(6) where the connection

22   between the plaintiff's injury and the alleged material support is remote or attenuated, *e.g.*, *In re*

23   *Terrorist Attacks on Sept. 11, 2001 (O'Neill v. Al Rajhi Bank)*, 714 F.3d 118, 123-124 (2d Cir.

24   2013); *Rothstein*, 708 F.3d at 95-97.  That is surely the case here.

25        First, as Plaintiffs themselves concede (at 2), the material support allegedly provided to

26   ISIS cannot have proximately caused Plaintiffs' injuries unless "ISIS is responsible for" the

27   attack that produced those injuries.  *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330

28   (E.D.N.Y. 2015) ("If Hamas did not use its resources to carry out the attack in which plaintiffs

were injured, then defendant's support in augmenting those resources could not have been a substantial factor in causing that attack."). But the Amended Complaint does not allege that ISIS planned the attack or recruited, armed, or funded the attacker. And although ISIS allegedly claimed credit for the attack, even that statement describes Abu Zaid as a "lone wolf"—*i.e.*, a terrorist who acted independently. Am. Compl. ¶¶ 80, 81. Moreover, courts have viewed such statements skeptically given the "perverse" incentives for terrorists to claim credit for attacks they do not commit. *Strauss*, 925 F. Supp. 2d at 449; *see also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 569 (E.D.N.Y. 2012). ISIS may arguably "bear[] some moral responsibility" for having inspired Abu Zaid, then, but inspiration alone is too weak a link to support Plaintiffs' claims. *See Linde*, 97 F. Supp. at 330.

Moreover, Plaintiffs are wrong that beyond tying ISIS to the attack, they need only "allege that [Twitter] provided material support to ISIS." Opp. at 2. Rather, and at a minimum, they must plausibly allege that the material support in question was a "*substantial factor*" in causing the attack. *See Rothstein*, 708 F.3d at 91. Much like the elaborate chains of causation rejected in *Rothstein*, 708 F.3d at 95-97, and *Al Rajhi Bank*, 714 F.3d at 123-124, however, Plaintiffs' theory of causation is far too speculative and attenuated to meet this requirement, *see* Mot. at 21-22 (detailing each speculative step in Plaintiffs' theory).

## B. Plaintiffs Fail To Plausibly Allege An "Act of International Terrorism" By Twitter

As Twitter's motion explained, Plaintiffs also fail to state a claim under the Terrorism Civil Remedy provision because they allege no conduct by Twitter that "appear[s] to be intended" to achieve a terrorism purpose, 18 U.S.C. § 2331(1)(B), and so cannot establish that Twitter committed "an act of international terrorism," *id.* § 2333(a). *See* Mot. at 23-25. Plaintiffs contend (at 2) that the element of objective intent is irrelevant because conduct that violates the material support statutes is "*per se* [an] act[] of international terrorism." Although some district courts have adopted Plaintiffs' preferred interpretation, the Seventh Circuit *en banc* court, among others, has applied the statute *as written* and thus required plaintiffs to satisfy the elements listed in the statutory definition of "international terrorism," including the intent

element at issue here, *see Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 690, 694, 699 (7th Cir. 2008) (en banc); *Stansell v. BGP*, 2011 WL 1296881, *9 (M.D. Fla. Mar. 31, 2011).[5]  Only the latter approach is faithful to the statute Congress enacted.

Congress certainly *could* have provided a civil remedy for all injurious violations of the material support statutes.  *Cf.* 15 U.S.C. § 15(a) (authorizing suit based on "anything forbidden in the antitrust laws").  Instead, Congress elected to make a "violation of the criminal laws of the United States" just *one* element of the relevant test.  18 U.S.C. § 2331(1)(A).  *In addition*, Congress required that the defendant's conduct "involve violent acts or acts dangerous to human life," *id.*, that it "appear to be intended" to achieve at least one terrorism purpose, *id.* § 2331(1)(B), and that it have an international nexus, *id.* § 2331(1)(C).  And Congress asked *not* whether the alleged "violation of the criminal *laws*" satisfies these elements, but whether the defendant's "*act*" does so, *id.* § 2333(a) (emphasis added).  This language plainly limits civil liability under § 2333(a) to particular acts that meet every element of the statutory definition.

Plaintiffs are incorrect, moreover, that their allegations demonstrate that Twitter's alleged conduct appears to be intended to achieve a terrorism purpose.  *See* Opp. at 17-20.  Contrary to this case, in which Twitter's platform was allegedly (and incidentally) made available to terrorists in the course of providing an undifferentiated service to millions of users, each of Plaintiffs' authorities involve material support targeted specifically to a terrorist organization or state-sponsor of terrorism.  In *Linde*, for example, the defendant bank was held liable for, among other acts, knowingly wiring "martyr" payments to the families of suicide bombers, thereby providing an incentive for the bombers to carry out their attacks.  97 F. Supp. 3d at 329, 335; *see*

---

[5] Plaintiffs cite dicta (at 17) from *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, suggesting that the Seventh Circuit in *Boim* adopted Plaintiffs' view of the statute.  673 F.3d 50, 68-69 (2d Cir. 2012).  That is incorrect.  The *Boim en banc* court separately evaluated whether the specific conduct in that case was "dangerous to human life," 549 F.3d at 690, and "appear[ed] to [have] be[en] intended" to achieve a terrorism purpose, *id.* at 694.  And the court further explained that, whether or not a humanitarian group violates the material support statutes by knowingly "rendering [] medical assistance" to individual terrorists in the course of providing aid in a conflict zone, it would *not* be liable under the Terrorism Civil Remedy provision because such aid does not "appear to be intended" to achieve a terrorism purpose.  *Id.* at 699.

1    *also Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 262-263 (E.D.N.Y. 2007) (similar

2    allegations).  In *Abecassis v. Wyatt*, defendants allegedly bypassed the U.N. Oil for Food

3    Program in order to illegally funnel money to the Saddam Hussein regime, knowing that the

4    money would be used to support terrorist activity in Israel (or willfully blinding themselves to

5    that fact).  7 F. Supp. 3d 668, 673-674 (S.D. Tex. 2014).  And in *Wultz v. Islamic Republic of*

6    *Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010), the defendant bank allegedly executed dozens of

7    wire transfers to accounts controlled by the Palestinian Islamic Jihad (PIJ), after being warned

8    that those specific transfers were destined for the PIJ.  Each of these alleged acts was specifically

9    directed to, and tailored to the particular needs of, the terrorist recipient.

10         By contrast, Twitter's alleged conduct closely resembles that of the aid organizations

11   hypothesized in *Boim* to have provided generic and beneficial services to all comers.  *See* 549

12   F.3d at 699.  By their nature, these services appeared intended to serve the public at large, not to

13   promote terrorism.  *Id.*  It is no surprise that Plaintiffs ignore this distinction, for it is fatal to their

14   claims: Twitter no more commits an "act of international terrorism" by running its platform for

15   "freedom of expression for hundreds of millions of people," Am. Compl. ¶ 65, than do such

16   refugee organizations when providing their services.

17         Because Twitter did not proximately cause Plaintiffs' injuries or commit an act of

18   international terrorism, the Amended Complaint should be dismissed with prejudice.

19                                 **CONCLUSION**

20         This Court's "discretion to deny leave to amend is particularly broad where," as here,

21   "plaintiff[s] ha[ve] previously amended the complaint."  *Allen v. City of Beverly Hills*, 911 F.2d

22   367, 373 (9th Cir. 1990).  Any further amendment, moreover, "would likely prove futile," *id.* at

23   374, as Plaintiffs can neither overcome Section 230's protections nor state a plausible claim for

24   relief under the Terrorism Civil Remedy provision.  *See Johnson v. Buckley*, 356 F.3d 1067,

25   1077 (9th Cir. 2004) ("Futility alone can justify the denial of a motion to amend.").  Especially

26   because Section 230 "is an immunity statute" intended to protect entities like Twitter "not merely

27   from ultimate liability, but from having to fight costly and protracted legal battles," *Roommates*,

28   521 F.3d at 1174-1175, this Court should dismiss the Amended Complaint with prejudice.

1    Dated: May 25, 2016                        Respectfully submitted,

2

3                                                   /s/ Patrick J. Carome
                                                SETH P. WAXMAN (admitted *pro hac vice*)
4                                               seth.waxman@wilmerhale.com
                                                PATRICK J. CAROME (admitted *pro hac vice*)
5                                               patrick.carome@wilmerhale.com
                                                WILMER CUTLER PICKERING
6                                                  HALE AND DORR LLP
7                                               1875 Pennsylvania Avenue
                                                Washington, D.C. 20006
8                                               Telephone:  (202) 663-6800
                                                Facsimile:  (202) 663-6363
9

10                                              MARK D. FLANAGAN (CA SBN 130303)
                                                mark.flanagan@wilmerhale.com
11                                              WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
12                                              950 Page Mill Road
                                                Palo Alto, California  94304
13                                              Telephone:  (650) 858-6000
                                                Facsimile:  (650) 858-6100
14

15                                              ***Attorneys for Defendant***
                                                **TWITTER, INC.**

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2016, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   /s/ Patrick J. Carome

Patrick J. Carome