**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
Joshua D. Arisohn (*Admitted Pro Hac Vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com
         jarisohn@bursor.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA FIELDS, on behalf of herself and as a representative of the ESTATE OF LLOYD FIELDS, JR., HEATHER CREACH, on behalf of herself and as a representative of the ESTATE OF JAMES DAMON CREACH, J.C. (1), a minor, and J.C. (2), a minor,<br><br>                          Plaintiffs,<br><br>     v.<br><br>TWITTER, INC.,<br><br>                          Defendant. | Case No. 3:16-cv-00213-WHO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date: November 9, 2016<br>Time: 2:00 p.m.<br>Courtroom 2, 17th Floor<br><br>Hon. William H. Orrick |

**TABLE OF CONTENTS**

**PAGE(S)**

I. INTRODUCTION ................................................................................................................. 1

II. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CDA ............................................ 1

    A. Plaintiffs' Allegations Are Not Content-Based ........................................................ 1

    B. Providing Terrorists With Twitter Accounts Is Not Publishing Activity .................. 2

    C. Reliance On Content For Proximate Causation Does Not Implicate The CDA ................................................................................................................ 4

    D. Direct Messages Are Not Published ......................................................................... 5

    E. Barring Plaintiffs' Claims Would Not Further The Goals Of The CDA ................... 8

III. PLAINTIFFS ADEQUATELY PLEAD PROXIMATE CAUSATION ............................. 10

IV. CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Am. Tobacco Co. v. Patterson*,
  456 U.S. 63 (1982) ................................................................................................................. 7

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ......................................................................................... 2, 3, 4

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ................................................................................................................ 7

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ............................................................................................. 8, 9

*Bauer v. MRAG Americas, Inc.*,
  624 F.3d 1210 (9th Cir. 2010) ................................................................................................ 8

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ............................................................................................ 11, 12

*BP America Production Co. v. Burton*,
  549 U.S. 84 (2006) .................................................................................................................. 6

*Cheffins v. Stewart*,
  825 F.3d 588 (9th Cir. 2016) .................................................................................................. 6

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
  710 F.3d 946 (9th Cir. 2013) .................................................................................................. 7

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) .......................................................................................... passim

*Fair Housing Council v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ................................................................................................ 8

*Fields v. Twitter, Inc.*,
  2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) ..................................................................... 1, 2

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) .............................................................................. 11, 12

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ......................................................................................................... 9, 12, 13

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ................................................................................................ 9

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
  227 F.3d 8 (2d Cir. 2000) ...................................................................................................... 11

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 914 (9th Cir. 2015) .................................................................................................. 6

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016) ............................................................................................. 3, 4

*Johnson v. Aljian*,
   490 F.3d 778 (9th Cir. 2007) ............................................................................................ 6, 9

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ........................................................................................... 7

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) ............................................................................................... 11

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) .................................................................................. 11

*Maracich v. Spears*,
   133 S. Ct. 2191 (2013) ........................................................................................................ 10

*Nitro-Lift Techs., L.L.C. v. Howard*,
   133 S. Ct. 500 (2012) .......................................................................................................... 10

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
   469 U.S. 189 (1985) ............................................................................................................. 7

*Perrin v. United States*,
   444 U.S. 37 (1979) ............................................................................................................ 6, 7

*Peruta v. Cty. of San Diego*,
   742 F.3d 1144 (9th Cir. 2014) ............................................................................................. 9

*Richards v. United States*,
   369 U.S. 1 (1962) ................................................................................................................. 7

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ................................................................................................. 11

*Sandifer v. U.S. Steel Corp.*,
   134 S. Ct. 870 (2014) ........................................................................................................... 6

*Sebelius v. Cloer*,
   133 S. Ct. 1886 (2013) ......................................................................................................... 6

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................................................ 7, 8, 9

*Strauss v. Credit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) ............................................................................... 12

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ............................................................................................... 8

**STATUTES**

18 U.S.C. § 2331 .................................................................................................................... 1

18 U.S.C. § 2331(1) ............................................................................................................. 11

18 U.S.C. § 2339A ................................................................................................................ 8

18 U.S.C. § 2339A(b)(1) ..................................................................................................... 13

18 U.S.C. § 2339B .............................................................................................................. 12

18 U.S.C. § 2339B(g)(4) ..................................................................................................... 13

47 U.S.C. § 230 ............................................................................................................ 1, 2, 4

47 U.S.C. § 230(c)(1) ............................................................................................................ 6

## I. INTRODUCTION

Plaintiffs seek to hold Defendant responsible for knowingly providing material support to ISIS in violation of the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* ("ATA"). That Defendant violated the ATA is essentially beyond dispute; it is a matter of public record that Defendant provided ISIS with Twitter accounts and did so knowingly. Nevertheless, Defendant seeks to avoid liability by invoking the protections of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"). But the CDA does not apply to Plaintiffs' claims because Plaintiffs do not seek to hold Defendant liable as a publisher or speaker. Their claims are not based on the dissemination of offensive content, but rather the provision of Twitter accounts to ISIS in the first place. Indeed, Plaintiffs' allegations regarding Twitter's violation of the ATA does not rely on content at all beyond the causal allegations, and references to content for purposes of proving causation alone are not sufficient to invoke the protections of the CDA. Nor can the provision of a Twitter account itself be deemed publishing activity given that such activity is content-neutral. The CDA also does not bar Plaintiffs' claims insofar as they are based on private communications which are not published.

In addition, Defendant argues that Plaintiffs fail to state a claim under the ATA because they do not properly allege proximate causation. But under the ATA, Plaintiffs are not required to allege a "direct" link between Twitter's provision of material support to ISIS and the deaths of Lloyd Fields, Jr. or James Damon Creach. Rather, because the provision of any kind of material support to terrorists helps them commit acts of terrorism, it is sufficient to allege that Defendant provided material support to ISIS and that ISIS is responsible for the deaths of Mr. Fields and Mr. Creach. That is precisely what Plaintiffs allege in the Second Amended Complaint, ECF No. 48 ("SAC").

## II. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CDA

### A. Plaintiffs' Allegations Are Not Content-Based

Defendant argues that the CDA bars Plaintiffs' claims because the SAC "describe[s] a theory of liability based on Twitter's knowing failure to prevent ISIS from disseminating content through the Twitter platform." Def.'s Mot. To Dismiss SAC, ECF No. 49 ("Mot.") at 7 (quoting *Fields v. Twitter, Inc.*, 2016 WL 4205687, *5 (N.D. Cal. Aug. 10, 2016)). That is incorrect. The theory of liability set out in the SAC is based purely on Defendant's knowing provision of Twitter accounts to

ISIS, not content created with those accounts. All references to content in the SAC are limited to proving causation and thus do not implicate the CDA.

Plaintiffs claim that Defendant violated the ATA because it knowingly provided Twitter accounts to ISIS. In Section I of the SAC, labeled "TWITTER PROVIDED ACCOUNTS TO ISIS," Plaintiffs allege that Twitter provided numerous accounts to ISIS, including to Al-Furqan, ISIS's official media arm, and Al-Hayat Media Center, ISIS's official public relations group. SAC ¶¶ 9-13. In Section II of the SAC, labeled "TWITTER PROVIDED ACCOUNTS TO ISIS KNOWINGLY AND RECKLESSLY," Plaintiffs establish that ISIS is a well-known terrorist organization that Defendant knew that it was providing the terrorist group with accounts on its social network.

These sections of the SAC are devoid of references to content. They are not "riddled with detailed descriptions of ISIS-related messages, images, and videos disseminated through Twitter and the harms allegedly caused by the dissemination of that content." Mot. at 2 (quoting *Fields*, 2016 WL 4205687, *6). The allegations in these sections are not "accompanied by information regarding the ISIS-related content disseminated from the accounts," and they do not "describe a theory of liability based on Twitter's knowing failure to prevent ISIS from disseminating content through the Twitter platform." *Fields*, 2016 WL 4205687, *5. In fact, they do not refer to or depend on content at all. Instead, Sections I and II set out a theory of liability based on Twitter's provision of accounts to ISIS and not the use of those accounts.

### B.   Providing Terrorists With Twitter Accounts Is Not Publishing Activity

Defendants argue that, even if this framing of the theory of liability is accepted, "'decisions about whether particular third parties may have Twitter accounts' are no different, for purposes of Section 230 immunity, from decisions about 'what particular third-party content may be posted.'" Mot. at 9 (quoting *Fields*, 2016 WL 4205687, *6). That is inaccurate. The decision to provide ISIS with a Twitter account is wholly distinct from permitting ISIS to tweet propaganda. The content-neutral decision about whether to provide someone with a tool is not publishing activity as defined by the Ninth Circuit.

"[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009);

*id.* (A publisher is one who "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it."); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) ("Jane Doe's failure to warn claim has nothing to do with Internet Brands' efforts, or lack thereof, to edit, monitor, or remove user generated content."). Providing ISIS with a Twitter account is not publishing under these definitions because it does not involve reviewing, editing or deciding whether to publish or withdraw tweets. Nor is deciding whether someone can sign up for a Twitter account the same thing as deciding what content can be published; handing someone a tool is not the same thing as supervising their use of that tool. The CDA bars claims based on the latter, but the theory of liability in this case is based solely on the former. And, notably, many Twitter users who sign up for accounts never issue a single tweet. In other words, account creation and content creation on Twitter are two distinct activities.

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) is distinguishable. There, the plaintiff alleged that Backpage.com was aiding human trafficking in the way that it constructed its website. The First Circuit found that despite being framed as a claim about the structure and operation of the site, the claim was really about what content would be published, including whether phone numbers would be displayed, whether email addresses would anonymized and whether photographs should have been stripped of their metadata. *Id.* at 20. Accordingly, the focus of the claims was really about what content could "appear on the website and in what form." *Id.* at 21; *id.* at *20 ("[S]ome of the challenged practices—most obviously, the choice of what words or phrases can be displayed on the site—are traditional publisher functions under any coherent definition of the term."). Here, on the other hand, Plaintiffs' claims are not tied to content in the same fashion. Indeed, apart from the causal chain, they are not dependent on content at all. Whereas the claims in *Backpage.com* were directly related to what content would appear and in what form, as well as word choices and phrases, Plaintiffs' claims in this action are not similarly tied to content. Creating an account on Twitter does not involve any of these content-based decisions. Nor are Plaintiffs' claims based on the structure and operation of Twitter.com; they do not claim that Twitter should have built it website differently, but that it should not have knowingly provided ISIS with access to accounts on the site at all. That was not the issue *Backpage.com*.

1        **C.     Reliance On Content For Proximate Causation Does Not Implicate The CDA**

2        All of the content-based allegations in the SAC are strictly limited to Section III, titled

3  "TWITTER PROXIMATELY CAUSED PLAINTIFFS' INJURIES."  Because the Ninth Circuit has

4  repeatedly held that the CDA does not bar claims simply because publishing activity is part of the

5  causal analysis, these references to ISIS's tweets have no bearing on the Court's analysis under

6  Section 230.

7        In *Internet Brands*, the plaintiff brought a negligent failure to warn claim based on her

8  allegation that defendant knew rapists were using its website to lure victims.  The Ninth Circuit ruled

9  that the CDA did not apply despite the fact that Internet Brands' publishing activity "could be

10 described as a 'but-for' cause of [plaintiff's] injuries.  *Id.* at 853.

> Publishing activity is a but-for cause of just about everything Model Mayhem is involved in.  It is an internet publishing business.  Without publishing user content, it would not exist.  As noted above, however, we held in *Barnes* that the CDA does not provide a general immunity against all claims derived from third-party content.

14 *Id.*  Because the failure to warn claim did not depend on content outside of the causal analysis, the

15 CDA was not a bar to relief.

16       The Ninth Circuit reached a similar conclusion in *Barnes*.  In that case, the plaintiff filed a

17 promissory estoppel claim against defendant Yahoo because she had relied on its promise that it

18 would remove private information and photographs that her ex-boyfriend had posted.  *Barnes*, 570

19 F.3d at 1098-99.  Yahoo's failure to remove the offensive profile was a but-for cause of plaintiff's

20 injury "because without that posting the plaintiff would not have suffered any injury.  But that did

21 not mean that the CDA immunized the proprietor of the website from all potential liability."

22 *Internet Brands*, 824 F.3d at 853.  Even though the causal chain required reference to published

23 content, the CDA did not apply because the theory of liability was otherwise not based on Yahoo's

24 publishing functions.

25       These cases stand for the proposition that where a theory of liability relies on content purely

26 for purposes of causation, but otherwise does not depend on content as a critical element, the CDA

27 does not apply.  Here, Sections I and II, which explain that Defendant violated the ATA because it

28 knowingly provided ISIS with Twitter accounts, do not rely on or refer to content.  All references to

1  content are limited to allegations of causation.  Under the law as stated in *Internet Brands* and

2  *Barnes*, such references no not give rise to immunity under the CDA.

### D. Direct Messages Are Not Published

Alternatively, Plaintiffs' allege that Defendant is liable under the ATA because it provided ISIS with Direct Message capabilities.  SAC ¶¶ 43-45.  Because Direct Messages are unpublished private communications, this theory of liability does not seek to treat Defendant as a publisher or speaker and, accordingly, the CDA does not apply.

As Twitter acknowledges, Direct Messages sent through its social network are private communications:

> Direct Messages are the private side of Twitter. . . .  Communicate quickly and privately with one person or many.  Direct Messages support text, photos, links, emoji and Tweets, so you can make your point however you please. . . .  Have a private conversation with anyone on Twitter, even a friend of a friend.  <u>Direct messages can only be seen between the people included</u>.

*Id.* ¶ 43 (emphasis added).  Twitter also advertises its Direct Messaging tool by stressing privacy:



*Id.* ¶¶ 44-45.

ISIS has used these Direct Messages to its great advantage.  "ISIS reaches potential recruits

by maintaining accounts on Twitter so that individuals across the globe may reach out to them directly. After first contact, potential recruits and ISIS recruiters often communicate via Twitter's Direct Messaging capabilities." *Id.* ¶ 43.

> These Direct Messages are "extensively monitored by [ISIS's] emirs and supervisors of the recruiting unit." According to FBI Director James Comey, "[o]ne of the challenges in facing this hydra-headed monster is that if (ISIS) finds someone online, someone who might be willing to travel or kill in place they will begin a twitter direct messaging contact." Indeed, according to the Brookings Institution, some ISIS members "use Twitter purely for private messaging or covert signaling." ISIS has also been known to use Twitter's Direct Messaging capabilities for fundraising and operational purposes. . . .
>
> Through its Direct Messaging tool, Twitter enables ISIS members to receive private Direct Messages from potential recruits, terrorist financiers and other terrorists with operational and intelligence information. Giving ISIS the capability to send and receive Direct Messages in this manner is no different to handing it a satellite phone, walkie-talkies or the use of a mail drop, all of which terrorists use for private communications in order to further their extremist agendas.

*Id.* ¶¶ 44-45.

This theory of liability, based on purely private content, is not barred by the CDA because it does not involve publishing. The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The statute, however, does not define the term "publisher" and so that word must be given its ordinary meaning. *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'") (quoting *Perrin v. United States,* 444 U.S. 37, 42 (1979)); *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) ("As in any statutory construction case, '[w]e start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'") (quoting *BP America Production Co. v. Burton,* 549 U.S. 84, 91 (2006)); *Cheffins v. Stewart*, 825 F.3d 588, 594 (9th Cir. 2016) ("We adopt the 'common practice of consulting dictionary definitions' to clarify the 'ordinary meaning' of terms used in a statute but not defined therein.") (citing *Johnson v. Aljian*, 490 F.3d 778, 780 (9th Cir. 2007)); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 927 (9th Cir. 2015) ("Because

this language is not defined in the statute, we apply its ordinary meaning.") (quotation omitted); *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) ("We apply the fundamental precept of statutory construction that, unless otherwise defined, 'words will be interpreted as taking their ordinary, contemporary, common meaning.'") (quoting *Perrin*).

The ordinary meaning of "publisher" is one who disseminates information to the public. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) ("Although the [CDA] does not define 'publisher,' its ordinary meaning is 'one that makes public,' and 'the reproducer of a work intended for public consumption.'") (quoting Webster's Third New International Dictionary 1837 (1981)); *Publish Definition*, merriam-webster.com, http://www.merriam-webster.com/dictionary/publish (last visited Oct. 4, 2016) ("to disseminate to the public"); *Publish Definition*, Dictionary.com, http://www.dictionary.com/browse/publish (last visited Oct. 4, 2016) ("to issue . . . for sale or distribution to the public"; "to issue publicly the work of"; "to make publicly or generally known"); *Publish Definition*, Black's Law Dictionary (2d Pocket Ed.) ("To distribute copies (of a work) to the public."). Accordingly, the CDA does not apply to claims based on purely private communications, including claims based on ISIS's use of Twitter's direct messages.

The legislative history behind the CDA is irrelevant in interpreting the term "publisher" because there is no ambiguity in the plain language of the statute. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (In determining the plain meaning of statutory language, the court must "assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'") (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). While courts have noted that the CDA was enacted in reaction to the decision in *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) holding that an internet service provider could be liable for defamation, Congress did not define "publisher" according to its use in defamation law. Had Congress wanted to incorporate such a definition into the CDA, it surely knew how to do so. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438,

461–62 (2002) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Bauer v. MRAG Americas, Inc.*, 624 F.3d 1210, 1212 (9th Cir. 2010) (same).  As the Ninth Circuit has repeatedly warned about the CDA in particular, "we must be careful not exceed the scope of the immunity provided by Congress.  Congress could have written the statute more broadly, but it did not."  *Internet Brands*, 824 F.3d at 853 (quoting *Fair Housing Council v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 n.15 (9th Cir. 2008)).

In any event, even if Congress had intended that the defamation definition of "publisher" be applied in defamation cases, it makes no sense to apply that definition outside of the context of defamation claims.  Here, Plaintiffs are not seeking to hold Defendant liable for the dissemination defamatory material.  The ATA has nothing to do with defamation and there is no reason that a definition strictly confined to that area of law should apply to a statute like the ATA designed to prevent the provision of material support to terrorists.  Moreover, the threat of the decision in the *Stratton Oakmont* case was that it potentially opened up interactive computer services to tremendous liability due to their outsized readership.  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("Interactive computer services have millions of users. . . .   The specter of tort liability in an area of such prolific speech would have an obvious chilling effect.").  Liability for private communications present no such threat.

### E.     Barring Plaintiffs' Claims Would Not Further The Goals Of The CDA

Barring Plaintiffs' claims in this case would be at odds with the purported goals of the CDA.  First, in passing the CDA, "Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *id.* at 1033 (Congress was "concern[ed] with assuring a free market in ideas and information on the Internet.").  But Congress surely did not intend to promote speech that aids designated terrorist organizations.  To the contrary, it expressly prohibited such speech through the ATA's material support provisions.  18 U.S.C. §§ 2339A-B (defining "material support or resources" to include "training, expert advice" and "communications equipment").  Numerous courts have held that that violations of the ATA's material support statutes do not implicate free speech concerns.  *See, e.g.*,

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (the ATA's prohibition on providing material support to terrorists in the form of legal and political advocacy training is constitutional because such a ban is necessary to further the "[g]overnment's interest in combating terrorism," which "is an urgent objective of the highest order"); *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1194 (9th Cir. 2014) ("There are, of course, certain types of speech that do not fall within the protection of the First Amendment, such as . . . speech that materially assists a foreign terrorist organization."); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) (holding "as other courts have," that "there is no First Amendment right nor any other constitutional right to support terrorists"). Accordingly, nothing about the allegations in this lawsuit infringe upon Congress's goal of promoting free speech on the Internet. To the contrary, barring Plaintiffs' claims in this case would directly contradict the express language of the ATA and expand the reach of the CDA far beyond its intended purpose.

Nor would allowing this case to go forward have a "chilling effect" on Internet free speech simply because it "would make operating an internet business marginally more expensive." *Internet Brands*, 824 F.3d at 852. "Congress has not provided an all purpose get out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses." *Id.* at 824. Here, at most, it would deter interactive computer services from knowingly providing material support to terrorists.

Second, Congress enacted the CDA in order "to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material. . . ." *Batzel*, 333 F.3d at 1028. The CDA was enacted in large part in reaction to the decision in *Stratton Oakmont*, where the court held that Prodigy could be held responsible for libelous statements posted on one of its bulletin boards because it had proactively monitored that forum for offensive content. 1995 WL 323710, at *1-4. But this is not a case that has anything to do with Twitter's efforts, or lack thereof, to edit or remove user generated content. Nothing about this case should discourage "Good Samaritan" filtering of third party content. Indeed, it defies credulity that a section entitled "Protection For 'Good Samaritan' Blocking And Screening Of Offensive Material" would create

immunity for the knowing provision of material support to a terrorist organization.[1] Such an interpretation of the CDA would expand that law far beyond its narrow language and purpose. *Internet Brands*, 824 F.3d at 852 ("[L]iability would not discourage the core policy of section 230(c), 'Good Samaritan' filtering of third party content.").

Various canons of statutory interpretation further counsel against a ruling that the CDA bars Plaintiffs' claims. First, such a ruling should be avoided because it would needlessly create a conflict between the CDA's protections for interactive computer services and the ATA's prohibition on providing material support to terrorists. *See Maracich v. Spears*, 133 S. Ct. 2191, 2205 (2013) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory. . . . [T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.") (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts ("Scalia/Garner") 180 (2012)). But a ruling that the scope of the CDA does not cover the ATA violations alleged in this case would maintain a harmonious reading of the two statutes. In addition, the CDA's general language stating that "an interactive computer service" should not "be treated as the publisher or speaker" must give way to the ATA's specific prohibitions against providing material support to terrorists, including in the form of "communications equipment." *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 504 (2012) (referring to "the ancient interpretive principle that the specific governs the general (*generalia specialibus non derogant* )"); Scalia/Garner 185 ("[T]he [general/specific] canon does apply to successive statutes.").

### III.  PLAINTIFFS ADEQUATELY PLEAD PROXIMATE CAUSATION

Defendant argues that the SAC should also be dismissed "because it fails to plead facts

---

[1] At the oral argument on rehearing in *Internet Brands*, Judge Clifton questioned whether the CDA applies at all to knowing violations of law:

> And Congress intended to say and you don't have to let anybody else know that you've got this knowledge that bad stuff's going on out there? . . . In a provision labeled "Good Samaritan"? . . . I have trouble looking at the statute seeing how a provision that's entitled . . . "Protection for a Good Samaritan blocking and screening offensive materials" gets turned into a hall pass, a get out of jail free card when it has something to do with the Internet.

*Jane Doe No. 14 v. Internet Brands, Inc.*, Apr. 8, 2015 Unofficial Tr. at 33:25-34:6; 39:19-40:2.

sufficient to plausibly establish that Plaintiffs were injured 'by reason of' Twitter's conduct." Mot. at 11.  But this argument both misstates the applicable law and ignores Twitter's role in the rise of ISIS.  The material support that Twitter has provided to ISIS more than adequately satisfies the ATA's proximate causation requirement.[2]

Proximate causation is established under the ATA when a defendant's "acts were a substantial factor in the sequence of responsible causation," and the injury at issue "was reasonably foreseeable or anticipated as a natural consequence."[3]  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) ("The causation charge the Court gave focused solely on whether defendant's acts were a substantial factor in causing plaintiffs' injuries, and whether such injuries were a foreseeable result of those acts.").  "A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012) ("*Gill I*") (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000)).

Importantly, there is no "directness" requirement for proximate causation under the ATA.  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) ("[P]roposed language [for the jury instructions] concerning the 'directness' of the relation between plaintiffs' injury and defendant's acts was inappropriate in the ATA context.").  In cases involving the provision of financial support to terrorist organizations, courts have refused to impose a "directness" requirement for proximate causation under the ATA because money is fungible.  *See, e.g.*, *Boim v. Holy Land*

---

[2] Defendant incorporates by reference "all of the arguments made in its motion to dismiss the FAC, including the argument that Plaintiffs have failed to allege facts that would establish that Twitter committed an act of "international terrorism" within the meaning of 18 U.S.C. § 2331(1)." Mot. at 6 n.2.  Plaintiffs likewise incorporate by reference their responses to this argument.  Opp'n to Def.'s Mot. To Dismiss the FAC, ECF No. 31, at 16-20.

[3] Notably, the ATA does not require but-for causation.  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015) ("As the only cases to directly address the issue have held, requiring 'but for' causation would effectively annul the civil liability provisions of the ATA.  That cannot have been the intent of Congress in enacting them."); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012) ("'But for' cause cannot be required in the section 2333(a) context.").

*Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) ("*Boim III*") ("Because money is fungible, the combination of the link to Hamas and the receipt of an amount that would have been sufficient to finance the shooting at the Beit El bus stop would be enough to show that the 'material assistance' of giving money caused the terrorist act that took David Boim's life.") (Posner, J.); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433–34 (E.D.N.Y. 2013) ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard.  Such a task would be impossible and would make the ATA practically dead letter because '[m]oney is fungible.'") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010)); *Gill I*, 893 F. Supp. 2d at 507 ("The money used need not be shown to have been used to purchase the bullet that struck the plaintiff.  A contribution, if not used directly, arguably would be used indirectly by substituting it for money in [ISIS's] treasury. . . .").

As the Supreme Court has noted, non-financial forms of material support to terrorists are just as fungible.  In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), plaintiffs sought a preliminary injunction because they wished to provide legal and political advocacy training to designated terrorist organizations, but feared that they would be prosecuted under 18 U.S.C. § 2339B for providing material support to FTOs.  *Id.* at 10.  The Supreme Court considered "whether the Government may prohibit" the provision of "material support to [terrorists] in the form of speech," and focused on whether a ban on the kind of material support at issue was necessary to further the Government's interest in combatting terrorism.  *Id.* at 28.  The Supreme Court, following the lead of Congress, determined that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct."  *Id.* at 29 (quoting Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)) (original emphasis).  The court likewise deferred to the expertise of the State Department which found that "all contributions to foreign terrorist organizations further their terrorism," and that "it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities."  *Id.* at 33.

"Material support," the court reasoned, "is a valuable resource by definition." *Id.* at 30.

> Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks. . . . Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.

*Id.* at 30-31 (quotation marks omitted). It is thus unsurprising that the ATA's material support statutes prohibit not only providing money to terrorist groups, but also "any property, tangible or intangible, or service," which expressly includes "communications equipment." 18 U.S.C. § 2339A(b)(1). "The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Humanitarian Law Project*, 561 U.S. at 35.

Under this standard, Plaintiffs adequately establish proximate causation because they allege (1) that Twitter provided fungible material support to ISIS, and (2) that ISIS was responsible for the attack in which Lloyd Fields, Jr. and James Damon Creach were killed. As to the first point, there is little doubt that the accounts that Twitter provided to ISIS constitute material support. Twitter accounts are powerful communications tools that can be used in myriad ways to help spread terror. Recognizing the importance of these kinds of resources to terrorists, the ATA even defines "material support or resources" as including "any property, tangible or intangible, or service" such as "communications equipment." 18 U.S.C. §§ 2339A(b)(1); 2339B(g)(4). Twitter accounts undoubtedly meet this definition.

On the second point, Plaintiffs adequately allege that ISIS was responsible for the November 9, 2015 in Amman, Jordan. The attack was carried out by Anwar Abu Zaid, who, according to Israeli intelligence, was a member of a clandestine ISIS terror cell. SAC ¶ 81. In addition, ISIS itself issued two separate claims of responsibility for the attack. *Id.* ¶ 80. Because material support to terrorists is fungible, and there is no requirement that such support be traced directly to an attack, it is enough that Plaintiffs have alleged that Twitter provided material support to ISIS and that ISIS carried out the attack in which one of its operatives killed Mr. Fields and Mr. Creach.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in all respects.

Dated:  October 4, 2016

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  /s/ *Joshua D. Arisohn*
     Joshua D. Arisohn

Scott A. Bursor (State Bar No. 276006)
Joshua D. Arisohn (*Admitted Pro Hac Vice*)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com
         jarisohn@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiffs*