SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

***Attorneys for Defendant***
**TWITTER, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMARA FIELDS, et al.,<br><br>                Plaintiffs,<br><br>        v.<br><br>TWITTER, INC.,<br><br>                Defendant. | Case No. 3:16-cv-00213-WHO<br><br>**DEFENDANT TWITTER, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. William H. Orrick<br><br>[Fed. R. Civ. Proc. 12(b)(6)]<br><br>Hearing Date:  November 9, 2016 at 2:00 p.m.<br>Courtroom 2, 17th Floor |

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ......................................................... ii

ARGUMENT .............................................................................. 1

I.    Section 230 Mandates Dismissal Of Plaintiffs' Claims........................ 1

    A.    Artful Pleading Cannot Circumvent Section 230 Immunity.................. 1

    B.    Twitter's Provision Of Accounts Is Publishing Activity ..................... 3

    C.    Reliance On Content For Proximate Causation Triggers Section 230.......................................................................................... 4

    D.    Section 230 Applies With Equal Force To Third-Party Content Privately Transmitted Through Service-Provider Platforms .................. 6

    E.    Allowing This Case To Proceed Would Cause Precisely The Harms Section 230 Was Enacted To Prevent ......................... 7

II.   The Second Amended Complaint Fails To State A Claim Under The Terrorism Civil Remedy Provision......................................... 9

    A.    The Second Amended Complaint Fails To Allege Facts Plausibly Establishing Proximate Cause ................................... 9

    B.    The Justice Against Sponsors Of Terrorism Act Confirms That The Second Amended Complaint Fails To State A Claim Under 18 U.S.C. § 2333(a) ............................................ 11

III.  The Dismissal Of Plaintiffs' Claims Should Be With Prejudice ..................... 13

CONCLUSION......................................................................... 15

CERTIFICATE OF SERVICE

## **TABLE OF AUTHORITIES**

Page(s)

### **CASES**

*Al Haramain Islamic Found. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2011) ............................................................................9

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ...............................................................2, 4, 6, 7

*Barrett v. Rosenthal*,
  146 P.3d 510 (Cal. 2006) ..................................................................................8

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ...........................................................................8

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) (en banc) ...........................................................12

*Couch v. Cate*,
  379 F. App'x 560 (9th Cir. 2010) .....................................................................11

*Delfino v. Agilent Techs., Inc.*,
  145 Cal. App. 4th 790 (2006) .............................................................................7

*Doe v. Backpage.com LLC*,
  817 F.3d 12 (1st Cir. 2016) .....................................................................2, 9, 14

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ..........................................................................5, 6

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) .......................................................................7, 9

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ..............................................................11

*Goddard v. Google, Inc.*,
  2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ..................................................14

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ....................................................................14, 15

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010) .............................................................................................11

*Hibbs v. Winn*,
  542 U.S. 88 (2004)..................................................................................................13

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)................................................................................................8, 9

*Kimzey v. Yelp! Inc.*,
  __ F.3d __, 2016 WL 4729492 (9th Cir. Sept. 12, 2016) ................................2, 3, 5

*Linde v. Arab Bank, PLC*,
  97 F. Supp. 3d 287, 329 (E.D.N.Y. 2015), *appeal pending*, 2d Cir. No. 16-
  2134........................................................................................................................11

*PatentWizard, Inc. v. Kinko's, Inc.*,
  163 F. Supp. 2d 1069 (D. S.D. 2001) ...................................................................14

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984)...............................................................................................12

*Doe ex rel. Roe v. Backpage.com, LLC*,
  104 F. Supp. 3d 149 (D. Mass. 2015) ...................................................................14

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)...............................................................................11, 12

*Smith v. People of the State of California*,
  361 U.S. 147 (1959)..............................................................................................7, 8

*Stansell v. BGP, Inc.*,
  2011 WL 1296881 (M.D. Fla. Mar., 31, 2011) ....................................................13

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 118 (2d Cir. 2013)..............................................................................11, 12

*Zeran v. Am. Online*,
  129 F.3d 327 (4th Cir. 1997) ..............................................................................7, 8

**CONSTITUTIONAL PROVISIONS**

First Amendment ...............................................................................................9, 12

Due Process Clause..................................................................................................12

**STATUTES**

18 U.S.C. § 2331..............................................................................................12, 13

18 U.S.C. § 2333..................................................................................12, 13, 14, 15

18 U.S.C. § 2339B ..................................................................................................9

47 U.S.C. § 230................................................................................................ *passim*

Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222
    (enacted Sept. 28, 2016)......................................................................12, 13, 14, 15

**RULES**

Fed. R. Civ. P. 15 ..................................................................................................14

Plaintiffs' Opposition leaves no doubt that the Second Amended Complaint ("SAC") merely rehashes rejected theories, rather than trying to satisfy the legal framework that led this Court to dismiss the First Amended Complaint ("FAC").   *First*, Plaintiffs confirm that the SAC relies entirely on the account-provision and direct messaging theories that this Court concluded are barred by 47 U.S.C. § 230(c)(1) ("Section 230").  Plaintiffs offer no reason for this Court to reconsider that sound judgment.  *Second*, Plaintiffs likewise confirm the SAC depends on a theory of causation that this Court previously deemed "too speculative" and "attenuated to raise a plausible inference of proximate causation."  Instead of explaining how the SAC cures either of the fundamental defects that this Court identified, Plaintiffs almost completely ignore this Court's opinion.  For these reasons, and as more fully explained in Twitter's opening brief and below, the SAC should be dismissed with prejudice.

## ARGUMENT

## I.   Section 230 Mandates Dismissal Of Plaintiffs' Claims

Plaintiffs barely address this Court's Section 230 analysis, directly citing this Court's opinion only once, *see* Opp. 2, and devoting most of their opposition brief to repeating the account-provision and direct messaging theories of liability that this Court has already rejected.  Plaintiffs' sole new argument is that Section 230 does not bar a claim that explicitly relies on content to establish only the causation element of the claim.  That argument is irrelevant to this Court's conclusions that both of Plaintiffs' theories—account-provision and direct messaging—seek to hold Twitter liable for its publishing decisions and are therefore barred by Section 230—conclusions that provide a sufficient basis to dismiss the SAC with prejudice even without addressing Plaintiffs' new causation argument.  And Plaintiffs' new causation theory also fails in its own right—both because it conflicts with Ninth Circuit precedent prohibiting plaintiffs from pleading around Section 230 and because Plaintiffs misread the two cases on which they principally rely.  Section 230 thus again requires dismissal of Plaintiffs' claims.

### A.  Artful Pleading Cannot Circumvent Section 230 Immunity

Plaintiffs do not dispute that the SAC continues to heavily feature and rely on "detailed descriptions of ISIS-related messages, images, and videos disseminated through Twitter" by

third-parties and "the harms allegedly caused by the dissemination of that content."  Order
Granting Mot. to Dismiss, Dkt. No. 47, at 8 (hereafter "Order").  But they argue that such
references "do not implicate [Section 230]" because Plaintiffs have banished all content-based
allegations from the first two sections of the SAC, and so, supposedly, have "limited" "[a]ll
references to content … to proving causation."  Opp. 2.  This is wrong on multiple levels.
Plaintiffs' reliance on the content of user-generated messages to prove proximate causation is
itself enough to trigger Section 230.  *See infra* 4-6.  And, even setting aside that defect, Plaintiffs
are wrong that they can avoid Section 230 simply by moving their content-based allegations to a
different section of the complaint.

As an initial matter, it is false that the first two sections of the SAC "do not refer to or
depend on content at all."  Opp. 2.  Repeating allegations verbatim from the FAC, the SAC's
first two sections, like the allegations that this Court addressed previously, "specifically fault[]
Twitter for failing to detect and prevent the dissemination of ISIS-related content through the
Twitter platform."  Order 8-9.  Plaintiffs accuse Twitter of "failing to 'actively monitor … and
censor *user content*," SAC ¶ 36, of "fail[ing] … to shut down *clear incitements to violence* by
terrorists," *id.* ¶ 30, of "refus[ing]" to "suspend … accounts … *for promoting terrorism*," *id.* ¶
40, and of not deploying a "tracking system" to identify and "stop … *terror content*," *id.* ¶ 37
(emphasis added to each quote).  Thus, even as written, the SAC continues to "describe a theory
of liability based on Twitter's knowing failure to prevent ISIS from disseminating content
through the Twitter platform, not its mere provision of accounts to ISIS."  Order 7.

The Ninth Circuit, moreover, has repeatedly rejected attempts—like Plaintiffs' efforts
here—to "circumvent" Section 230 using "'creative' pleading."  *Kimzey v. Yelp! Inc.*, __ F.3d
__, 2016 WL 4729492, at *2 (9th Cir. Sept. 12, 2016); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d
1096, 1102-1103 (9th Cir. 2009); *Doe v. Backpage.com LLC*, 817 F.3d 12, 19-20 (1st Cir. 2016).
"[W]hat matters" is not how plaintiffs organize their complaint or label their cause of action, but
"whether the cause of action *inherently* requires the court to treat the defendant as the 'publisher
or speaker' of content provided by another."  *Barnes*, 570 F.3d at 1101-1102 (emphasis added);
*see also* Order 5-6.  Contrary to what they assert, Plaintiffs cannot quarantine their content-based

allegations from the rest of the SAC by "strictly limit[ing]" those allegations to any one section. Opp. 4.  Allegations throughout the SAC illuminate the true nature of Plaintiffs' claims, revealing why Plaintiffs assert accounts should have been blocked (because they would be used to disseminate terrorist-content), and how Plaintiffs expect Twitter to have identified those accounts (based on the content of their Tweets).  Indeed, Plaintiffs themselves rely on allegations about user-generated content in Section III of the SAC to advance an entire theory of liability that would otherwise be forfeited—the theory that Twitter allegedly "provided ISIS with Direct Message capabilities."  Opp. 5 (citing only paragraphs in Section III); *see also* Motion to Dismiss SAC at 3 n.1 (asserting forfeiture).  Plaintiffs' content-based allegations both in Section III and elsewhere confirm that they are still trying "to advance the same basic argument that [Section 230] plainly bars:  that [Twitter] published user-generated speech that was harmful to [the Plaintiffs]."  *Kimzey*, 2016 WL 4729492, at *2.

### B.  Twitter's Provision Of Accounts Is Publishing Activity

Even setting aside Plaintiffs' improper effort to disguise the essence of their claims through artful pleading, Plaintiffs do not dispute that the SAC—at best—continues to rely on an account-provision theory that this Court squarely rejected.  Order 9-12.  Plaintiffs again argue that "[p]roviding ISIS with a Twitter account is not publishing … because it does not involve reviewing, editing or deciding whether to publish or withdraw tweets."  Opp. 3.  But this Court has already concluded otherwise, and Plaintiffs offer no good reason to reconsider that decision.

As this Court explained, the decision about *who* may open a Twitter account is itself a "decision[] about *what* third-party content may be posted online."  Order 9 (emphasis added).  Presumptively allowing everyone with access to the Internet to sign up for an account is integral to Twitter's decision that its platform should "allow[] for the freedom of expression for hundreds of millions of people around the world."  SAC ¶ 35; *see* Order 11.  Imposing liability on Twitter based on who it permits to open an account—which would saddle it with the onerous task of screening every user—would change the content posted to Twitter's platform and the nature of the platform itself.  Such a decision "regarding the 'structure and operation'" of Twitter's platform is thus "no less [a] publisher choice[]," than a decision about whether to withdraw or

alter content directly.  *Backpage.com*, 817 F.3d at 20-21; *see also* Order 10-11.

Plaintiffs mistakenly argue that "handing someone a tool [i.e., an account] is not the same thing as supervising their use of that tool."  Opp. 3.  But as this Court recognized, the difference between the former and the latter is merely a matter of timing:  Twitter can restrict users from posting Tweets either by blocking them from signing up in the first place, by removing particular Tweets, or by shutting down accounts because of the Tweets they have posted.  *See* Order 10 ("Under either theory, the alleged wrongdoing is the decision to permit third parties to post content—it is just that under plaintiffs' provision of accounts theory, Twitter would be liable for granting permission to post … instead of for allowing postings that have already occurred.").  At any stage, these decisions about what may be posted are publishing decisions, and therefore within the scope of Section 230 immunity.

Plaintiffs also argue that decisions about accounts do not affect content because "many Twitter users who sign up for accounts never issue a single tweet."  Opp. 3.  It is, of course, ludicrous to suggest that this case concerns accounts that were opened but never used.  And, in any event, a user who opens an account necessarily puts content online even without "issu[ing] a single tweet."  Opp. 3.  As soon as a Twitter account  "spring[s] … up," SAC ¶ 39, it displays a user name—such as "@TurMedia334," *id.*—and a photograph—such as a "photograph of a bearded man's face," *id.*  That content conveys a simple, but significant, message:  follow me.  Thus, even focusing only on what happens when an individual opens an account, any decision about whether to block that account necessarily "involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," *Barnes*, 570 F.3d at 1101, and so is a publishing decision protected by Section 230.

### C.  Reliance On Content For Proximate Causation Triggers Sections 230

Plaintiffs now concede that they rely on user-generated content and on Twitter's alleged failure to block that content to try to satisfy the proximate cause element of their claim, but nevertheless argue that such reliance has "no bearing on the Court's analysis under Section 230."  Opp. 4.  That is incorrect.  As the Ninth Circuit recently reiterated, the "basic argument that [Section 230] plainly bars" is that a provider of interactive computer services, like Twitter,

---

"published user-generated speech that was harmful to [the plaintiff]," *Kimzey*, 2016 WL 4729492, at *2—an argument, in other words, that by publishing user-generated content, the provider *caused* some harm to befall the plaintiff.  Neither *Internet Brands* nor *Barnes*—the two cases on which Plaintiffs rely—hold otherwise.

The Ninth Circuit's analysis in *Internet Brands* actually undermines Plaintiffs' theory.  In *Internet Brands*, the Ninth Circuit sustained a negligent failure to warn claim against a Section 230 defense.  The Court explained that it was Internet Brand's "*failure to warn* Doe of [the third parties'] rape scheme"—and not the publication of any harmful third-party content—that "*caused* her to fall victim to [that scheme]."  *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) (emphasis added).  Doe's claim sought to hold Internet Brands liable for harms arising from its "fail[ure] to generate its own warning," and had "*nothing to do with* Internet Brands' efforts, or lack thereof, to edit, monitor, or remove user generated content."  *Id.* at 852 (emphasis added).  The Court repeatedly emphasized that the information giving rise to the duty to warn "was obtained by Internet Brands from an outside source, not from monitoring postings on the Model Mayhem Website," and that the perpetrators of the harm Doe suffered "did not post on the website."  *Id.* at 849.  The Court, in sum, took pains to stress that it was the platform's *own* failure to speak and third-parties' *offline* conduct—and not any decision to publish or not publish harmful user-generated content on the platform—that allegedly caused Doe's injuries.  And the Court emphasized that imposing a duty to warn on Internet Brands would not "require [it] to remove any user content *or otherwise affect how it publishes or monitors such content*."  *Id.* at 851 (emphasis added).  The Court discussed "but for" causation solely to make the unexceptional point that Section 230 "does not provide a general immunity" to platforms simply because they are in the "business" of "publishing user content."  *Id.* at 853.  Here, by contrast, Plaintiffs' entire case—including their theory of causation—depends on harmful user-generated content and Twitter's alleged publishing decisions with respect to that content.  And quite unlike the claims in *Internet Brands*, Plaintiffs' claims here, if successful, "would significantly affect Twitter's monitoring and publication of third-party content."  Order 12.

The promissory estoppel claim at issue in *Barnes* likewise "did not 'seek to hold Yahoo

liable as a publisher or speaker of third-party content, but rather as the counterparty to a contract, as a promisor who has breached.'"  Order 11 (quoting *Barnes*, 570 F.3d at 1107).  In reaching this conclusion, the Court in *Barnes* emphasized that contract law treats a promise as a "legal duty distinct from the conduct at hand." *Barnes*, 570 F.3d at 1107.  Because a promise is severable from the action promised, the Court concluded that "plaintiff's theory of liability was based not on Yahoo's 'publishing conduct,' but rather on its 'manifest intention to be legally obligated to do something,'" Order 11 (quoting *Barnes*, 570 F.3d at 1107)—notwithstanding the fact that third-party content, in addition to Yahoo's breach of a promise, may have been "a 'but-for' cause of [plaintiff's harm]," *Internet Brands*, 824 F.3d at 853.  Having made such a promise, moreover, Yahoo "also signifie[d] the waiver of [any Section 230] defense[]." *Barnes*, 570 F.3d at 1108.  "By contrast, [P]laintiffs here assert no theory based on contract liability and allege no promise made or breached by Twitter." Order 11.  Plaintiffs do not seek to hold Twitter liable for any legal duty apart from Twitter's publishing conduct.  And unlike in *Barnes*, where Yahoo's breach of its promise itself caused harm, Plaintiffs identify no cause for their harms other than third-party content posted on Twitter's platform.  Plaintiffs' claims therefore "derive liability from behavior that is identical to publishing or speaking." *Barnes*, 570 F.3d at 1107.  And, also unlike in *Barnes*, Twitter has done nothing to waive its Section 230 defenses.  Neither *Internet Brands* nor *Barnes* authorize claims, like those here, that purport to exclusively rely on the defendant's publication of allegedly harmful third-party content to establish causation.

### D.  Section 230 Applies With Equal Force To Third-Party Content Privately Transmitted Through Service-Provider Platforms

Even though Plaintiffs' allegations regarding Direct Messages appear only in Section III of the SAC, Plaintiffs once again contend that Twitter is "liable … because it provided ISIS with Direct Message capabilities." Opp. 5 (citing SAC ¶¶ 43-45).  Completely ignoring this Court's opinion, Plaintiffs repeat their prior argument that because direct messages are private communications, they "are not published," Opp. 1, and so a theory of liability premised on their contents "does not seek to treat [Twitter] as a publisher or speaker," Opp. 5.  This Court has already rejected that argument.  Order 14 ("[T]he private nature of Direct Messaging does not

remove the transmission of such messages from the scope of publishing activity under section 230(c)(1)."); *see also, e.g.*, *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 795-796, 804-808 (2006).  As this Court explained, and as Plaintiffs acknowledge, Congress enacted section 230(c)(1) "in part to respond to a New York state court decision finding that an internet service provider could be held liable for defamation based on third-party content posted on its message boards."  Order 14 (citing *Fair Housing Council v. Roommates.com*, 521 F.3d 1157, 1163 (9th Cir. 2008)).  For that reason, "the statute's protections extend at least as far as the 'the treat[ment] [of] internet service providers as publishers … for the purposes of defamation,'" and—like the law of defamation—thus reach even communications that are sent to only "'one other'" person.  Order 14 (quoting *Barnes*, 570 F.3d at 1104).  Contrary to what Plaintiffs argue (at 7-9), this statutory history is relevant to, and necessary for, understanding the meaning of the term "publisher" in Section 230, *see, e.g.*, Order 14 (discussing Congress's intent in enacting Section 230); *Barnes*, 570 F.3d at 1104 (same); *Zeran v. Am. Online*, 129 F.3d 327, 331 (4th Cir. 1997) (same), and the term has the same meaning in all cases to which it applies, *see Barnes*, 570 F.3d at 1101 ("[T]he language of the statute does not limit its application to defamation cases.").

### E.  Allowing This Case To Proceed Would Cause Precisely The Harms Section 230 Was Enacted To Prevent

Finally, Plaintiffs' contention (at 8-10) that their claims would further the policy goals of Section 230 actually turns the statute on its head.  Plaintiffs' theories of liability would eviscerate the law's protections and bring about precisely the problems Congress sought to avoid in establishing Section 230 immunity.

Under Plaintiffs' account-provision theory, liability would attach the moment a terrorist or defamer or fraudster uses an online platform to create an account, leaving service providers little choice but to exhaustively evaluate every would-be user before allowing him or her to sign up for service.  Even ignoring the question whether any major Internet service provider would continue to operate under such conditions, this extraordinary "burden would become the public's burden."  *Smith v. People of the State of California*, 361 U.S. 147, 153 (1959) (invalidating strict liability anti-obscenity ordinance).  The resulting "self-censorship, compelled by the State, would

be a censorship affecting the whole public," and through it, *all* online expression, "both [unprotected] and [protected], would be impeded." *Id.* at 154.

That Plaintiffs' theory would impose liability only if a service provider *knowingly* allowed a terrorist to sign-up for the service is no answer. For one thing, the question whether a service provider knew of the danger posed by a particular would-be user at the moment that user signed-up for an account is a question of fact, so service providers would often be subjected to the burdensome process of discovery, even if not to ultimate liability. For another, imposing liability based on a service provider's knowledge—whether with respect to a particular user or particular user content—would undermine Congress's second purpose of eliminating disincentives for service providers to self-police their platforms. *See, e.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). Notice-based liability would "motivate providers to insulate themselves from receiving complaints" and "discourage active monitoring of Internet postings." *Barrett v. Rosenthal*, 146 P.3d 510, 525 (Cal. 2006); *accord Zeran*, 129 F.3d at 333. Indeed, allegations in the SAC *confirm* that Section 230 is working exactly as Congress intended: in just the last six months, Twitter's responsible self-policing has led it to "suspend[] 235,000 accounts … for promoting terrorism," SAC ¶ 40—an effort that Twitter may not have been able to undertake if doing so threatened to expose Twitter to liability.

Plaintiffs' alternative theory—that service providers should be liable for harms arising from any third-party content transmitted *privately* through their platforms—fares no better. Because policing private content raises a host of legal and practical concerns, service providers might well choose to protect themselves from liability on this front by altogether ceasing to offer private messaging applications. Plaintiffs' theory thus could do more than just *chill* lawful private online speech—it could eliminate it altogether.

Contrary to Plaintiffs' assertion (at 8-9), courts have repeatedly recognized that application of the material support statutes very much *can* "implicate [the] free speech concerns" that animate Section 230. For example, although the Supreme Court in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") upheld 18 U.S.C. § 2339B under the First Amendment "as applied to the particular activities" that the plaintiffs wished to pursue, *id.* at 8, it did so only

after applying strict scrutiny in light of the important speech interests at stake, *id.* at 27-28 (rejecting government's request for intermediate scrutiny because "§ 2339B regulates speech on the basis of its content").  And the Ninth Circuit, noting these interests and the manner in which the Supreme Court "carefully circumscribed its analysis in *HLP*," has "hesit[ated] to apply that decision to facts far beyond those at issue in that case."  *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 1001 (9th Cir. 2011).  Indeed, Congress issued a similar warning in Section 2339B itself, advising that the material support statutes should be carefully construed to safeguard "the exercise of rights guaranteed under the First Amendment to the Constitution of the United States."  18 U.S.C. § 2339B(i).  Plaintiffs' theory would improperly require this Court to disregard these many admonitions.

Nor is there any conflict here between the Terrorism Civil Remedy provision and Section 230.  Even assuming that Twitter's opening of its platform for free speech to nearly all comers could somehow give rise to a cause of action under that provision—and it cannot—Congress enacted Section 230 for the very purpose of barring a cause of action where one might otherwise lie.  Whether that cause of action is predicated on the common law, *supra* at p. 7 (Congress enacted Section 230 in response to defamation case), a local ordinance, 47 U.S.C. § 230(e)(3) (prohibiting any cause of action under "any State or local law that is inconsistent with this section"), or a federal statute such as the material support provisions, *Roommates.com*, 521 F.3d 1157 (dismissing in part complaint alleging violations of federal Fair Housing Act on Section 230 grounds); *Backpage.com*, 817 F.3d 12 (affirming dismissal of complaint alleging violations of TVPRA on Section 230 grounds), Section 230 mandates dismissal where a lawsuit seeks to hold a service provider liable for harm allegedly arising from third-party content.

## II.    The SAC Fails To State A Claim Under The Terrorism Civil Remedy Provision

### A.  The SAC Fails To Allege Facts Plausibly Establishing Proximate Cause

Plaintiffs once again contend that to satisfy the proximate cause element of the Terrorism Civil Remedy they need only allege that "Twitter provided material support to ISIS and that ISIS carried out the attack in which one of its operatives killed Mr. Fields and Mr. Creach," without showing that any of the acts allegedly constituting material support played even the slightest role

in the attack itself and regardless of how many intervening steps and actors separated those alleged acts from the attacker and the attack.  Opp. 13.  This Court has already concluded that such a breathtakingly broad theory of causation is "too speculative [and] attenuated to raise a plausible inference of proximate causation," "[e]ven under plaintiffs' proposed 'substantial factor' test."  Order 12 & 13 n.4.  Plaintiffs completely ignore that conclusion:  They never once mention this Court's proximate cause analysis, choosing instead to copy and paste two-and-a-half pages from their previous opposition brief.  *Compare* Opp. 11-13, *with* Dkt. 31, at 13-15.  This Court correctly rejected Plaintiffs' overbroad theory of causation in dismissing the FAC, and should dismiss the SAC for the same reasons as well.

The SAC, like the FAC, "do[es] not allege that ISIS recruited or communicated with Abu Zaid over Twitter, that ISIS or Abu Zaid used Twitter to plan, carry out, or raise funds for the attack, or that Abu Zaid ever viewed ISIS-related content on Twitter or even had a Twitter account."  Order 2.  Indeed, the FAC at least *tried* to link Twitter to Abu Zaid by alleging that his "brother told reporters that [the attacker] had been very moved by ISIS's horrific execution of al-Kassasbeh, which ISIS publicized through Twitter."  Order 12.  "That connection [was] tenuous at best," *id.*—and the SAC, which omits the allegation that Abu Zaid was inspired by the execution of al-Kassasbeh, alleges even less.

Instead, the SAC, like the FAC, piles speculation upon speculation:  (1) Twitter allegedly "knowingly and recklessly" permitted ISIS to create accounts on its platform (SAC ¶ 1), and then allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking the accounts from "springing right back up" (*id.* ¶¶ 19, 36, 39); (2) these failures allegedly permitted ISIS to send, via Twitter's platform, messages designed to recruit new members, raise money, and spread propaganda (*id.* ¶¶ 42-71); (3) recipients of those messages allegedly responded by joining ISIS and contributing funds (*id.* ¶¶ 47, 50, 51); (4) these recruits, funds, and publicity allegedly helped ISIS grow into a larger terrorist organization (*id.* ¶ 52); and (5) the attack that killed Mr. Fields and Mr. Creach was carried out by a man (Abu Zaid) who allegedly had been part of a "clandestine ISIS terror cell" when he was a student some unspecified amount of time in the past (*id.* ¶ 81).

Courts repeatedly have rejected similarly circuitous attempts to link businesses to acts of terrorism under the Terrorism Civil Remedy.  The Second Circuit, for example, dismissed any suggestion that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013).  And the Second Circuit reached the same conclusion about allegations that UBS had provided cash to a state sponsor of terrorism that would be used to cause and facilitate terrorist acts, *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), and about allegations that defendants had "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations," *Terrorist Attacks*, 714 F.3d at 123-125.  The district court cases that Plaintiffs cite have "reject[ed] the contention that *any* reckless contribution to a terrorist group or its affiliates, *no matter how attenuated*, will result in civil liability, without the demonstration of a proximate causal relationship to the plaintiff's injury."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 522 (E.D.N.Y. 2012) (second emphasis added), cited by Opp. 11-12.  And the facts in those cases established a far closer causal nexus than is present here.   In *Linde*, for example, evidence revealed that the defendant bank had wired "'martyr' payments to the immediate relatives of the Hamas suicide attackers who perpetrated four of the terrorist attacks at issue," and plaintiffs were able "to trace" other "transfers for Hamas leaders to specific attacks."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 329 (E.D.N.Y. 2015), *appeal pending*, 2d Cir. No. 16-2134.  Plaintiffs have alleged nothing remotely approaching that degree of connection between Abu Zaid and the "material support" that Twitter allegedly provided.  For this reason as well, the SAC must be dismissed.[1]

### B.   The Justice Against Sponsors Of Terrorism Act Confirms That The Second Amended Complaint Fails To State A Claim Under 18 U.S.C. § 2333(a)

As Twitter has explained, the SAC also must be dismissed because it fails to allege facts

---

[1] Further, Plaintiffs do not even attempt to argue that the SAC states a claim under the "direct relationship" test that the statute's "by reason of" language requires this Court to apply.  *See* Dkt. No. 49, at 12 n.4; Dkt. No. 27, at 21; Dkt. No. 32, at 11; *see also Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 10 (2010); *Couch v. Cate*, 379 F. App'x 560, 565 (9th Cir. 2010).

plausibly establishing that Twitter's conduct involved "violent" or "dangerous" acts that "appear[ed] to be intended" to achieve certain specifically defined terrorist purposes, namely "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping," *id.* § 2331(1)(A), (B). *See* Dkt. No. 49, at 6 n.2; Dkt. No. 27, at 23-25; Dkt. No. 32, at 13-15. Such facts must be pled to establish that Twitter committed an act of "international terrorism" within the meaning of 18 U.S.C. § 2331(1), as required by the provision under which Plaintiffs have brought their claims, 18 U.S.C. § 2333(a). *See* SAC at 15. A recent amendment to 18 U.S.C. § 2333, enacted as part of the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (enacted Sept. 28, 2016), further confirms that Twitter's ordinary business conduct does not qualify as an act "international terrorism" and that Plaintiffs therefore have not and cannot state a claim against Twitter under § 2333(a).[2]

JASTA, among other things, amends 18 U.S.C. § 2333 to create a new subsection (d) providing limited causes of action for aiding and abetting and conspiracy liability. Before JASTA, courts had held that the Terrorism Civil Remedy Provision did not permit any aiding-and-abetting or secondary liability claims. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689-690 (7th Cir. 2008) (en banc); *Terrorist Attacks*, 714 F.3d at 123; *Rothstein*, 708 F.3d at 97-98. Some out-of-circuit courts, however, had formulated a convoluted "chain of incorporations by reference" to permit some secondary-like claims to proceed under 18 U.S.C. § 2333(a) under certain circumstances. *E.g.*, *Boim*, 549 F.3d at 690. Whatever the merits of that (rather strained) formulation, it imposed a substantial hurdle on plaintiffs—a requirement to

---

[2] JASTA was enacted after Twitter moved to dismiss the SAC and about a week before Plaintiffs filed their opposition. By its terms, JASTA applies to any civil action pending on the date of enactment. *See* JASTA, § 7(1), Pub. L. No. 114-222. Twitter assumes, solely for the purposes of this motion, that JASTA applies retroactively to this action but reserves the argument that such retroactive application would violate Twitter's rights under the First Amendment and the Due Process Clause. *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984) ("The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.").

1    allege and prove that not only the terrorist himself, but also the alleged secondary actor, had

2    committed an "act of international terrorism" by engaging in conduct that "involve[d] violent

3    acts or acts dangerous to human life" and that "appear[ed] to be intended" to achieve certain

4    specified terrorist purposes.  18 U.S.C. § 2331(1)(A), (B); *see, e.g.*, *Stansell v. BGP, Inc.*, 2011

5    WL 1296881, at *9 (M.D. Fla. Mar., 31, 2011) (dismissing claim for failure to plead facts

6    sufficient to satisfy the "appear to be intended" requirement).

7            With JASTA, Congress has now rationalized and clarified secondary liability under the

8    statute by providing a coherent and "widely recognized … legal framework for how such

9    liability should function," JASTA, § 1(5), Pub. L. No. 114-222.  At least with respect to

10   defendants—like Twitter here—whose *own conduct* plainly did not involve a "violent" or

11   "dangerous" act that "appear[ed] to be intended" to achieve any of the specified terrorist

12   purposes, Dkt. No. 49, at 6 n.2; Dkt. No. 27, at 23-25; Dkt. No. 32, at 13-15, the only provision

13   of § 2333 under which any claim may even theoretically be asserted is subsection (d) (for aiding

14   and abetting or conspiracy) and not subsection (a) (for direct liability).  No other interpretation of

15   the statute makes sense.  If a full panoply of secondary claims could be brought under subsection

16   (a), then newly enacted subsection (d) would be entirely redundant.  That would violate the

17   strong presumption against superfluity.  *See Hibbs v. Winn*, 542 U.S. 88, 89 (2004).  And it

18   would disregard the statement in JASTA's preamble that adding subsection (d) was "necessary

19   to *recognize* the substantive causes of action for aiding and abetting and conspiracy liability."

20   JASTA, § 1(4), Pub. L. No. 114-222 (emphasis added).  Moreover, channeling secondary claims

21   into subsection (d) would respect the considered policy judgments Congress made in carefully

22   defining the scope of secondary liability under the statute.  Plaintiffs' claims may be brought, if

23   at all, under subsection (d) alone.

24           Because Plaintiffs have not asserted a claim under § 2333(d), and because they have not

25   pled facts plausibly establishing a claim under § 2333(a), the SAC must be dismissed.

26   **III.    The Dismissal Of Plaintiffs' Claims Should Be With Prejudice**

27           Plaintiffs do not dispute that if the Court again finds their claims lacking, then this action

28   should be dismissed with prejudice and with no further leave to amend.  Twitter has already

---

briefed three separate motions to dismiss in this case; especially given Section 230's objective of shielding Internet platforms from the burdens of litigation, Twitter should not be put to the burden of having to move to dismiss yet again.  And any amendment Plaintiffs might attempt, whether in light of JASTA or otherwise, would be futile, and so contrary to Fed. R. Civ. P. 15.

*First*, if Plaintiffs were to try to reframe their claims as aiding and abetting claims, then Section 230 would bar those claims for the same reasons that their present claims are barred.  As with any other theory of liability, Section 230 applies with full strength against claims based on an aiding and abetting theory.  *See, e.g.*, *Goddard v. Google, Inc.*, 2008 WL 5245490 at *7 (N.D. Cal. Dec. 17, 2008) (rejecting plaintiff's argument that aiding and abetting liability is beyond the scope of § 230 and holding that plaintiff's attempt to hold website liable under aiding and abetting theory was "simply inconsistent with § 230"); *PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1071 (D. S.D. 2001) (holding aiding and abetting claim barred by Section 230); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 161 n.9 (D. Mass. 2015) (same), *aff'd sub nom. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016). Indeed, given that Section 230 is framed as a shield from liability for content generated by someone else, secondary liability is at the heart of the statute.

To state a claim for aiding and abetting liability under 18 U.S.C. § 2333(d), a plaintiff must plead and prove that the defendant "knowingly provid[ed] substantial assistance … [to] the person who committed" the "act of international terrorism" that injured the plaintiff.  18 U.S.C. § 2333(d); *see also* JASTA, § 1(5), Pub. L. No. 114-222 (dictating that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "provides the proper legal framework for how [aiding and abetting] liability should function"); *Halberstam*, 705 F.2d at 488 ("the defendant must knowingly and substantially assist the principal violation").  For the reasons already discussed, however, Section 230 would bar any claim that Twitter provided "substantial assistance" by providing accounts or allowing direct messaging.  *See supra* pp. 3-4, 6-7.

*Second*, any aiding and abetting claim would also fail because the facts alleged in the SAC are not sufficient to support a claim for relief under the *Halberstam* framework that Congress required courts to apply.  *See* JASTA, § 1(5), Pub. L. No. 114-222.  The SAC alleges

1   nothing that plausibly establishes Twitter "*knowingly* … assist[ed] the principal violation"—

2   here, Abu Zaid's attack.  *Halberstam*, 705 F.2d at 488 (emphasis added); *see also* 18 U.S.C.

3   § 2333(d) (defendant must have "*knowingly* provid[ed] substantial assistance … [to] the person

4   who committed" the "act of international terrorism" that injured the plaintiff (emphasis added)).

5   Not a single allegation suggests that Twitter knew Abu Zaid even existed, let alone that Twitter

6   knew Abu Zaid would attack the training center in Jordan.

7           Moreover, the SAC also fails to allege facts plausibly establishing that Twitter's alleged

8   conduct "*substantially* assist[ed] the principal violation."  *Halberstam*, 705 F.2d at 488

9   (emphasis added).  *Halberstam* identified six factors a court should consider to determine

10  whether assistance was "substantial."  These factors are: "the nature of the act encouraged; the

11  amount and kind of assistance given; the defendant's absence or presence at the time of the tort;

12  his relation to the tortious actor; and the defendant's state of mind," 705 F.2d at 483-484, as well

13  as the "duration of the assistance provided," *id.* at 484.  The only way in which Twitter allegedly

14  "assisted" Abu Zaid was by letting some other persons affiliated with or supportive of ISIS sign-

15  up for Twitter accounts.  (Of course, if Plaintiffs were to continue to rely on how those persons

16  *used* the accounts, that would only re-affirm Twitter's Section 230 immunity.)  Plaintiffs have

17  not alleged that these users communicated with Abu Zaid, or that Abu Zaid used Twitter to plan,

18  fund, or carry out the attack, or even that he had a Twitter account.  The *Halberstam* factors thus

19  also militate overwhelmingly against liability:  Plaintiffs do not (and apparently cannot) allege

20  that Twitter provided *any aid* to Abu Zaid directly for *any length of time*, had *any relationship*

21  with Abu Zaid himself, was *present* during the attack, or had *any knowledge or intent* that Abu

22  Zaid would carry out the attack.  Any further leave to amend would therefore also be futile

23  because it is evident that Plaintiffs have not and cannot plausibly allege that Twitter acted

24  "knowingly" or that the assistance it allegedly provided was "substantial."

                                    **CONCLUSION**

26          For the foregoing reasons, the Second Amended Complaint should be dismissed with

27  prejudice in its entirety.

Dated: October 18, 2016

Respectfully submitted,


   /s/ Seth P. Waxman

SETH P. WAXMAN (admitted *pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (admitted *pro hac vice*)
patrick.carome@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

***Attorneys for Defendant***
**TWITTER, INC.**

1

2

CERTIFICATE OF SERVICE

3

        I hereby certify that on October 18, 2016, I electronically filed the above document with
the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all
registered counsel.

4

                                        By:   /s/ Seth P. Waxman
                                              Seth P. Waxman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28